# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**S.C. JOHNSON & SON, INC.,**

        Plaintiff,

       **-vs-**                        **Case No. 11-C-861**

**NUTRACEUTICAL CORPORATION and
NUTRAMARKS, INC.,**

        Defendants.

---

# DECISION AND ORDER

---

The expression "bug off" is not novel;[1] this trademark infringement action relates to the use of the pithy phrase "BUG OFF" in conjunction with insect repellant products. The Plaintiff, S.C. Johnson & Son, Inc. ("SCJ"), claims that the Defendants, Nutraceutical Corporation ("Nutraceutical") and NutraMarks, Inc. ("NutraMarks") (collectively the "Defendants") have engaged in: trademark counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1114 (count I); trademark infringement in violation of 15 U.S.C. § 1114 (count II); false designation of origin in violation of 15 U.S.C. § 1125 (count III); unfair competition in violation of 15 U.S.C. § 1125 (count IV); and unfair competition under Wisconsin common law (count V). (ECF No. 1.)

---

[1] The *Random House Historical Dictionary of American Slang,* 295 (J.E. Lighter, ed. 1994) cites a 1895 date for the usage of the phrase.

Asserting that their ownership of nationwide common law rights to BUG OFF predates SCJ's rights, the Defendants' counterclaim against SCJ for false designation of origin under § 43(a) of the Lanham Act (first counterclaim); declaratory judgment of trademark invalidity pursuant to 15 U.S.C. § 1052(d) and 28 U.S.C. §§ 2201 and 2202 (second counterclaim); and for trademark cancellation pursuant to 15 U.S.C. § 1119 (third counterclaim). (ECF No. 5.)

This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121; 28 U.S.C. § 1331; and 28 U.S.C. § 1338(a), and over the Wisconsin unfair competition cause of action under 28 U.S.C. 1338(b) and 28 U.S.C. § 1367. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c).

This matter is before the Court on several motions. Before addressing SCJ's motion for summary judgment dismissing the Defendants' counterclaims against it and finding in its favor on all claims, the Court resolves the Defendants' motions to seal and for leave to file a sur-reply.

**Motion to Seal**

Pursuant to General L.R. 79(d) (E.D. Wis.), the Defendants seek an order sealing exhibits K, L, M, N, U, Y, BB, CC, EE, FF, GG, JJ, and KK (ECF Nos. 45-39 through 45-52) to the declaration of Timothy P. Getzoff ("Getzoff") in support of their response brief to SCJ's summary judgment motion. (ECF No. 42.) No brief accompanies the motion and the motion does not address the standards for sealing documents that are filed.

The Court's August 20, 2013, Decision and Order (ECF No. 36), stated that a party seeking to seal items has the burden of showing cause and must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Baxter Int'l, Inc. v. Abbott Labs.,* 297 F.3d 544, 548 (7th Cir. 2002). "[N]arrow, specific requests will be granted when based on articulated, reasonable concerns for confidentiality." *KM Enter., Inc. v. Global Traffic Techs., Inc.,* 725 F.3d 718, 734 (7th Cir. 2013) (regarding a motion to seal or to return several documents filed on appeal that contained customer and pricing information).

With the sole exception of exhibit U, and despite this well-articulated burden, the Defendants only identify the source of the documents: either a third-party, Frontier National Products Co-op ("Frontier"); SCJ; or the Defendants, and state that the source has designated the document as containing confidential information.

With respect to exhibit U, the Defendants' pricing and sales figures for 2011 and 2013, the information is recent enough to establish good cause for sealing. However, sealing may be just a gesture. The font size of exhibit U is so small that it is impossible to read without magnification or enlarging it 200 times its original size. Consistent with controlling case law, the order will expressly state that any party and any interested member of the public may challenge the sealing of the subject document. *See Cnty. Materials Corp. v. Allan Block Corp.,* 502 F.3d 730, 740 (7th Cir. 2007).

With respect to the dozen other documents for which sealing is sought, the

- 3 -

Defendants' have not presented articulated concerns for confidentiality or cited any cases to support the request to seal them; rather they rely on the conclusory statement that the documents are confidential. The Defendants have not established that those 12 exhibits should be sealed.

Except for exhibit U, the Defendants' motion falls far short of fulfilling their burden of establishing good cause. These deficiencies are perplexing given the explanation provided in the Court's earlier decision in this case addressing a similar issue. The Defendants' motion to seal (ECF No. 42) is granted with respect to exhibit U (ECF No. 45-44) and denied with respect to the other 12 exhibits (ECF Nos. 45-39 through 45-43 & 45-45 through 45-52).

### Motion to File Sur-Reply Brief

The Defendants' request leave to file a sur-reply brief. (ECF No. 54.) SCJ opposes the request. The Defendants' sur-reply addresses new arguments and evidence presented by SCJ's reply brief. Therefore, in an exercise of the Court's discretion, the motion is granted. The next motion for resolution is SCJ's motion for summary judgment. Initially, the Court sets forth the summary judgment standard.

### Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

- 4 -

(1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. "In determining whether a genuine issue of material fact exists, all facts are construed in favor of the nonmoving party." *Springer v. Durflinger,* 518 F.3d 479, 483-84 (7th Cir. 2008).

## Relevant Facts[2]

SCJ is a corporation organized under Wisconsin law with its principal place of business located in Racine, Wisconsin. SCJ makes, distributes, and sells dozens of insect repellant products, including various formulations of aerosol sprays and spritzers (such as Off!, Naturals, Deep Woods Off, and Deep Woods Dry), as well as candles, clip-ons, and other products all of which fall under the "primary" Off! brand. Several of these products are also sold under the "sub-brand" name "Deep Woods." Promoting the Off! brand is "priority number one," followed by promotion of the Deep Woods sub-brand. (Getzoff Decl., Ex. EE (Anne Brolly Dep.) 20.) (ECF No. 45-28.)

---

[2] The relevant facts are based on the parties' proposed findings of fact ("PFOF") to the extent they are actually facts — not arguments — and undisputed. Arguments or colored words included in proposed findings of fact are not facts and have been omitted. (*See* Pl.'s PFOF ¶¶ 25-27, 29.) (ECF No. 31.) Arguments that are presented in a response to a proposed finding of fact do not raise an issue of fact and have been disregarded. (*See e.g.*, Defs.' Resp. Pl.'s PFOF, ¶¶ 10-14, 27-29.) (ECF No. 46.) Citations for all quotations are included.

- 5 -

Nutraceutical and NutraMarks are Delaware corporations with their principal place of business in Park City, Utah. Nutraceutical manufactures and markets a variety of products that are primarily geared to consumers with an interest in natural and organic products. NutraMarks holds the rights to the intellectual property of Nutraceutical.

SCJ owned a federal registration for the BUG OFF mark in connection with insect repellent, U.S. Registration No. 1,506,763 (the "'763 registration"). The '763 registration was issued on October 4, 1988, based on use in commerce dating back to October 10, 1985, and was in effect until April 10, 1995, when the United States Patent and Trademark Office ("PTO") cancelled the mark for failure to file an acceptable declaration of use under Section 8 of the Lanham Act, 15 U.S.C. § 1058.

### Chervitz & Kaz Applications

On June 22, 1998, Melvin Chervitz ("Chervitz") filed an application for U.S. Registration No. 2,369,898 (the "'898 registration" or the "Chervitz registration") for the mark BUG OFF used with "wristbands for repelling insects," providing January 26, 1998, as the date of first use in commerce and a priority date of June 22, 1998, based on the PTO filing date. The '898 registration issued on July 25, 2000.

To support the claim that BUG OFF was used in commerce as of June 22, 1998, Chervitz relied on a price list from Seven C's International Liquid Crystal Products, which included a listing for a "BUG OFF ™ Bracelet." The price list does not include information indicating any actual sales; the purchasers or the locations

- 6 -

where sales took place. To support his use-based trademark registration for BUG OFF, Chervitz also submitted a supplemental declaration dated February 5, 2003, with exhibits that provide additional information regarding his sales activity.[3]

On June 23, 1998, DeJay Corporation ("DeJay") filed an intent-to-use application to register the mark BUG OFF and an accompanying design. In August 1998, DeJay was acquired by Kaz, Inc. ("Kaz"). The PTO examiner cited the Chervitz registration as a basis to refuse to register the Kaz application. In January 2001, Kaz responded with a petition to cancel the Chervitz registration.

As a part of the Trademark Trial and Appeal Board ("TTAB") cancellation proceeding, Chervitz was deposed. He testified that he had sold approximately one gross of product to a "variety store" in St. Louis in 1998. However, he had "no documentation that reflect[ed] that sale;" the variety store did not appear on Chervitz's customer list for 1998; and he could not recall the unit price. (Getzoff Decl., Ex. X (Chervitz testimony) SCJ006964-65.) (ECF No. 45-22.) The only sales records Chervitz has for 2007 and 2008 are summaries; they do not show that the product was branded as BUG OFF, or provide the location or the identity of the purchasers.

The TTAB did not rule on the merits of Kaz's petition to cancel. Instead the parties settled, and Chervitz assigned his rights and registration in the BUG OFF trademark to Kaz in April 2004. After that, the PTO office advanced the Kaz

---

[3] The parties' PFOF do not include the date of the supplemental Chervitz declaration.

Case 2:11-cv-00861-RTR   Filed 01/14/14   Page 7 of 29   Document 65

application to registration in 2007 as U.S. Registration No. 3,303,024 (the "'024 registration" or the "Kaz registration").

## SCJ's 2003 BUG OFF Trademark Application

On January 29, 2003, SCJ filed an "intent to use" trademark application, (Ser. No. 78/208245) (the "SCJ application"), with the PTO for BUG OFF for "Citronella candles, insect repellants, and insect repelling pads, lamps, and candle lanterns for insect repelling."

On July 13, 2003, SCJ received a PTO office action refusing its registration based on likelihood of confusion with the Chervitz registration. The Kaz application was also cited by the PTO examiner as a basis to refuse to register the SCJ application.

On July 22, 2005, SCJ initiated cancellation proceedings against Kaz seeking to have the Chervitz registration cancelled on the basis that the mark was not used in commerce on or before the filing date of June 22, 1998. In its petition for cancellation, SCJ argued:

> for more than three years, Kaz pursued cancellation of the [Chervitz] Registration on the very grounds of no use at the time of application filing that [SCJ] now alleges here [sic.]. Kaz would have to change its prior position 180 degrees to avoid the implications and affect [sic] of the allegations it made . . . namely, that the BUG OFF mark was not in use at the time the application for the Registration was filed and therefore was subject to cancellation.

(Getzoff Decl., Ex. W (SCJ's Pet. for Cancellation) ¶¶ 20, 21.) (ECF No. 45-21.)

SCJ also opposed the Kaz application in October 2005. The TTAB

- 8 -

consolidated the two proceedings. Kaz produced the supplemental declaration of Chervitz and exhibits referred to therein to SCJ in the SCJ/Kaz proceeding.

After SCJ filed the petition to cancel, it

> learned facts that changed what we understood to be the situation with the trademark. . . . [SCJ] subsequently learned facts which satisfied us that the [Chervitz] application had been filed in good faith and had met the trademark office's requirements for a use-based application. At the time we filed the [petition] to cancel we were not in possession of that information

(Schill Suppl. Decl., Ex. 8 (June 11, 2013, Sally L. Davis Dep.) 40-41.) (ECF No. 52-8.)

SCJ and Kaz resolved their dispute by an agreement dated January 18, 2007, (the "SCJ-Kaz agreement") that provided, among other things, for an assignment to SCJ of the Chervitz registration and, upon issuance, the Kaz registration, as well as the rights associated with those registrations. SCJ paid Kaz $1.1 million for the Chervitz registration, which also compensated Kaz for an acknowledgement of the validity of trademarks owned by SCJ, the assignment of the Chervitz registration and the goodwill represented by the trademark, the assignment of a Kaz application to register BUG OFF along with the associated goodwill, Kaz's agreement to abandon other applications to register TICKED OFF and BUG OFF in connection with certain goods, and an agreement by Kaz not to use or attempt to register any trademark confusingly similar to trademarks owned by SCJ.

Under the SCJ-Kaz agreement, SCJ licensed the BUG OFF mark back to Kaz

- 9 -

royalty-free so that Kaz could continue making and selling the BUG OFF insect repelling wrist bands through a "cease date" of December 31, 2009. Pursuant to the agreement, Kaz agreed not to "manufacture, sell, or otherwise distribute any Licensed Product after the Cease date. To the extent inventory of Licensed Product remain[ed] after the Cease date, Kaz [would] destroy such inventory and provide SCJ with written certification of destruction within fourteen (14) days of the Cease Date."[4]  (Schill Decl., Ex. S SCJ000866, ¶5.) (ECF No. 32-28.)[5]

### SCJ's BUG OFF Registration

The PTO renewed SCJ's BUG OFF registrations in 2009, based on evidence of continued use in commerce. SCJ is the successor-in-interest to both the Chervitz and Kaz registrations in connection with their BUG OFF trademark rights.

SCJ has not licensed any other entity to sell wrist bands under the BUG OFF

---

[4]SCJ's proposed finding did not include the 14-day limit for Kaz to provide the certificate of destruction.

[5] There is a genuine factual dispute regarding whether Kaz abided by the settlement agreement and whether additional sales of the Kaz wrist bands occurred after the December 31, 2009, date.

SCJ has presented "a true and correct copy of a spreadsheet excerpted from an AC Nielson spreadsheet regarding BUG OFF branded wrist bands sold in the United States from January 1, 2010, through January 1, 2011." (*See* Supp. Davis Decl. ¶ 2, Ex. A.) (ECF 51, 51-1.) The database is available by subscription and reports actual register sales by cashier "swipes." (*Id.*) The Defendants challenge the admissibility of the document, asserting it is not properly authenticated and is hearsay. (*See* Defs.' Proposed Sur-Reply, 4.) (ECF No. 54-1.)

Federal Rule of Evidence 803(6) excepts business records from the hearsay ban if certain conditions for admissibility are met, so long as those conditions "are shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6)(D). The Rule does not require the witness [himself] to have created the records about which he is testifying. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006). For the purposes of summary judgment the document will not be excluded. *See id.* at 776-80.

mark.  SCJ has not manufactured, distributed, or sold a wrist band under the BUG OFF mark.

An August 4, 2010, email from an SCJ in-house paralegal advised that SCJ needed "to keep using these [wrist bands] in order to keep the registration [for wrist bands for repelling insects] active.  If we are not using products under the BUG OFF name, a third party could petition to cancel our registration."  (Getsoff Decl., Ex. CC, SCJ002097.) (ECF No. 45-47.)

The spray-on repellants sold by SCJ are related to insect repellant wrist bands. (*See, e.g.,* Schill Decl., Ex. M (TTAB decision in *In re Sunfeather Natural Soap Co.,* Ser. No. 76/480170, mailed on Sept. 25, 2008, upholding PTO examiner's refusal to register Sunfeather's BUG OFF mark because of the likelihood of confusion with registered mark and finding that Sunfeather's goods, including insect repellant sprays, and the Chervitz and Kaz insect repellant wrist bands were "related inasmuch as they are insect repellants in various forms for personal use.") 266; Schill Decl., Ex. L (Sunfeather Trademark Application Ser. No. 76/480169 for Bug OFF filed on Dec. 12, 2002) 55; Schill Decl., Ex. K (PTO Office Action regarding BUG OFF and Sunfeather's request to revive) 53. (ECF Nos. 32-13, 32-12, 32-11.)  SCJ also has considered and continues to consider the addition of a wrist band repellant product.

Purchasing the Chervitz registration from Kaz cleared the way for SCJ to proceed with obtaining an additional registration for BUG OFF for "insect repellants" as reflected in the SCJ application.  The application remains "intent to use" for

citronella candles, insect repelling pads, and lamp and candle lanterns. The PTO allowed the SCJ application for the BUG OFF trademark to advance to registration for insect repellents under Registration No. 3,963,304 (the "SCJ registration"), which issued May 17, 2011.

SCJ began using the BUG OFF trademark on insect repellent spray in March 2010, placing it in block print on the back of its 11 oz. aerosol cans of "Off! Deep Woods" spray.



Research establishes that consumers of these insect repellants look at and read the backs of the cans before making a purchase.

An August 16, 2011 internal SCJ email regarding a pending trademark

- 12 -

application in the United States for BUG-OFF for "citronella candles, insect repelling pads, and lamp and candle lanterns for insect repelling" suggests adding the wording to the back panel of either SCJ's Club PowerPad SKU or its Sportsman Power Pad SKU to "protect the Trademark," which was the "same tactic" SCJ had used to protect other trademarks. (Getzoff Decl. Ex. GG (August 16, 2011, email) SCJ002079.) (ECF No. 45-30.)

BUG OFF is not the primary brand for any SCJ bug repellant products. It exists only as a tertiary brand for SCJ. The BUG OFF mark has never appeared on the front of any SCJ product; SCJ has never featured the BUG OFF mark in advertising for any insect repellant product, and it has never invested in market research for BUG OFF as a brand.

Since 2010, SCJ has sold millions of units of insect repellant bearing the BUG OFF mark. At least one SCJ product bearing the BUG OFF mark is carried in 3,500 Wal-Mart stores.

### Sunfeather's Use of Bug-Off

In 1979, the Defendants' predecessor-in-interest, Sandy Maine ("Maine"), founded a sole proprietorship, Sunfeather Natural Soap Company ("Sunfeather"), in Potsdam, New York. Until about 1989 her product line was limited to handmade soaps. (Katherine W. Schill ("Schill") Supp. Decl., Ex. 9 (Maine Dep.) 11.) (ECF No. 52-9.)

While working as an Adirondack wilderness guide in the 1980s, Maine had a

- 13 -

"great need" for a bug repellant but did not want to use conventionally available products that contained DEET. So she attended an herbal conference and began learning about formulas that she could use to concoct an herbal bug repellant. (Getzoff Decl., Ex. A (Maine Dep.) 15.) (ECF No. 45-1.) Maine selected the name BUG OFF because she thought it was an eye-catching play-on-words. Maine used this technique when naming her products — as an example, Sunfeather's pet shampoo product was called "DogPoo."

Initially, Maine sold the bug repellant "kind of willy-nilly, like [she] bottl[ed] it and photocopied the label and taped the label to the bottle, and just sold it to people that . . . [she] was hiking with." (*Id.*, 16, 18.) Then sales progressed to a consignment arrangement with the Potsdam Consumer Co-op.

In about 1992, sales of Sunfeather BUG OFF grew beyond her local area when she began marketing it at trade shows in New York, Maryland, and Virginia. This included the New York International Gift Fair, which is one of the largest gift shows in the world and is attended by buyers from every state and several countries. Maine's records of her 1992 trade show sales were thrown away.

By 1993 Sunfeather BUG OFF was also being sold through the Sunfeather Wholesale Catalog. Sunfeather circulated approximately 5,000 catalogs by mail throughout the year to recipients nationwide. Circulation was not limited to major metropolitan areas. In addition, Sunfeather handed out another 5,000 copies at trade shows. This practice was consistent throughout the 1990s.

- 14 -

Maine estimated that she had approximately $2,000 in sales of BUG OFF in 1992, and between $3,000 and $4,000 in 1993. Maine provided a one-page Sunfeather summary document titled "Inventory Sales/Wholesale," that shows wholesale unit sales from 1992 through 1995; however, it does not include any evidence regarding the geographic location of customers. The sales numbers for 1994 and 1995 do not include Smith & Hawken's sales of the product. However, Sunfeather has no "solid records until [1996]." (Schill Decl., Ex. B (Maine Dep.) 23.) (ECF No. 32-2.) In 1995, Sunfeather's BUG OFF was featured in a Chicago Tribune article about effective bug repellants.

Sunfeather BUG OFF was carried by some larger retailers with national distribution channels, including Smith & Hawken, a California-based high-end retailer of "quality garden lifestyle products," (Pl.'s PFOF ¶ 32), which began selling Sunfeather's BUG OFF sometime in 1994.

From 1994 through 1996, Smith & Hawken had catalogs and a "small number" of retail locations. (*Id*. at ¶ 33). Marta Benson ("Benson"), Smith & Hawken's catalog merchandise manager from 1992 to 1996, indicated that Smith & Hawken offered the Sunfeather BUG OFF product in its catalog at least as early as the summer of 1994. Smith & Hawken only carried the original Sunfeather BUG OFF, it never sold any ancillary products such as Sunfeather's Lady BUG OFF or Little Bugger. Smith & Hawken's catalog was the company's primary marketing vehicle during that time period, and the catalog was distributed nationally.

- 15 -

Smith & Hawken distributed its "core" catalog two or three times per season (Spring, Summer, Fall, and Holiday) totaling ten to twelve distributions annually. In addition, Smith & Hawken distributed specialty books, such as its tool catalog or bulb catalog, which were mailed in the spring and fall. Sunfeather BUG OFF was included in the spring (two distributions, or "drops") and summer catalogs (three "drops") because it was seasonally relevant. It was also included in the tool book, which offered essential gardening products. In 1994 the spring and summer catalogs had an approximate circulation of 200,000 copies per drop, totaling one million copies for the five drops. The tool catalog (one drop per year) would have an additional circulation of approximately 200,000 annually. Therefore, catalogs promoting and selling Sunfeather BUG OFF were sent annually to roughly 1.2 million households starting in 1994. Catalog circulation increased roughly 5-10% over the next few years because Smith & Hawken had a goal of growing its market share and revenue base, and catalog circulation followed that trend. Sunfeather BUG OFF was sold through the Smith & Hawken catalog continuously from approximately 1994 through 2001.

The fact that Sunfeather BUG OFF was consistently displayed in the Smith & Hawken catalog for more than seven years indicates that it was a top selling product and was considered "iconic" to the company. (Getzoff Decl. ¶ 7, Ex. F (Benson Dep.) 56; Ex. G [1996 Spring S&H catalog] (showing Sunfeather BUG OFF as a "Staff Favorite").) Moreover, as a product with a relatively small retail price of $8 per bottle, Smith & Hawken needed to sell a high volume of units — roughly 700 per

- 16 -

season — of Sunfeather's BUG OFF to justify its continued inclusion in the catalog. The fact that the product was in the catalog season after season is an indicator that it met these sales goals.

Initially Smith & Hawken only had a handful of retail stores in California. In 1996 CML, a publicly traded holding firm, purchased Smith & Hawken intending to take the brand from catalog-only to retail stores. In the summer of 1997 Smith & Hawken had 25 retail stores, and their catalogs were always available in the stores and were offered to interested customers. By 2000 Smith & Hawken operated 43 stores in twenty states. Sunfeather BUG OFF also became available on the Smith & Hawken website at least as early as 2000.

In late 1996 Sunfeather also started selling BUG OFF through Frontier's mail order catalog. Frontier is based in Norway, Iowa. During the relevant time period, Frontier published and distributed a lengthy, 400-page wholesale catalog twice a year along with an annual retail catalog. Sunfeather's BUG OFF repellent first appeared in the 1997 spring/summer edition of the wholesale catalog. It was also distributed through Frontier's retail catalog approximately once a year from 1998 through 2001. Frontier sales records demonstrate actual sales of Sunfeather BUG OFF as early as November, 1996 through June, 1998. Sunfeather sales records demonstrate additional actual sales of Sunfeather BUG OFF through Frontier from 1998 through 2001.

The wholesale catalog was distributed to approximately 15,000 wholesalers in the spring of 1997, with steady increases in circulation through 2002. Catalogs were

- 17 -

distributed nationwide.

Frontier produced a document entitled "Item Sales by Account" for orders from November 1996 through June 22, 1998 which indicates that Frontier sold approximately 267 units of the Sunfeather's product totaling $949.72: three units of BUG OFF products through the Frontier catalog in 1996; 100 units in 1997; and 164 units from January 1, through June 22, 1998.

Although Sunfeather sold its BUG OFF product directly to consumers through retail trade shows and a retail catalog, the majority of Sunfeather BUG OFF was sold wholesale to retailers, who in turn sold the products to end consumers. Generally speaking these retailers operated only one or two stores, so sales of Sunfeather BUG OFF were made to hundreds of different retailers annually.

A Sunfeather document entitled "AR Invoice History 1998-2007" shows that between April 28, and June 22, 1998, its wholesale sales of BUG OFF were made to customers in 14 states. (Schill Decl., Ex. I.) (ECF No. 32-26.)[6] One Sunfeather document entitled "Sunfeather Sales to Smith & Hawken 1998-2007" shows no sales prior to June 22, 1998. However, Sunfeather's list of open invoices aged as of July

---

[6] The parties disagree regarding the number of units sold between April 28, and June 22, 1998. (Defs.' Resp. Pl.'s PFOF, ¶ 30.) SCJ asserts that 113 units were sold, and the Defendants assert that 141 units were sold. They also disagree regarding the number of states the product was sold to during the same time period.

The Court has reviewed the underlying data contained in exhibit I. Fourteen states are listed for wholesales sales of BUG OFF or Lady BUG OFF. However, the Court has not calculated the number of units sold during that time period because the exact number is not critical to the disposition of SCJ's summary judgment motion.

- 18 -

13, 1998, shows that $6,636.00 of product was invoiced to Smith & Hawken as of April 28, 1998, which represents 1,896 of unit sales for $3.5 each.

Due to the seasonal nature of the product, a disproportionately high number of sales were invoiced in the first four months of the calendar year to allow for shipping and ultimate sale to end customers in advance of the summer season. As such, the fact that few sales to any given customer (or overall) appear after April 28, 1998 in Sunfeather's line-item sales records does not indicate a lack of sales for that year.

Throughout the 1990s and 2000s, Sunfeather continued to market its BUG OFF product through nationwide trade show appearances, catalogs, and other types of marketing.

In December 2002, Sunfeather filed three separate applications to register the BUG OFF mark; one recited a date of first use of March 1992. The other two applications, which covered slightly different although related goods, recited a first use date of 2001. The Chervitz registration and Kaz application were cited against all three Sunfeather applications in Office Actions from the TTAB refusing to register Sunfeather's trademark. Sunfeather responded with the argument, which was rejected by the TTAB, that its goods were different from those covered by the Chervitz registration and Kaz application. Sunfeather did not assert that it owned trademark rights in BUG OFF that predated the Chervitz registration or the Kaz registration.

On June 23, 2003, Maine's attorney sent a letter to SCJ with regard to SCJ's trademark application for BUG OFF. The letter expressed concern over SCJ's new

- 19 -

trademark application for BUG OFF and put SCJ on notice that Sunfeather had used the BUG OFF trademark since at least as early as 1992. Maine's attorney indicated that she would get back to SCJ regarding SCJ's trademark application. No further communication was received by SCJ.

In February 2011, Sunfeather sold its assets to the Defendants, who took over sales and distribution of the Sunfeather BUG OFF products. Sunfeather continues to manufacture the Sunfeather BUG OFF products, and they continue to be sold under the Sunfeather name.

Nutraceutical distributes a bug repellant soap, herbal oil, spritzer, and balm under the Sunfeather BUG OFF brand. Until approximately June 2012, it also distributed a Sunfeather BUG OFF candle. The products are available for purchase online at http://www.sunfeather.com/outdoor.html and at retail shops around the country. The Defendants' sales records demonstrate continued sale of Sunfeather BUG OFF, from the time of acquisition through present.

### Substantive Federal Trademark Law

SCJ asserts a federal trademark infringement claim under 15 U.S.C. § 1114. In a trademark infringement action, "the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.,* 149 F.3d 722, 726 (7th Cir. 1998). A trademark registration "is admissible into evidence to establish registrant's rights on a prima facie basis but . . . . an opposing party may prove any legal or equitable defense . . . which might have

- 20 -

been asserted if the mark had not been registered." *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 378 (7th Cir. 1976), superseded on unrelated grounds by the amendment to Fed. R. Civ. P. 52(a) effective August 1, 1985, *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985).

SCJ also claims that the Defendants violated section 1125(a) of the Lanham Act by using the BUG OFF mark in false designation of their origin. 15 U.S.C. § 1125(a). Section 1125(a) sweeps more broadly than § 1114, which applies only to registered marks. Under § 1125(a), one who believes that another person's use of the same mark will cause a likelihood of confusion, mistake or deception about the origin of the good may bring a civil action against that person. 15 U.S.C. § 1125(a)(1). To prevail, SCJ must show that it has (1) prior ownership rights in the mark; and (2) that the Defendants' use of the mark creates a likelihood of confusion, deception or mistake. *See Dunn v. Gull,* 990 F.2d 348, 351 (7th Cir. 1993) (addressing pre-1988 amendment version of 15 U.S.C. § 1125(a)).

Even when a plaintiff has a federally registered trademark, a defendant who in good faith used the trademark continuously from a time prior to a plaintiff's application for registration may have rights to use that mark in the areas in which it had trademark rights prior to the plaintiff's registration application. 15 U.S.C. § 1115(b); *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 104 (7th Cir. 1970) (holding that the defendant's innocent continuous use of the mark prior to plaintiff's registration was a defense to a trademark infringement claim for geographic

- 21 -

areas where the defendant, but not the plaintiff, was using the mark prior to plaintiff's federal registration); *Burger King of Fla., Inc. v. Hoots*, 403 F.2d 904, 907 (7th Cir. 1968) (stating that defendants who adopted a mark without knowledge of the plaintiff's prior use and who had continuously used the mark from a date prior to plaintiffs' federal registration of the mark are entitled to protection in the area of such earlier remote use).

Prior to federal registration, trademark priority is determined by the first use in a market area. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir. 1992) ("Under the common law, one must win the race to the marketplace to establish the exclusive right to a market"). A second user who uses the mark in good faith may still use its trademark in areas geographically remote from the market appropriated by the first user. *V & V. Food Prods., Inc. v. Cacique Cheese Co., Inc.,* 683 F. Supp. 662, 666 (N.D. Ill. 1988). The second user has the right to use its trademark "except to the extent that such use infringes what valid right [any previous users] have acquired by their continuous use of the same mark prior to plaintiff's federal registration." *Burger King*, 403 F.2d at 907; *see also Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395 (3d Cir. 1985).

With respect to bona fide use of trademarks, an entity only acquires rights in a trademark through commercial use of the mark. *Johnny Blastoff, Inc., v. L.A. Rams Football Co.,* 188 F.3d 427, 433-34 (7th Cir. 1999). Under the common law, ownership is conferred upon the person who employs the first actual use of a mark in a

- 22 -

genuine commercial transaction. Also under common law, the winner of the race to the marketplace establishes exclusive use of the mark. *Zazu Designs,* 979 F.2d at 503. To establish use, the mark must be attached to the product or service sold to the public and must be continuous and bona fide. *Id.* at 502 n.†.

As long as there is genuine use of the mark in commerce, ownership may be established even if the first uses are not extensive and do not result in "deep market penetration or widespread recognition." *See Allard Enters., Inc. v. Advanced Programming Res. Inc.,* 146 F.3d 350, 358 (6th Cir. 1998); *Kathreiner's Malzkaffee Fabriken v. Pastor Kneipp Medicine Co.,* 82 F. 321, 326 (7th Cir. 1897) (for rights in a mark to accrue, "[i]t is not essential that its use has been long continued, or that the article should be widely known, or should have acquired great reputation.").

The determination of rights between two users of the same mark, when one has a federally registered mark, does not simply involve a determination of which party presents evidence to demonstrate that it was the first user in each market in question. Rather, the party without the federal registration must prove its prior and continuous rights in a market that preempts the registrant's constructive nationwide rights. 15 U.S.C. § 1115(b)(5); *Allard Enterprises, Inc.,* 146 F.3d at 361.

### Analysis

By its original motion, SCJ asserted that the Defendants have and are infringing its rights to the BUG OFF trademark, contending that (1) it possesses valid rights to the BUG OFF mark, and (2) its rights are superior to those of the Defendants.

- 23 -

Furthermore, SCJ maintained that the Defendants' inability to present sufficient evidence that they have senior nationwide common law rights in the BUG OFF mark entitles SCJ to summary judgment on its claims and against the Defendants on their counterclaims. (ECF No. 30-1).

In opposition, the Defendants assert that they have presented considerable evidence that they are the senior user of the BUG OFF mark and are entitled to a nationwide zone of exclusion over SCJ — the junior user. Additionally, they contend that neither the Chervitz nor the SCJ registration is valid.

With respect to the Chervitz registration that SCJ relies upon to claim priority back to June 1998, the Defendants contend that SCJ knowingly abandoned the registration with no intent to resume use, and that the Chervitz registration lacked a bona fide use at the time of registration. Additionally, they contend that SCJ's registration with priority of March 29, 2010, should be cancelled because SCJ has never made bona fide use of the mark to support the registration.

The Defendants maintain that because they are the senior — and only bona fide — user and owner of the BUG OFF mark they are entitled to prevail against SCJ on the parties' competing claims for trademark infringement, and to recover damages in the form of SCJ's profits for the products on which SCJ uses the BUG OFF mark.

Because SCJ has established that it has a federally registered trademark, the Defendants bear the burden of proving each of the elements of their § 1115(b)(5) affirmative defense. *See Zazu Designs*, 979 F.2d at 504; *Emergency One, Inc. v. Am.*

*Fire Eagle Engine Co., Inc.,* 332 F.3d 264, 272 (4th Cir. 2003) (noting that the good faith junior user defense is an affirmative defense under the Lanham Act.)

In its reply, SCJ concedes that Sunfeather is the senior user of the BUG OFF mark; however, it contends that the Defendants cannot extend market penetration in any particular territory that would entitle them to common law trademark rights superior to SCJ's. Viewing the facts in the light most favorable to the non-movant — the Defendants — it is undisputed that in the 1980's Sunfeather began using the BUG OFF name in conjunction with bug repellant which Maine bottled and sold to fellow hikers in New York's Adirondacks. The product remained local even after a cooperative in the area began handling the product.

However, within the following decade the distribution of Sunfeather's BUG OFF repellant expanded. In roughly 1992, Sunfeather began marketing the product at gift shows in New York, Maryland, and Virginia, including at the New York International Gift show which was attended by buyers from every state. Additionally, in 1993, Sunfeather began nationwide circulation of a wholesale catalog.

From 1994 through 2001, national distribution of Sunfeather's BUG OFF was further increased by means of Sunfeather's relationship with Smith & Hawken, which placed Sunfeather's BUG Off insect repellant in several catalogs each year. As of 1996, Sunfeather's distribution of BUG OFF was further increased because Frontier, an Iowa company, was selling Sunfeather's BUG OFF through its semiannual wholesale catalog, sent to 15,000 wholesalers beginning in the spring of 1997, and its

- 25 -

annual retail catalog. Sunfeather's sales records for April through the end of June 1998 indicate that it sold BUG OFF products in 14 states: Pennsylvania, Ohio, Maine, Massachusetts, Tennessee, Indiana, Virginia, Montana, New York, Texas, West Virginia, Connecticut, Georgia, and California.

Viewed in the light most favorable to Sunfeather, it has presented sufficient evidence upon which a reasonable jury could find that it was the senior user of the mark and was distributing its BUG OFF product nationally prior to January 26, 1998, the date of first use in commerce claimed by the Chervitz registration that SCJ eventually purchased and now owns. Therefore SCJ's motion for summary judgment on the issue of trademark ownership is denied.

### Abandonment

Under the Lanham Act, a mark will be deemed abandoned when its use is discontinued with an intent not to resume such use. 15 U.S.C. § 1127. When not explicitly stated, the intent not to resume use can be inferred from the circumstances of the case. Specifically, three consecutive years of nonuse serves as *prima facie* evidence of abandonment. 15 U.S.C. § 1127. The statutory language clarifies that "'use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *Id.* Under the Lanham Act, SCJ would have to be able to show that it did not discontinue use of the mark for three or more consecutive years.

Trademark rights are acquired and retained only through actual use of a mark.

- 26 -

*See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 954-55 (7th Cir. 1992) ("Because trademark rights derive from the use of a mark in commerce . . . , the owner of a mark will lose his exclusive rights if he fails actually to use it."). *See also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.,* 304 F.3d 1167, 1173 (11th Cir. 2002) ("Abandonment is trademark law's way of recognizing that trademark rights flow from use."). A mark is used in commerce in connection with services "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127.

Establishing abandonment, then, requires proof of two elements: nonuse of the mark and an intent not to reuse the mark. *Zelinski v. Columbia 300, Inc.,* 335 F.3d 633, 639 (7th Cir. 2003*); Sands, Taylor & Wood,* 978 F.2d at 955; *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 938 (7th Cir. 1989). Three consecutive years of nonuse creates a presumption that the owner intended not to resume use of the mark. 15 U.S.C. § 1127. If the presumption is triggered, the owner of the mark "has the burden of producing evidence of either actual use during the relevant period or intent to resume use. The ultimate burden of proof (by a preponderance of the evidence) remains always on the challenger." *Emergency One, Inc. v. Am. FireEagle, Ltd.,* 228 F.3d 531, 536 (4th Cir. 2000) (citations omitted); *see also Roulo,* 886 F.2d at 938-39 ("The trial judge properly instructed the jury that the defendant must prove by a preponderance of the evidence that plaintiff abandoned the . . . trade dress, that abandonment is found when use has been discontinued with intent not to resume use,

- 27 -

and that such intent may be presumed from nonuse for two consecutive years.").

There is a factual dispute regarding whether Kaz abided by the license agreement and stopped manufacturing, selling, and distributing the BUG OFF wrist bands by December 31, 2009. SCJ has taken inconsistent positions. It asserts that Kaz abided by its agreement. However, it also has presented evidence that Kaz's licensed wrist bands were in retail distribution between January 1, 2010 and January 1, 2011. Regardless of the dispute and despite construing the evidence and the reasonable inferences therefrom in the light most favorable to the Defendants, the Court cannot conclude that they met their burden of producing evidence upon which a reasonable jury could conclude that SCJ intended not to reuse the mark.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Defendants' motion to seal (ECF No. 42) is **GRANTED** as to exhibit U (ECF No. 45-44) and **DENIED** with respect to the other 12 exhibits (ECF Nos. 45-39-43 & 45-45-52);

Any party and any interested member of the public may challenge the sealing of exhibit U.

The Clerk of Court is directed to unseal exhibits K, L, M, N, Y, BB, CC, EE, FF, GG, JJ, and KK (ECF Nos. 45-39-43 & 45-45-52);

The Defendants' motion for leave to file a sur-reply (ECF No. 54) is **GRANTED;** and

- 28 -

The Clerk of Court is **DIRECTED TO FILE** the proposed sur-reply brief (ECF No. 54-1); and

SCJ's motion for summary judgment (ECF No. 29) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 14th day of January, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 29 -