**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

---

S. C. JOHNSON & SON, INC.,

        Plaintiff,

vs.

NUTRACEUTICAL CORPORATION and
NUTRAMARKS, INC.,

        Defendants.

Case No. 2:11-cv-00861-RTR

---

**S. C. JOHNSONS. C. JOHNSON & SON, INC.'S RESPONSE TO DEFENDANTS'
PROPOSED FINDINGS OF FACT**

---

S. C. JohnsonS. C. Johnson & Son, Inc., for its Response to Defendants' Proposed

Findings of Fact states as follows:

**<u>FINDINGS OF FACT</u>**

**I.**     **<u>SCJ and its BUG OFF Mark</u>**

    1.     SCJ is a Wisconsin corporation that offers dozens of insect repellent products, among other products, including aerosol sprays, candles, and clip-on products.

    **<u>RESPONSE</u>**:     No dispute.

    2.     SCJ is the owner of three federal trademark registrations for BUG OFF, which form the basis for its claims against Defendants as further described below. (Trial Exs. 1–3).

    **<u>RESPONSE</u>**:     No dispute.

    **A.**     **The Chervitz Registration**

    3. On June 22, 1998, Chervitz applied to register BUG OFF (SN 75,506,293) for "wristbands for repelling insects." The mark registered on July 25, 2000 (RN 2,369,898) (the "Chervitz Registration"). (Trial Tr. 1, at 43:16–25; Trial Exs. 1, 5).

    **<u>RESPONSE</u>**:     No dispute.

1

4.      On June 23, 1998, DeJay Corporation ("DeJay") filed an intent-to-use ("ITU") application to register BUG OFF. A few months later, Kaz, Inc. ("Kaz") acquired DeJay as well as the application (the "Kaz Application"). The United States Patent and Trademark Office (the "PTO") refused the Kaz Application, citing the Chervitz Registration. (Trial Ex. 6).

**RESPONSE**:      No dispute.

5.      Kaz petitioned to cancel the Chervitz Registration with the Trademark Trial and Appeal Board ("TTAB"), claiming that Chervitz had not made actual use in commerce of the mark as of the filing date. (Trial Tr. 1, at 46:13–19; Trial Ex. 1058, at 18–23).

**RESPONSE**:      No dispute.

6.      To support his claim that BUG OFF was in use as of June 22, 1998, Chervitz relied on a price list from Seven C's International Liquid Crystal Products ("Seven C's"), which included a listing for a "BUG OFF ™ Bracelet," but lacked any information regarding actual sales, purchasers, or locations of sales. (Trial Exs. 10/1111, 12).

**RESPONSE**:      Mischaracterizes evidence. Chervitz relied on the Seven C's International Liquid Crystal Products's price list, as well as other evidence of sales to support registration. In particular, Ms. Davis testified as to the examples of use Chervitz describes in his declarations (Tr. Exs. 10, 11) as follows:

   A.      There were several that were significant. He makes reference on Page 2 in the last paragraph about traveling from Missouri to Texas to take samples of the BUG OFF wristbands with him, and to make them available for purchase. He also describes on Page 3 of giving an interview – or being highlighted on a St. Louis radio station, his BUG OFF wristband products. Page 4 at the top he makes reference to a specific sale to a woman named Sandy Parres, P-A-R-R-E-S, where he sells units of the BUG OFF product to her. And that's on May 28th of 1998. So it pre-dates his application date. He talks then in the following paragraph about making a sales call on a retail outlet. Again, prior to filing his application. And then he talks about everything after that is – oh, I'm sorry – he also then – the second from the last

2

paragraph on page 4, he sends samples of BUG OFF product in April and in June to a

company out of state.

(Tr. Tran. 1, pp. 51:21-52:10.)

7.      Chervitz testified in the TTAB action that he had sold approximately one gross of product to a "variety store" in St. Louis in 1998, but he had "no documentation that reflect[ed] that sale," the store did not appear on Chervitz's 1998 customer list, and Chervitz could not recall the unit price.  (Trial Ex. 1111, at 6–8).

    **RESPONSE**:  Irrelevant.  Chervitz later submitted a supplemental declaration

explaining the use in more detail after uncovering documents that he thought had been

given to Seven C's.  (Tr. Ex. 11.)  His testimony is therefore superceded by the later

supplemental declaration.  (Tr. Ex. 11.)

8.      Before a final ruling, the parties settled and Chervitz assigned his BUG OFF rights to Kaz in April 2004.  (Trial Tr. 1, at 46:23–47:9; Trial Ex. 8).  The Kaz Application proceeded to registration in 2007 (RN 3,303,024) (the "Kaz Registration").  (Trial Tr. 1, at 44:7–18; Trial Ex. 2).

    **RESPONSE**:      No dispute.

9.      The Kaz insect repellent wristband product was always marketed as a safe, non-toxic, natural product, and it never contained DEET.  (Trial Tr. 1, at 148:23–149:13; Trial Tr. 2, at 61:2–5; Trial Ex. 1065).

    **RESPONSE**:      Irrelevant.  The composition of the Kaz insect repellent wristband

product is irrelevant to the issues in this case.

### B.      SCJ Purchases the Chervitz and Kaz Registrations

10.      On January 29, 2003, SCJ filed an ITU application to register BUG OFF for "citronella candles, insect repellants, and insect repelling pads, lamps, and candle lanterns for insect repelling" (SN 78,981,457) (the "SCJ Application").  (Trial Tr. 1, at 45:1–5; Trial Ex. 7).

    **RESPONSE**:      No dispute.

11.      As opposed to a use-based application, an ITU application is for a mark the applicant is not yet using in commerce, but for which it has a "bona fide intent" to use in commerce.  (Trial Tr. 1, at 39:23–40:2); 15 U.S.C. § 1051(b).

    **RESPONSE**:      No dispute.

12.     The PTO refused to register the SCJ Application based on a likelihood of confusion with the Chervitz Registration and the Kaz Application. (Trial Tr. 1, at 46:2–9; Trial Ex. 1057).

**RESPONSE**:     No dispute.

13.     On June 23, 2003, SCJ received a letter from Sunfeather's attorney, expressing concern over the SCJ Application and informing SCJ that Sunfeather had been using BUG OFF on an insect repellant product since at least as early as 1992. (Trial Tr. 1, at 72:13–21; Trial Tr. 2, at 42:10–43:2; Trial Exs. 35/1064, 1019). In the letter, Sunfeather's lawyer asked several specific questions regarding SCJ's planned use of BUG OFF to assist Sunfeather in determining whether there would be a likelihood of confusion. (Trial Tr. 1, at 115:15–116:1; Trial Tr. 2, at 42:24–43:2; Trial Exs. 35/1064, 1019).

**RESPONSE**:     No dispute.

14.     Sally Davis, SCJ's Corporate Counsel in charge of Pest Control, telephoned Sunfeather's attorney in response to the letter, in which Ms. Davis stated that Sunfeather was infringing SCJ's Off! mark. Ms. Davis never provided any information to Sunfeather regarding SCJ's intended use of BUG OFF, as the conversation ended relatively quickly once the issue of OFF! was raised. (Trial Tr. 1, at 73:2–19; 116:2–10; Trial Tr. 2, at 43:3–17). Aside from that conversation, SCJ has never asserted that Sunfeather was infringing the OFF! mark, either in this litigation or otherwise.

**RESPONSE**:     Incomplete. Ms. Davis also stated that an earlier BUG OFF

registration, beginning in the late 1980s had also been owned by S. C. JohnsonS. C.

Johnson, which would have prevented the acquisition of common law rights while it was in

force. After Ms. Davis stated that SunFeather's use was infringing S. C. JohnsonS. C.

Johnson's trademark rights, SunFeather's counsel represented that it would review their

respective rights and get back to Ms. Davis with a response, but Ms. Davis never heard

back from SunFeather's counsel. Specifically, Ms. Davis testified as follows:

A.     Yeah. Ms. Johnson reiterated SunFeather's objections to S. C. Johnson's

BUG OFF application. And I responded by telling her that we were the owner of the

famous OFF! trademark. And I said that it was S. C. Johnson's position that any use

of BUG OFF by SunFeather would infringe on S. C. Johnson's OFF! trademark.

And those OFF! related marks. I also told her that – she was telling me about use of

4

BUG OFF by SunFeather back into the 1990's, and I told her that S. C. Johnson had

owned a trademark registration in the late 90's and early 90's. A Federal registration

for BUG OFF for insect repellents. And it was S. C. Johnson's position that

SunFeather couldn't have acquired common law rights in BUG OFF during the

period that there was a valid trademark registration on the books.

(Tr Tran. 1, p 73:7-19.)

    Q.    Did – what was the result of the phone call?

    A.    It was a relatively short call, and once I had laid out those two positions, she

said she wanted to think about it, and she wanted to talk to her client. And then she

would get back to me. And that was the end of the call.

    Q.    Did she get back to you?

    A.    No. We never spoke again.

(Tr. Tran. 1, pp. 73:24-74:5.)

    15.    Despite the unresolved issue with Sunfeather, in 2005 SCJ initiated a petition to cancel the Chervitz Registration and an opposition of the Kaz Application, which proceedings were consolidated before the TTAB. (Trial Tr. 1, at 47:18–20; 48:15–20; 50:23–51:1; Trial Ex.1058, at 7).

    **RESPONSE**:    Mischaracterizes testimony. As described in Response to

Paragraph 14, there appeared to be no unresolved issue with SunFeather. SunFeather's

attorney planned to speak with her client and get back to S. C. Johnson, but S. C. Johnson

never heard back from SunFeather after the initial conversation. SunFeather neither called

nor sent any additional letters regarding BUG OFF. (Tr. Tran. 1, pp. 73:24-74:8.)

    16.    Like Kaz, SCJ argued the Chervitz Registration should be cancelled because the mark was not in use as of the registration filing date. (Trial Tr. 1, at 50:3–6; Trial Ex. 1058, at 7–8).

**RESPONSE**:    Incomplete.  The petition for cancellation was made prior to receiving information regarding Chervitz's use of the mark.  (Tr. Tran. 1, pp. 50:3-23.)  After receiving Chervitz's declaration, which had been filed under seal and was inaccessible to S. C. Johnson prior to its petition for cancellation, S. C. Johnson realized that Chervitz had made "all the kinds of use based activities in interstate commerce that would be sufficient to support an actual use application."  (Tr. Tran. 1, pp. 50:20-52:15; Tr. Exs. 10, 11.)  Moreover, SCJ first alleged that the Chervitz Registration conflicted with SCJ's famous OFF! trademark.  (Tr. Ex. 1058; SCJ FOF ¶ 44.)

17.    In its petition for cancellation, SCJ argued:

> For more than three years, Kaz pursued cancellation of the [Chervitz] Registration on the very grounds of no use at the time of application filing that S. C. Johnson now alleges here.  Kaz would have to change its prior position 180 degrees to avoid the implications and effect of the allegations it made . . . namely, that the BUG OFF mark was not in use at the time the application for the Registration was filed and therefore was subject to cancellation.
> (Trial Ex. 1058, at 7).

**RESPONSE**:    Incomplete.  The petition for cancellation was made prior to receiving information regarding Chervitz's use of the mark.  (Tr. Tran. 1, p. 50:3-23.)  After receiving Chervitz's declarations, which were filed under seal and were inaccessible to S. C. Johnson prior to its petition for cancellation, S. C. Johnson realized that Chervitz had made "all the kinds of use based activities in interstate commerce that would be sufficient to support an actual use application."  (Tr. Tran. 1, pp. 50:20-52:15; Tr. Exs. 10, 11.)  *See also* Response to Paragraph 16.

18.    In the consolidated proceeding, Kaz produced a supplemental declaration by Chervitz purporting to document Chervitz's use.  (Trial Tr. 1, at 51:1–10; Trial Ex. 11).  The declaration stated that Chervitz attended a trade show in Texas where he made no sales and made a sales call to an unspecified retail outlet.  It also claimed entries in Chervitz's diary

indicated that he made a sale to a woman in an unspecified location. (Trial Tr. 1, at 51:19–52:10; 93:21–95:7; Trial Ex. 11). The declaration originally included attachments, but SCJ is no longer in possession of these attachments and could not recall exactly what they consisted of. (Trial Tr. 1, at 95:8–22; 96:4–7).

**RESPONSE**:     Incomplete. Ms. Davis testified as to the use described in Chervitz's declarations that demonstrated "all kinds of use based activities in interstate commerce that would be sufficient to support an actual use application." (Tr. Tran. 1, pp. 50:20-52:15.) Specifically, she testified as follows:

Q.     Okay. And what are some of the examples of use that Mr. Chervitz references in this declaration?

A.     There were several that were significant. He makes reference on Page 2 in the last paragraph about traveling from Missouri to Texas to take samples of the BUG OFF wristbands with him, and to make them available for purchase. He also describes on Page 3 of giving an interview – or being highlighted on a St. Louis radio station, his BUG OFF wristband products. Page 4 at the top he makes reference to a specific sale to a woman named Sandy Parres, P-A-R-R-E-S, where he sells units of the BUG OFF product to her. And that's on May 28th of 1998. So it pre-dates his application date. He talks then in the following paragraph about making a sales call on a retail outlet. Again, prior to filing his application. And then he talks about everything after that is – oh, I'm sorry – he also then – the second from the last paragraph on page 4, he sends samples of BUG OFF product in April and in June to a company out of state.

(Trr Tran. 1, p. 51:19-10.)

19.     Prior to a decision on the merits, SCJ and Kaz settled the dispute and in 2007 SCJ purchased the rights to the Chervitz Registration and Kaz Application for $1.1 million. (Trial Tr. 1, at 53:2–4; 97:3–13; Trial Ex. 9).

**RESPONSE**:     No dispute except that the monetary payment also served as

consideration for other rights and responsibilities.  (Tr. Ex. 9.)

20.     After purchasing the Chervitz Registration that SCJ had originally sought to cancel, SCJ claimed that it "came into possession of more full information about" Chervitz's early use of the mark, referring to Chervitz's supplemental declaration, and therefore "changed [its] position" about the validity of the Registration.  (Trial Tr. 1, at 93:1–3; 13–17).

**RESPONSE**:     Mischaracterizes evidence.  S. C. Johnson received information

regarding Chervitz's use of the BUG OFF mark through discovery in the cancellation

proceedings, ***prior to*** purchasing the Chervitz and Kaz Registrations.  (Tr. Tran. 1, pp.

50:20-52:15; Tr. Exs. 10, 11.)

21.     As part of the agreement, SCJ licensed the Chervitz Registration back to Kaz royalty-free, allowing Kaz to continue selling BUG OFF wristbands up to December 31, 2009. (Trial Tr. 1, at 54:1–5; Trial Ex. 9).  Kaz was not required to recall inventory that was already in the stream of commerce after December 2009, but it could not manufacture or sell any product after that date.  (Trial Tr. 1, at 54:6–16; 98:22–99:11).

**RESPONSE**:  No dispute.

22.     Kaz abided by the license agreement and ceased all sales of the BUG OFF wrist bands by December 31, 2009.  However, some BUG OFF wristband products may have remained in the stream of commerce through 2010, as third-party retailers continued to sell off their existing inventory.  (Trial Tr. 1, at 54:6–16; 58:4–13; 99:18–100:12; Trial Ex. 32[1]).  There is no evidence of any sales, advertising, or other use of BUG OFF for wristbands after 2010.

**RESPONSE**:  No dispute with regard to the body of paragraph 22.  With respect to the

footnote, Nutraceutical's attempt to discredit Tr. Ex. 32 lacks merit.  The Court did not, in fact,

"note" any authenticity deficiencies.  Nutraceutical's footnote is therefore improper and

misleading.

Additionally, Ms. Davis testified that she has first-hand knowledge of the document and

how the document is created and that it is a document created by a person with knowledge and

---

[1] Trial Ex. 32 is purportedly a print-out from ACNielsen which tracks actual sales by retail outlet for particular products.  (Trial Tr. 1, at 58:7–13).  The Court notes that this exhibit suffers from authenticity deficiencies, including that the document does not say that it is from ACNielson, Davis did not obtain the document herself, and Davis does not have first-hand knowledge regarding how ACNielsen inputs data.  (Trial Tr. 1, at 100:18–101:21).  As such, the Court should give this document limited weight.

8

was made and kept in the ordinary course of business. (Tr. Tran. 1, pp. 58:25-59:7, 101:13-18.) Ms. Davis therefore provided ample foundation for the document and explained how to interpret it based on her own first-hand knowledge.

23. Aside from the license to Kaz, SCJ never licensed any other entity to sell BUG OFF wristbands. (Trial Tr. 1, at 99:12–14.) SCJ never sold a wristband itself and has no business plans to make a BUG OFF branded wristband. (Trial Tr. 1, at 99:15–17; 106:7–107:4).

**RESPONSE**: Mischaracterizes testimony. Ms. Davis testified that S. C. Johnson has no **current** plans to make a BUG OFF branded wristband, but that S. C. Johnson has explored the possibility and profitability of making such a wristband in the future. Specifically, Ms. Davis testified as follows:

Q. And there's been – there's no current business plan by S. C. Johnson to produce a wristband product, is there?

A. I wouldn't say that. We know the consumers want wristbands. We don't currently have a technology that easily lends itself to a wristband. But I can tell you through sitting through multiple project meetings that we come back to wristbands frequently for the reasons I talked about.

(Tr. Tran. 1, p. 106:10-16.)

Q. And does S. C. Johnson intend to use the BUG OFF mark on wristbands in the future?

A. We would very much like to be able to use this mark on wristbands. We know consumers love wristbands, and that was evidenced by the – sort of meteoric rise of Kaz product. But to date we have not been able to come up with a wristband that is technologically able to deliver the level of insect repellency that we want consumers to associate with the BUG OFF and the OFF! brand.

9

(Tr. Tran. 1, p. 65:6-14.)

24.     In 2008, SCJ conducted a focus group for an insect repellent wristband concept. (Trial Tr. 1, at 103:1–18; Trial Ex. 22).  SCJ tested this "paper concept" with consumers to gauge interest, but never tested the actual product, nor is it clear that an actual working prototype was ever created.  (Trial Tr. 1, at 103:19–104:19).  SCJ ultimately determined the wristband was not viable and took no further steps after 2008 to bring the concept to market. (Trial Tr. 1, at 105:23–106:1).

**RESPONSE**:  Mischaracterizes testimony.  Ms. Davis testified that S. C. Johnson has no **current** plans to make a BUG OFF branded wristband, but that S. C. Johnson has explored the possibility and profitability of making such a wristband in the future.  Specifically, Ms. Davis testified as follows:

Q.     And there's been – there's no current business plan by S. C. Johnson to produce a wristband product, is there?

A.     I wouldn't say that.  We know the consumers want wristbands.  We don't currently have a technology that easily lends itself to a wristband.  But I can tell you through sitting through multiple project meetings that we come back to wristbands frequently for the reasons I talked about.

(Tr. Tran. 1, p. 106:10-16.)

Q.     And does S. C. Johnson intend to use the BUG OFF mark on wristbands in the future?

A.     We would very much like to be able to use this mark on wristbands.  We know consumers love wristbands, and that was evidenced by the – sort of meteoric rise of Kaz product.  But to date we have not been able to come up with a wristband that is technologically able to deliver the level of insect repellency that we want consumers to associate with the BUG OFF and the OFF! brand.

(Tr. Tran. 1, p. 65:6-14.)

10

25.     SCJ acknowledged in internal emails that its failure to use BUG OFF in connection with wristbands for more than three years (after termination of the Kaz license) could result in abandonment of its rights in this mark.  Namely, an August 4, 2010 email from an SCJ in-house paralegal advised that SCJ needed "to keep using these [wristbands] in order to keep the registration active.  If we are not using products under the BUG OFF name, a third party could petition to cancel our registration."  (Trial Tr. 1, at 107:5–108:10; Trial Ex. 1062, at 2).

**RESPONSE**:  Irrelevant.  A non-lawyer's analysis of the use necessary under the law to maintain the vitality of a mark is irrelevant to the determination of abandonment.  (Tr. Tran. 1, p. 108:2-6.)  In fact, Ms. Davis stated "She's a paralegal.  She's not – she's not able to make that distinction."  (Tr. Tran. 1, p. 108:2-6.)  Further the email statement is contrary to law.  As described in S. C. Johnson's Proposed Conclusions of Law ("SCJ's COL"), ¶ 57, abandonment requires not only non-use, but intent not to resume use.  Ms. Davis testified as follows:

A.     We would very much like to be able to use this mark on wristbands.  We know consumers love wristbands, and that was evidenced by the – sort of meteoric rise of Kaz product.  But to date we have not been able to come up with a wristband that is technologically able to deliver the level of insect repellency that we want consumers to associate with the BUG OFF and the OFF! brand.

(Tr. Tran. 1, pp. 65:6-14.)  Additionally, use on a related good continues the use of the mark and S. C. Johnson began using BUG OFF on bug repellent sprays in March of 2010.  (Tr. Tran. 1, p. 147:7-8; SCJ's COL ¶¶ 60-64.)

### C.     SCJ's Use and Registration of BUG OFF on DEET Aerosol Sprays

26.     SCJ's Application—originally filed in 2003—was suspended until 2007 during the pendency of the Kaz and Chervitz combined TTAB proceedings.  (Trial Tr. 1, at 109:14–21).

**RESPONSE**:  No dispute.

27.     After SCJ's acquisition of the Chervitz Registration and Kaz Application in 2007, there were no remaining obstacles for the SCJ Application to proceed to registration, assuming

11

SCJ could show actual use of the mark on the claimed goods. (Trial Tr. 1, at 109:1–7; 109:22–25).

      **RESPONSE**: No dispute. As of 2007, the use by Kaz inured to the benefit of S. C. Johnson.

      28.      However, after acquiring the Chervitz and Kaz trademark rights in 2007, SCJ did not make actual use of BUG OFF until three years later, in March 2010. (Trial Tr. 1, at 110:1–8; 147:6–8). At that point, SCJ began placing the term BUG OFF in block print on the back panel of two sizes (9-oz. and 11-oz.) of Off! Deep Woods spray. (Trial Tr. 1, at 61:3–8; 110:1–8; Trial Ex. 7, at 50; Trial Exs. 14A, 14B, 1043).



      **RESPONSE**: Incomplete. From 2007 through December 31, 2009, Kaz maintained a

license to use BUG OFF on bug repellent products and used the mark in commerce until at least

2010. ((Tr. Tran. 1, pp. 54:1–5; Trial Ex. 9.) Additionally, Ms. Davis explained the delay in

using the mark. S. C. Johnson's use on bug repellent spray did not begin until after completing

the "extremely laborious process of adding [the mark] to registration – pesticide registration

12

labels with the U.S. E.P.A. and the 50 states that also require registration before you can add

something to a label." (Tr. Tran. 1, pp. 63:20-64:24.)

29.     Based on this use, the insect repellent portion of the SCJ Application registered on May 17, 2011 (RN 3,963,304) (the "SCJ Registration"). (Trial Ex. 3).

**RESPONSE**: No dispute.

30.     However, SCJ had still not used BUG OFF on candles, pads, lamps, or lanterns, despite having sold those products under its Off! brand for many years. SCJ therefore divided the Application, leaving these remaining goods the subject of a continuing ITU Application. (Trial Tr. 1, at 110:9–17; Trial Ex. 7).

**RESPONSE**: No dispute that S. C. Johnson divided the application between bug

repellent and candles, pads, lamps, or lanterns. The cited testimony does not support the

assertion regarding the sale of those products under the OFF! brand.

31.     On August 16, 2011, in an internal email regarding the continuing Application, Jason Allen suggests adding BUG OFF to the back panel of either SCJ's Club PowerPad SKU or its Sportsman PowerPad SKU to "protect the Trademark," noting this was the "same tactic" SCJ had used to protect other trademarks. (Trial Tr. 1, at 69:6–14; 83:25–84:4–8; Trial Ex. 1062, at 3–4).

**RESPONSE**: No dispute.

32.     At trial, SCJ's in-house attorney Sally Davis testified that Mr. Allen's use of the word "tactic" was commonly known within SCJ and meant execution of a strategy with respect to a certain trademark. (Trial Tr. 1, at 69:18–25; 85:15–18). However, in her earlier deposition, Davis testified as follows:

> **Question**: Have you ever heard within SCJ the practice of adding a mark to a back panel as a tactic?
> **Answer**: No.
> **Question**: Other than reading it right here?
> **Answer**: No.
> **Question**: Do you disagree with that word choice?
> **Answer**: Given the fact that I don't know who Jason Allen is - - I suspect he's a 23 year old Assistant Brand Manager. So I don't know that he speaks for what the Legal Department instructs them or - - instructs them to do, or how the company manages its trademarks.

(Trial Tr. 1, at 86:15–25).

13

**RESPONSE**: Mischaracterizes testimony. In the deposition, a completely different question was posed as to whether "the practice of adding a mark to a back panel is a tactic" to which Ms. Davis responded that it is not. During the trial, Ms. Davis further testified that using the word tactic is the execution of a strategy with respect to a certain trademark. (Tr. Tran. 1, pp. 69:18-25.) These are not contradictory responses.

33.     In November 2013, after filing five six-month extensions of time to show actual use, and each time submitting a new declaration under oath of a bona intent to use the mark on the remaining goods, SCJ abandoned the Application. (Trial Tr. 1, at 64:24–25; 111:10–25; Trial Ex. 7).

**RESPONSE**: Irrelevant. The separate application relating to candles, pads, lamps, or lanterns has no bearing on the issues presented in this case.

34.     In 2014, just prior to trial of this case, SCJ filed a *new* application to register BUG OFF in connection with the same goods it had just abandoned. (Trial Tr. 1, at 65:3–5; 117:21–118:6).

**RESPONSE**: Irrelevant. The submission of a new application to register BUG OFF has no bearing on the issues presented in this case.

35.     Davis testified that SCJ still has an intent to use BUG OFF in connection with candles, lamps, and lanterns, and that SCJ "would never file an extension of time request . . . [or]. . . a new application, unless [it] had had a conversation with [its] client and they had confirmed that there was an ongoing interest and business plan to use the mark in connection with those goods." (Trial Tr. 1, at 63:25–64:8; 64:21–23).

**RESPONSE**: No dispute.

36.     However, Anne Brolly, SCJ's Senior Director of Brand Marketing for Raid and Off! in North America, testified that SCJ has no plans to use the mark on any products other than the 9-oz. and 11-oz. cans of Off! Deep Woods, has no plans to expand the use of BUG OFF in any way, and that she did not even know of the new BUG OFF trademark application until trial began in this matter. (Trial Tr. 1, at 136:20–21; 143:20–22; 154:7–156:10).

**RESPONSE**: Irrelevant. The application relating to candles, pads, lamps, or lanterns has no bearing on the issues presented in this case. Further, Ms. Brolly is in the marketing department and not part of the trademark prosecution legal department.

14

37.     Brolly explained that BUG OFF is used on the back of the 9-oz. and 11-oz. cans primarily to keep open "options from a branding perspective . . . for the future." (Trial Tr. 1, at 142:12–13; 158:14–22).

**RESPONSE**:  Misleading and incomplete.  Ms. Brolly did not state that placing a mark on the back of a can is "primarily" used to keep branding options available.  Instead, she stated the following:

Q.     Even though the primary brand is OFF!, why is it important to have a mark like BUG OFF or TICKS OFF on the back?

A.     It is important because we're always looking for ways that consumers can identify us.  And BUG OFF, along with TICKS OFF, is a nice and catchy way for consumers to link it back to the OFF! brand.  So – and we also want to make sure that from a marketing standpoint we always have options from a branding perspective available for the future.

(Tr. Tran. 1, p. 142:6-13.)

38.     Brolly explained that SCJ places priority marks, such as Off! and Deep Woods, on the front of product because that is where consumers are most likely to see the marks and therefore identify the product on the shelf.  (Trial Tr. 1, at 156:11–157:6).  According to Brolly, the marks on the back of the product are not used by SCJ or consumers as source-identifiers.  (Trial Tr. 1, at 158:14–22).

**RESPONSE**:  Mischaracterizes testimony.  Ms. Brolly did not testify as to whether consumers use the marks on the back of the product as source-identifiers.  (Tr. Tran. 1, p. 158:14-22.)  Instead, Ms. Brolly testified that the priority marks, OFF! and Deep Woods, appear on the front and other marks may appear on the back.  (Tr. Tran. 1, p. 158:14-22.)  Ms. Brolly further testified as follows:

Q.     Okay.  Is real estate for use of trademarks scarce on the back of a can?

A.     It is.

Q.     So is putting BUG OFF a use of what otherwise would be valuable trademark real estate?

15

A.      Yes.  Absolutely.

Q.      Would you consider that an investment?

A.      Yes.

(Tr. Tran. 1, pp. 160:18-23.)

Ms. Davis also explained that use of a trademark on the back of a product is common and

identifies the source:

Q.      And with respect to those specimens of use, have you ever filed a use based

trademark application that included a specimen showing trademark use only on the back

of a product?

A.      Yes, we do that routinely.

Q.      Can you think of any specific examples?

A.      Yeah.  For example, we were sort of an industry leader in disclosing the

ingredients in our products.  And so we developed a logo called "facts you can feel good

about", and that appears exclusively on the back label of our product.  So that's an

example of where we filed that specimen.  And it just shows you some back label.  It's

common, particularly in our home storage, our Ziploc business, our cleaners business,

like Scrubbing Bubbles, we have we work hard so you don't have to exclusively on back

label as another example.

(Tr. Tran. 1, pp. 40:17-41:5.)

In fact, Ms. Maine also testified that having a mark on the back of a can identifies a

source:

Q.      Okay.  And the Smith & Hawken units, I believe you testified that they had the

Smith & Hawken name eventually on the front?

16

A.     Correct.

Q.     They had "SunFeather" on the back?

A.     Right.

Q.     And you found that use on the back of the product to be valuable, didn't you?

A.     It was.

Q.     Customers looked at it?

A.     Yeah.

Q.     They noticed the mark that was on the back of the product?

A.     Yes.  I remember getting phone calls and business because they noticed it.

(Tr. Tran. 1, pp. 75:17-76:4.)

39.     SCJ makes twelve to fifteen insect repellent products, each of which contain the same formula, though some have more or less DEET.  (Trial Tr. 1, at 119:4–10; 147:9–17; Trial Ex. 1047.)  Yet, BUG OFF appears on the back of only two products—the 9-oz. and 11-oz. cans of Off! Deep Woods.  (Trial Tr. 1, at 147:9–148:5.)

**RESPONSE**: No dispute.

40.     In particular, SCJ sells an 8-oz. can of Off! Deep Woods aerosol spray, which looks nearly identical to, and contains the same formula as, the 9-oz. and 11-oz. cans, but in place of BUG OFF, it bears the mark TICKS OFF.  (Trial Tr. 1, at 119:21–24; Trial Ex. 1045).

**RESPONSE**: No dispute.

41.     BUG OFF is not a primary brand for any SCJ bug repellant product, has never appeared on the front of any product, has never appeared in any advertising for any product, and SCJ has never invested in any market research for BUG OFF as a brand.  (Trial Tr. 1, at 151:2–4; 154:7–22; Trial Exs. 21/1047).

**RESPONSE**: Mischaracterizes testimony.  Ms. Brolly testified that BUG OFF is not a priority brand but is still used as a way for customers to identify the source.  (Tr. Tran. 1, p. 142:6-13.)  Additionally, S. C. Johnson used a concept board to research interest in the BUG OFF mark.  (Tr. Ex. 22.)  Ms. Davis testified as to the concept board:

Q.     And is the BUG OFF mark on that concept?

17

A.      It is.  It's down in the lower left hand corner.  Because we knew that BUG OFF

had equity with wristbands, and we thought that it would tie those two together.

Q.      And this was actually handed to consumers?

A.      It was.  It went through – it went through testing.

            THE COURT:     What was that last answer?  It was what?

            THE WITNESS:   Yes, we did send this through testing with consumers to

            assess their interest.

(Tr. Tran. 1, p. 67:9-17; Tr. Ex. 22.)

        42.  From 2003 to the present, despite claiming a bona fide intent to use BUG OFF on
candles, pads, lamps, and lanterns throughout these years, SCJ has not used BUG OFF on any
of these products and has no plans to do so.  (Trial Tr. 1, at 112:23–113:13; 118:19–25; 143:20–
22; 147:24–148:8; 154:23–156:10).

        **<u>RESPONSE</u>**:  Irrelevant.  The application and intent to use the BUG OFF mark on

candles, pads, lamps, or lanterns has no bearing on the issues presented in this case.

        Mischaracterizes testimony.  Ms. Davis testified that S. C. Johnson intends to use the

BUG OFF mark in connection with candles, lamps, and lanterns:

Q.      Does S. C. Johnson still have an intent to use the BUG OFF mark in connection

with the candles, lamps, and lanterns that were divided out into a separate application?

A.      We do.  And, in fact, we would never file an extension of time request, we would

never file a new application, unless we had had a conversation with our client and they

had confirmed that there was an ongoing interest and business plan to use the mark in

connection with those goods.  Frankly, it's expensive to maintain marks we're not going

to use.

(Tr. Tran. 1, pp. 63:25-64:8.)

        43.     The products that SCJ does use BUG OFF on—the Off! Deep Woods repellent
line—carry the highest level of DEET in aerosol form that SCJ offers.  (Trial Tr. 1, at 132:18–

18

21; 147:20–23). SCJ "specifically chose to associate the BUG OFF trademark" with these products because it "wanted BUG OFF to be synonymous with higher protection." (Trial Tr. 1, at 65:15–21). However, despite the fact that there are 12–15 products in the Off! Deep Woods product line, all of which contain high levels of DEET, BUG OFF appears on the back of only two of those products. (Trial Tr. 1, at 147:9–148:5).

**RESPONSE**: Incomplete. Ms. Davis stated that some of the other products that could otherwise carry the BUG OFF mark are unable to do so because of space limitations and the writing on the back of the can would cover the mark. (Tr. Tran. 1, p. 119:4-10.)

## II.     SCJ's Sales of BUG OFF Branded Products

44.     SCJ has sold $2.1 million units of the 9-oz. and 11-oz. Off! Deep Woods aerosol spray cans from 2010 to 2013, totaling approximately $11.6 million dollars in gross sales. (Trial Tr. 1, at 140:24–141:1; Trial Exs. 30–31).

**RESPONSE**: Mischaracterizes testimony. Ms. Brolly testified that S. C. Johnson sold approximately 2.1 million **units** of BUG OFF spray repellent cans through the present, equaling approximately $11.6 million in gross sales. (Tr. Tran. 1, pp. 140:24-141:1.)

45.     For 2010 to 2012, SCJ claims a total of $4,092,633 in costs, including for production, transportation, and marketing. (Trial Tr. 1, at 141:19-22; 151:19-22; 152:2–24; 158:23–159:11; Trial Ex. 31).

**RESPONSE**: Mischaracterizes testimony. Ms. Brolly testified that the expenses for purposes of Trial Exhibit 31 include the "Delivered Profit" and "Marketing Spend," which equals $5,713,477. (Tr. Tran. 1, pp. 158:23-159:11, Tr. Ex. 31.)

46.     SCJ did not provide its claimed costs or net profit for 2013, instead simply providing its gross revenue number as part of its total above. Therefore, for the entire time period of SCJ's sales from 2010 through 2013, SCJ's total claimed gross revenue minus its total claimed costs equals $7,507,367.[2]

---

[2] "Delivered Profit" is "Gross Sales" less costs, so costs equal Gross Sales minus Delivered Profit. (Trial Ex. 31).

**RESPONSE**: Mischaracterizes testimony. Ms. Brolly explained that "Delivered Profit" and "Marketing Spend" constitute the expenses described in Trial Exhibit 31.

19

**RESPONSE**:  Mischaracterizes testimony.  Using Ms. Brolly's explanation of the costs, when applied to the $11.6 million dollars in gross sales, the total revenue under this calculation would be $5,886,523.  (Tr. Tran. 1, pp. 158:23-159:11; Tr. Ex. 31.)

III. **Nutraceutical and its Use of BUG OFF**

47.     Nutraceutical and NutraMarks are Delaware corporations with their principal place of business in Park City, Utah. NutraMarks holds the rights to Nutraceutical's intellectual property, including the BUG OFF trademark.

**RESPONSE**: No dispute.

48.     Nutraceutical manufactures and markets a variety of products that are primarily geared to consumers with an interest in natural and organic products. (Trial Tr. 2, at 79:22–24). Nutraceutical is the successor-in-interest to Sunfeather Natural Soap Company, the original user of the BUG OFF trademark at issue in this case.

**RESPONSE**: S. C. Johnson disputes Nutraceutical's characterization of SunFeather

Natural Soap Company as the "original user of the BUG OFF trademark." Otherwise, no

dispute.

 A.     **Sandy Maine's First Use of BUG OFF**

49.     In 1979, Sandy Maine ("Maine") founded Sunfeather as a sole proprietorship, in Potsdam, New York. Sunfeather originally offered handmade, artisan soaps. (Trial Tr. 2, at 3:16–21; 4:9–11).

**RESPONSE**: No dispute.

50.     While working as an Adirondack wilderness guide in the early 1980's, Maine recognized a need for a DEET-free bug repellant with a more pleasing smell than the pine tar product she had been using. At an herbal conference, Maine obtained a recipe for an all-natural bug repellant formula from which she developed her own formula that she bottled under the BUG OFF mark and handed out to her wilderness guide clients ("Sunfeather BUG OFF"). (Trial Tr. 2, at 5:19–6:10).

**RESPONSE**: No dispute as to Ms. Maine's testimony. To clarify, Ms. Maine testified

that she gave the product to her wilderness guide clients. (Tr. Tran. 2, p. 6:5-10.) She did not

testify that any of the product was "sold" to wilderness guide clients during the 1980s.

51.     Maine chose the BUG OFF mark because she thought it was a cute, sassy, eye-catching name. (Trial Tr. 2, at 6:13–16).

Case 2:11-cv-00861-RTR   Filed 03/11/14   Page 21 of 37   Document 85

**RESPONSE**: Incomplete. Despite her explanation for choosing the BUG OFF mark,

Ms. Maine was aware of the OFF! brand for insect repellent, dating back to her use of OFF!

insect repellent as a child.

52.     Because Sunfeather BUG OFF received such a positive response from Maine's wilderness guide clients, Maine began selling it through the Potsdam, NY Consumer Co-Op, again under the mark BUG OFF.  (Trial Tr. 2, at 7:7–8).

**RESPONSE**: Mischaracterizes testimony.  Ms. Maine stated that the BUG OFF product

was in the Potsdam Consumer Co-op but did not testify as to any sales of the BUG OFF product

at that time.  (Tr. Tran. 2, p. 7:7-8.)

53.     In 1992, Maine started marketing and selling Sunfeather BUG OFF to craft fairs, including fairs in Maryland, New York, Pennsylvania, Virginia, and West Virginia, each of which Sunfeather attended twice a year.  (Trial Tr. 2, at 7:20–25).  These craft fairs were professionally promoted and would draw as many as 30,000 attendees in the Spring and 60,000 attendees in the Fall.  (Trial Tr. 2, at 8:12–18).  Attendees came to these craft fairs from all over the United States.  (Trial Tr. 2, at 9:3).

**RESPONSE**:  Mischaracterizes testimony.  Ms. Maine testified to attending one craft

fair in West Virginia, two craft fairs in Maryland, one craft fair in Pennsylvania, and did not

explain how many craft fairs she attended in Virginia.  (Tr. Tran. 2, pp. 7:20-25.)  Ms. Maine

did not testify as to a craft fair in New York.  Additionally, Paragraph 53 mischaracterizes Ms.

Maine's testimony regarding the customer base at craft fairs.  Ms. Maine testified that

"customers were from all over the region," not from all over the United States.  (Tr. Tran. 2, pp.

9:3.)  Further, BUG OFF was one of the products presented at craft fairs, but Ms. Maine's

prominent product was SunFeather's soap line.  (Tr. Tran. 2, p. 4:19-24.)

Unsupported testimony.  Ms. Maine's testimony regarding the number of craft fair

attendees is purely speculative and not based on any documentary evidence.  It should therefore

be disregarded as unreliable.  Additionally, Ms. Maine testified that the craft fairs "kept records

on attendance," and that her knowledge is based on those records, but Nutraceutical did not

22

present any such documentary evidence. (Tr. Tran. 2, p. 8:14-15.) Her testimony is therefore inadmissible hearsay. Fed. R. Evid. 802, 803.

54.     In 1993, Sunfeather began bringing Sunfeather BUG OFF to trade shows in addition to craft fairs, starting with the Rochester New York trade show and then adding the George Little Management shows which were held all over the country, including in Arkansas, Atlanta, Chicago, Denver, California, Miami, New York, Ohio, Philadelphia, Seattle, and Tennessee. (Trial Tr. 2, at 9:12–14; 13:21–14:13).

**RESPONSE**: Mischaracterizes testimony. Ms. Maine testified that the George Little

Management shows were held all over the country, but that Ms. Maine attended individual

shows held in New York City, San Francisco, Los Angeles, Seattle, Denver, Chicago, Miami,

Atlanta, Philadelphia, Arkansas, Tennessee, New Jersey, and Ohio. (Tr. Tran. 2, p. 14:1-13.)

55.  One of these George Little Management shows was the New York International Gift Fair. This is one of the largest gift shows in the world—filling four floors of the New York Javits Center—and is attended by buyers from every state and several countries. (Trial Tr. 2, at 9:23–10:1; 10:11–11:3; 14:18–19).

**RESPONSE**: Mischaracterizes testimony. The cited testimony does not support the

assertion that the New York International Gift Fair is "one of the largest gift shows in the

world." Additionally, although Ms. Maine made the speculative statement that the customers

were "from across the country," she did not state that the buyers are from "every state." (Tr.

Tran. 2, p. 14:14-24.)

56.     By 1992, Sunfeather was attending up to 24 trade shows a year, with that number increasing to 40 by 1997. (Trial Tr. 2, at 11:21–12:4; 15:2–4; Trial Exs. 1104–05).

**RESPONSE**: Mischaracterizes testimony. Ms. Maine testified that SunFeather was

attending approximately 24 trade shows in 1992 and approximately 40 trade shows "[a]t the

peak" in 1997. (Tr. Tran., pp. 11:21-12:4.) Ms. Maine later qualified this testimony, explaining

that in 1997, SunFeather was attending "anywhere from 30 to 40 trade shows." (Tr. Tran. 2, p.

15:2-4.) SunFeather attended trade shows after 1997, but apparently not as many. (Tr. Tran. 2,

p. 11:10-13; Tr. Ex. 1104.)

23

57.     Except for two specialty trade shows, Sunfeather always brought Sunfeather BUG OFF to the craft fairs and trade shows that it attended and took "many, many orders" for the product from people from "every imaginable state." (Trial Tr. 2, at 11:4–20; 14:25–15:1).

**RESPONSE**: Ms. Maine did not testify as to knowledge of sales to customers from any specific state and did not testify as to what "many, many orders" constituted. In fact, there are only fifty "imaginable states" in the United States, and Ms. Maine did not testify as to actual sales to customers from any single state. These broad, conclusory, and unsupported statements should therefore be afforded very little weight.

58.     Because Sunfeather lacked its own physical retail location, the craft fairs and trade shows were Sunfeather's "lifeblood" because that is how it got orders and expanded its market presence more broadly. (Trial Tr. 2, at 17:4–10). At the trade shows, Sunfeather often gave interviews and provided "media kits" to the press room. (Trial Tr. 2, at 22:11–23:5).

**RESPONSE**: Mischaracterizes testimony. Ms. Maine testified that sales orders were taken at craft fairs and trade shows, but did not testify as to expanding a market presence or what geographic areas these orders served. (Tr. Tran. 2, p. 17:4-10.) Additionally, Ms. Maine testified that she placed media kits in media rooms, but did not indicate the whether these media kits involved the BUG OFF product and whether the media kits had any impact on the promotion of the BUG OFF product. (Tr. Tran. 2, p. 22:11-22.) In fact, the only media spot mentioned and supported by Ms. Maine is an article in the Chicago Tribune in 1995, which directed people to Smith & Hawken. (Tr. Tran. 2, p. 23:6-15; Tr. Ex. 1102.) Ms. Maine claimed that she had a thick file of newspaper articles, but that these articles were "purged" after Nutraceutical bought SunFeather. (Tr. Tran. 2, pp. 23:21-24:8.) The missing articles cannot be used to support an inference of "advertising" for the market penetration analysis.

59.     Many of the trade show buyers were "mom-and-pop stores and gift boutiques," who would purchase Sunfeather BUG OFF for resale in their brick-and-mortar stores. Maine visited many of these stores herself. (Trial Tr. 2, at 10:14–18; 15:12–22 ("I visited - - you know, over a 20-year period I probably visited at least 10 or 15 different retailers" carrying the Sunfeather BUG OFF product.)).

24

**RESPONSE**: No dispute. However, Ms. Maine's testimony that resale of the BUG OFF product at 10 or 15 retailers over a twenty-year period fails to suggest any market penetration in any particular area.

60.     Also in 1992, Sunfeather BUG OFF was being offered and sold through the Sunfeather Wholesale Catalog. (Trial Tr. 2, at 18:7–12; Trial Ex. 1000 (1993 Sunfeather Catalog, showing BUG OFF on page 12)). Sunfeather distributed 200 to 300 of these catalogs at every trade show it attended, and also distributed the catalog at craft fairs and upon request. (Trial Tr. 2, at 19:10–19; 21:18–22:1). Also in 1992, Sunfeather began marketing Sunfeather BUG OFF on its website, which was available to consumers nationwide. (Trial Tr. 2, at 26:18–20).

**RESPONSE**: Although Ms. Maine testified that BUG OFF appeared in a 1992 SunFeather Wholesale Catalog, she was unable to locate that catalog, despite being able to find the 1993 catalog. (Tr. Tran. 2, p. 18:7-14, Trial Ex. 1000.) Ms. Maine's testimony regarding the distribution of the catalog is unsupported by any documentary evidence and is inconsistent with the number of catalogs printed when compared to the number of trade and craft shows Ms. Maine claims to have attended during 1992. (Tr. Tran. 2, p. 19:10-24.)

Mischaracterizes testimony. Ms. Maine testified that SunFeather had a website but did not explain how the website was used and whether BUG OFF was marketed on the website. (Tr. Tran. 2, p. 26:18-20.) Further, there is no indication as to the traffic on the website. (Tr. Tran. 2, p. 26:18-20.)

61.     Sunfeather printed 5,000 copies of its Wholesale Catalog in 1992, which it distributed until 1993. In 1993, Sunfeather printed another 15,000 copies, which it distributed from 1993–1996 at about 7,500 catalogs per year. In 1996, Sunfeather printed another 20,000 copies for distribution through 1998. (Trial Tr. 1, at 19:20–24; 20:14–21; 22:2–4; Trial Exs. 1000–01).

**RESPONSE**: Contradictory. Assuming the facts above, from 1993 through 1996, SunFeather distributed 30,000 catalogs. However, Paragraph 61 and Ms. Maine's corresponding testimony states that only 15,000 catalogs were available for distribution. (Tr. Tran. 2, pp. 52:14-53:1.) Additionally, from 1993-1996, or approximately four years, Ms.

25

Maine claims that she distributed 7,500 catalogs a year, but that in next eighteen month period, she distributed 20,000 catalogs. (Tr. Tran. 2, pp. 52:14-53:1.) Ms. Maine's testimony regarding catalog distribution is internally contradictory and should therefore be disregarded as unreliable.

### B. Sunfeather BUG OFF in Smith & Hawken Catalogs and Retail Stores

62. Smith & Hawken was a California-based high-end, national retailer of "quality garden lifestyle products," which began selling Sunfeather's BUG OFF in 1994 after noticing the product at a trade show. (Trial Tr. 2, at 25:7–9; Trial Ex. 1002 (1994 Smith & Hawken Catalog)).

**RESPONSE**: The cited transcript and exhibit support only the assertion that SunFeather's BUG OFF product appeared in Smith & Hawken in 1994. The remainder of the assertions in Paragraph 62 are unsupported by the record cited.

63. Sunfeather BUG OFF was offered in the Smith & Hawken catalog from 1994 until the company was sold in 2004 (Trial Tr. 2, at 25:21–26:1; Trial Exs. 1002, 1068–71, 1073–77). Smith & Hawken's catalog was the company's primary marketing vehicle and was distributed nationally to every state in the United States. (Deposition of Marta Benson ("Benson Dep."), 37:18–19; 41:17–20; 46:2–47:8).

**RESPONSE**: Mischaracterizes testimony. Ms. Benson did not state that Smith & Hawken's catalog was distributed "to every state in the United States." Instead, Ms. Benson stated that the catalog's circulation was "national." (Benson Dep., 46:2-8.) Ms. Benson had no knowledge of the actual distribution of the catalogs, but merely speculated that the catalogs were shipped to "pockets of affluence" and that mathematically, the catalogs likely went to each state. (Benson Dep., 46:14-47:8.) There is no evidence, however, as to where Smith & Hawken catalogs were shipped. This type of speculative testimony lacks foundation and reliability and should therefore be disregarded for proposition asserted.

64. Sunfeather BUG OFF was included in Smith & Hawken's Spring (two distributions, or "drops" per year) and Summer Catalogs (three "drops" per year), as well as the Tool Catalog (one "drop"). (Benson Dep., 42:21–44:2; Trial Exs. 1002, 1068–1071, 1073–77).

**RESPONSE**: No dispute.

65.     In 1994, Smith & Hawken's Spring and Summer Catalogs had an approximate circulation of 200,000 copies per drop. The Tool Catalog had an additional circulation of approximately 200,000 annually. (Benson Dep., 45:2–15; 48:1–4). Therefore, catalogs promoting and selling Sunfeather BUG OFF were sent annually to roughly 1.2 million households starting in 1994. Catalog circulation increased roughly 5–10% over the next few years. (Benson Dep., 51:18–24).

**RESPONSE**: Misleading. There is no evidence that each "drop" went to different households from the previous "drops." In fact, the inference could be equally drawn that the catalogs went to the exact same consumers, which would constitute a total circulation of at most 200,000 households. In fact, Ms. Benson testified that the Tool Catalog "would be sent out to the best customers," indicating that at least 200,000 catalogs were sent to persons already receiving the prior catalog distributions. (Benson Dep., 48:1-8.)

Additionally, even assuming that the catalogs reached 1.2 million households, this number does not indicate the actual effect of SunFeather's product placement in the catalog and further does not demonstrate whether any sales originated from the product placement or where these sales may have been made.

66.     Inclusion of Sunfeather BUG OFF in Smith & Hawken's Catalogs doubled Sunfeather's sales and increased its marketplace notoriety. Sunfeather sold thousands of units of BUG OFF through Smith & Hawken each year. (Trial Tr. 2, at 26:8–13; 73:14–24).

**RESPONSE**: There is no documentary evidence supporting Ms. Maine's estimation of sales. Additionally, Ms. Maine offers no facts supporting her conclusory statements of "increased marketplace notoriety" or sales of "thousands of units of BUG OFF to Smith & Hawken." (Tr. Tran. 2, pp. 26:8-13; 73:14-24.) This lack of support demonstrates that the Court should grant this self-supporting testimony little weight.

67.     Smith & Hawken was unable to recover documentary proof regarding where BUG OFF products were sold because the company is no longer in existence and because its former catalog manager, Benson, was not permitted to take such proprietary information with her upon her departure. (Benson Dep., 17:17–18:1). However, Benson testified that the catalog was distributed nationwide and sales were spread across the country. (Benson Dep., 19:15–24;

60:15–23) ("I have no awareness of a state that would have been missing from that national distribution.").

**RESPONSE**:  Lack of foundation.  Ms. Benson had no knowledge as to where any SunFeather BUG OFF product may have been sold.  Ms. Benson could not identify any city or state where any one SunFeather BUG OFF product may have been sold:

Q.     We've talked a lot about the catalog distribution, and I just want to make sure I understood your previous testimony correctly.

As you sit here today, is it fair to say that you don't recall a specific number of BUF [sic] OFF bug repellant units actually sold during 1994?

A.     That is fair to say.  I do not know a specific number.  I could mathematically estimate it and – given the kind of revenue per depiction that would have been required.

Q.     But even with a mathematical estimate based on that calculation, that wouldn't tell you where any one of those [1994] sales had occurred in terms of city or state, right?

A.     No, you're right.

Q.     And that would be true in 1995?

A.     Yes.

Q.     And 1996?

A.     Yes.

(Benson Dep., 68:12-69:5.)

68.     Products had to meet or exceed Smith & Hawken's sales goals in order to earn a place in the Catalog.  At only $8 per bottle, Sunfeather BUG OFF had to sell in high volume— roughly 700 units per season—to be considered a "best seller" and therefore earn its repeated placement in the Catalog.  The fact that it earned placement in the Catalog for more than seven years means that it met these sales goals.  (Benson Dep., 18:19–19:14; 23:12–15; 54:9–16; 71:9–13).

**RESPONSE**:  Lack of foundation and mischaracterizes testimony.  Ms. Benson explained that she did not know the actual sales of Sunfeather BUG OFF through the catalog,

28

but that she could offer an estimated guess. (Benson Dep. at 18:13-18.) Specifically Ms. Benson stated the following:

> Q.     When Smith & Hawken sold the BUF [sic] OFF repellant through tis catalog, do
>
> you know, for example, in 1994 how many units of BUF [sic] OFF were sold?
>
> A.     So I would – I would – it probably is not fair to say because it would be an
>
> estimated guess at this point – an educated estimated guess.

(Benson Dep., 18:13-18.)

Additionally, there is no evidence that SunFeather BUG OFF's placement in the catalog meant that it "met the sales goals." Instead, Ms. Benson testified that its placement in the catalog "suggests" that it met the benchmarks described in Ms. Benson's testimony. (Benson Dep., 54:9-16.)

69.     Benson considered Sunfeather BUG OFF to be "iconic" to the Smith & Hawken catalog and, in 1996, it was featured as a "Staff Favorite." (Benson Dep., 56:11–23).

**RESPONSE**: Irrelevant. An individual's view of a product bears no relationship to the factors relied upon to demonstrate market penetration.

70.     From 1994 until 1996, Sunfeather BUG OFF was also carried in Smith & Hawken's brick-and-mortar stores in California. (Benson Dep., 23:6–18; 34:8–16). In 1996 Smith & Hawken was purchased by a publicly traded holding firm and began expanding its brick-and-mortar stores so that by the summer of 1997, Smith & Hawken had 25 retail stores, including stores in California, Colorado, Connecticut, Illinois, Indiana, Maryland, New York, Ohio, Oregon, Pennsylvania, Texas, and Washington. (Benson Dep., 34:19–35:7). BUG OFF was offered in each of these stores. (Benson Dep., 23:6–18; 37:6–14).

**RESPONSE**: Mischaracterizes testimony. Ms. Benson testified that SunFeather BUG OFF would have been carried in the four California stores that existed at that time but did not have any indication on the sales out of any given store. (Benson Dep., 23:6-24.)

71.     By 1995, Sunfeather BUG OFF had achieved sufficient notoriety and popularity to receive unsolicited press in the *Chicago Tribune* in an article about effective bug repellants. (Trial Tr. 2, at 23:6–20; Trial Ex. 1102).

29

**RESPONSE**: SunFeather's inclusion in an article one time in a regional newspaper does not indicate that SunFeather's BUG OFF "had achieved sufficient notoriety and popularity".

72. By 2000, Smith & Hawken was operating more than 43 stores in 20 states. The Sunfeather BUG OFF product was offered in each of these stores, as was the Smith & Hawken Catalog, which contained Sunfeather BUG OFF. (Benson Dep., 37:6–38:10).

**RESPONSE**: There is no documentary support that SunFeather's BUG OFF product was offered in each of Smith & Hawken's stores. Additionally, there is no evidence as to the actual sales of any SunFeather BUG OFF product that may have been carried in the Smith & Hawken stores. This testimony lacks support and should therefore be given little weight.

73. Also in 2000, Smith & Hawken launched its website, on which the Sunfeather BUG OFF product was offered nationwide. (Benson Dep., 39:20–40:15).

**RESPONSE**: There is no evidence that the SunFeather BUG OFF product was actually sold to any end-customer through the website. No documents were provided evidencing sales to any particular customer in a specific geographic area. This testimony is therefore unsupported and should be given little weight.

### C. Sunfeather BUG OFF in Frontier Catalogs

74. Frontier Naturals Co-Op ("Frontier") is a wholesale co-op based in Norway, Iowa that distributes its catalogs and products nationwide to the natural food market. (Trial Tr. 2, at 27:4–6).

**RESPONSE**: Mischaracterizes testimony. The testimony cited does not support the assertion that Frontier distributes its catalogs and products nationwide. (Tr. Tran. 2, p. 27:4-6.) In fact, the representative from Frontier had no knowledge regarding distribution of the catalogs. (Deposition of Clinton Landis ("Landis Dep."), 11:10-13, 20:18-21:23, 22:1-15, 45:15-20, 85:11-86:2.) Specifically, Mr. Landis stated the following regarding catalog distributions:

Q. And do you have an understanding of who the catalog was distributed to?

A.     You know, I have some understanding, but, no, I don't – I don't know exactly.

(Landis Dep., 11:10-13.)

Q.     Do you have an approximate understanding of how many people that would have

been distributed to?

A.     I do not.

Q.     Any sort of ballpark figure if you were—

A.     No.

Q.     —looking back on your time there?

A.     No.  I can tell you how many we did, you know, ten years later, but I can't tell

you during that time.  I just don't know.  And I know that we had people here that looked

and tried to find out.  We just couldn't – we could not find that number.

(Landis Dep., 21:10-23.)

75.     During the relevant time period, Frontier published and distributed a wholesale
catalog twice a year, along with an annual retail catalog.  Sunfeather BUG OFF first appeared in
at least as early as the 1997 Spring/Summer Frontier Wholesale Catalog, which was distributed
twice a year.  (Trial Tr. 2, at 27:17–19; Trial Ex. 1083 (1997 Frontier Catalog)) (Deposition of
Clint Landis ("Landis Dep."), 11:4–9; 19:25–20:4).  It was also distributed through Frontier's
Retail Catalog approximately once a year from 1998 through 2007.  (Trial Tr. 2, at 28:1–3;
74:1–6; Trial Exs. 1083–95).

**RESPONSE**:  No dispute.

76.     The Frontier catalog was distributed to approximately 15,000 wholesalers in the
Spring of 1997, with steady increase in circulation through 2002.  (Landis Dep., 22:16–22;
80:14–18).  Catalogs were distributed to Frontier's customer base, which was nationwide.
(Landis Dep., 26:21–27:8; 35:16–36:21; 38:22–25; 40:22–25; 45:24–46:4; 47:2–8; Trial Ex.
1082.)

**RESPONSE**:  Lack of foundation.  Mischaracterizes testimony.  Mr. Landis had no

knowledge regarding the distribution of the catalogs during the relevant time period.  (*See*

Response to ¶ 74.)  Additionally, the testimony cited does not describe any steady increase in

circulation and Mr. Landis testified that he has no personal knowledge as to the 15,000 number cited in Paragraph 76:

> Q.      And any sense at all of what [catalog distribution] would have been then in the '90s?
>
> A.      No.
>
> Q.      If you were going to give a ballpark figure for the wholesale catalog distribution during the time you were the director of marketing, what would that be?
>
> A.      I would say probably 15,000.  And I could be off by a factor of 10 – probably 5- to 10,000 either way.

(Landis Dep., 22:16-22.)

77.      Frontier sales records indicate actual sales of Sunfeather BUG OFF as early as November, 1996 through June 1998 and additional sales from 1998 through 2001.  (Trial Ex. 1097).

**RESPONSE**:  No dispute.

78.      By 1997, Sunfeather was growing at approximately 15% sales per year and Maine added fourteen employees to handle administration and sales.  (Trial Tr. 2, at 16:3–16).  In 2001, Sunfeather started adding additional BUG OFF products, including a balm, a spritzer, a soy candle, and a soap and shampoo bar.  (Trial Tr. 2, at 30:18–31:10; Trial Ex. 1033, at 1–6).

**RESPONSE**:  Ms. Maine's testimony is inconsistent with the documentary evidence.  In particular, Ms. Main's testimony of a 15% increase is inconsistent with Trial Ex. 1022.  It is unreasonable to believe that SunFeather's BUG OFF product accounted for 15% of all sales in 1997-1998, but accounted for less than 5% in 2000-2003.

79.      Maine testified that during her first year of business, sales were $90, second year $900, third year $9,000, fourth year $90,000, until by 1998, Sunfeather's total sales topped $1 million.  (Trial Tr. 2, at 32:12–33:14).  From 1997 to 1998, BUG OFF was included in approximately 85% of all Sunfeather's customer orders, representing approximately 15% of the company's sales.  (Trial Tr. 2, at 33:21–34:1).  This percentage was even more meaningful to Sunfeather given the high profit margin for BUG OFF.  (Trial Tr. 2, at 34:1–7).

**RESPONSE**: Irrelevant. The sales dollars of all SunFeather products, including the flagship soap making and soap products, are irrelevant to the analysis of the sales volume of the specific BUG OFF products. Additionally, there is no support for the sales volume of all SunFeather products outside of Ms. Maine's self-serving testimony.

80. Throughout the 1990s and 2000s, Sunfeather continued to market BUG OFF through nationwide trade shows appearances, nationwide catalog distribution, the Internet, and other types of marketing.

**RESPONSE**: Conclusory and mischaracterizes testimony. (*See* Response to ¶¶ 47-79.)

### D. Sunfeather's BUG OFF Trademark Applications

81. In December 2002, Sunfeather filed three separate applications to register BUG OFF, one for insect repellent oil with a date of first use of March 1992. The other two applications, which covered a soy candle, recited a first use date of 2001. (Trial Tr. 2, at 39:9–40:8; Trial Exs. 39–41/1017).

**RESPONSE**: No dispute.

82. The PTO refused to register all three applications, citing the Chervitz Registration and Kaz Application. (Trial Tr. 2, at 40:11–17). Sunfeather argued that its goods were different from those covered by the Chervitz Registration and Kaz Application, but the PTO rejected this argument. (Trial Tr. 2, at 40:18–22).

**RESPONSE**: Incomplete. The PTO specifically found that all three applications would pose a likelihood of confusion with the Chervitz Registration and Kaz Application. (Tr. Exs. 39, pp. 3-8; 40, pp. 3-7; 41, pp. 6-10, 234-49.)

83. Sunfeather did not assert that it owned rights in BUG OFF that predated the Chervitz Registration or Kaz Application. (Trial Tr. 1, at 77:23–78:1). In order to make that argument, Sunfeather would have had to file a petition to cancel with the TTAB, which is an inter partes proceeding resembling a lawsuit and including written discovery and depositions. A cancellation petition is significantly more expensive than simply responding to the PTO's initial refusal by arguing no likelihood of confusion. (Trial Tr. 1, at 88:3–89:16; 90:19–91:4; Trial Tr. 2, at 40:23–41:19). Maine was warned that a cancelation petition could cost upwards of $150,000, which was "not within [Sunfeather's] grasp." (Trial Tr. 2, at 41:11–19).

**RESPONSE**: S. C. Johnson does not dispute that Ms. Maine chose not to petition to cancel the Chervitz Registration or Kaz Application based on prior common law rights.

However, the exorbitant estimated cost of the cancellation proceedings is in excess of the expense typically seen for a cancellation proceeding and is unsupported by anything in the record, other than Ms. Maine's own self-serving testimony. Additionally, Ms. Maine did not even attempt to contact Chervitz or Kaz regarding BUG OFF:

Q. You did not contact Mr. Chervitz, did you, after receiving that office action?

A. No.

Q. You didn't contact Kaz?

A. No.

Q. You didn't instruct your attorney to send a letter to either entity informing them of your rights in "BUG OFF?

A. No. I let my attorney handle all those matters.

Q. And you said that you thought that – that you considered a petition to cancel but decided it would be too expensive. Do you recall that?

A. Yes.

Q. It would not have been very expensive to send a letter, would it?

A. No, it wouldn't have been expensive to send a letter.

Q. So you could have simply written to Chervitz, or your attorney could have written to Chervitz to say, I see you have this registration, you need to know that I can prove to you that I have superior rights or I have common law rights. But you didn't do that, did you?

A. No, I didn't. And my lawyer apparently didn't either.

(Tr. Tran. 2, pp. 60:6-61:1.)

84.    In February 2011, Sunfeather sold substantially all of its assets, including the BUG OFF trademark rights, to Nutraceutical.  (Trial Tr. 2, at 81:18–21; 82:15–23; Trial Ex. 1021).

**RESPONSE**:  No dispute.

85.    Nutraceutical has continued the sales and distribution of the BUG OFF branded products, including a bug repellant soap, herbal oil, spritzer, and balm.  Marketing and sales occur via the Sunfeather website (www.sunfeather.com) and at retail stores around the country. Sales records demonstrate continued sale of Sunfeather BUG OFF from the time of acquisition until the present.  (Trial Tr. 2, at 103:18–104:2; Trial Ex. 1108).

**RESPONSE**:  Incomplete.  Nutraceutical submitted documentary evidence of sales of the

SunFeather BUG OFF products only for 2011 and 2012, not for 2013 and 2014.  (Trial Ex.

1108.)  This document demonstrates that a BUG OFF product was sold in approximately

twenty-two states, which is far from nationwide.  (Trial Ex. 1108.)  The sales that do exist are

too small to demonstrate continued use for purposes of establishing prior common law rights.

(Tr. Ex. 1108.)  There is no testimonial evidence supporting continued use either.  The

testimony cited by Nutraceutical does not indicate that SunFeather BUG OFF products are

available in retail stores or where these purported retail stores are located.  (Tr. Tran. 2, pp.

103:18-104:2.)  Instead, the testimony merely states that SunFeather products are manufactured

by Nutraceutical subsidiaries.  (Tr. Tran. 2, pp. 103:18-104:2.)

## E.    Sunfeather's Sales Records

86.    In the early 1990's, Sunfeather used Oak Street to track its sales records and Peachtree for accounting.  (Trial Tr. 2, at 36:18–37:2).

**RESPONSE**:  No dispute.

87.    In 1997, Oak Street crashed and Sunfeather replaced it with another accounting program called MAS 90.  (Trial Tr. 2, at 37:2–9).  Then in 1998, Sunfeather's computers crashed, and it lost much of its accounting records.  (Trial Tr. 2, at 37:15–18).

**RESPONSE**:  Incomplete.  Ms. Maine indicated that after her computer crashed in 1997,

she still had records demonstrating use sufficient to support her trademark applications in 2002.

(Tr. Tran. 2, pp. 54:7-56:22.)  After selling SunFeather to Nutraceutical in 2011, Nutraceutical

paid for the destruction of documents, despite understanding its obligation to preserve such

documents to prove common law rights.  (Tr. Tran. 2, p. 55:5-57:2.)  Thus, Nutraceutical cannot

use the lack of documentation as a reason to rely on Ms. Maine's unsubstantiated testimony.

88.     After Nutraceutical purchased Sunfeather in February of 2011 and prior to this
lawsuit, Maine hired a service to shred many historical paper records, including banker boxes of
invoices that contained potentially sensitive credit card information.  (Trial Tr. 2, at 55:7–23).

**RESPONSE**:  Incomplete.  (*See* Response to ¶ 87.)  Nutraceutical cannot use the lack of

documentation as a reason to rely on Ms. Maine's unsubstantiated testimony.

89.     In connection with this lawsuit, Sunfeather attempted to find all documents related
to actual sales of BUG OFF in the early 1990's.  (Trial Tr. 2, at 34:8–11; 35:20–36:2).

**RESPONSE**:  Incomplete.  (*See* Response to ¶ 87.)  Nutraceutical cannot use the lack of

documentation as a reason to rely on Ms. Maine's unsubstantiated testimony.

90.     Sunfeather attempted to retrieve files from the old laptop used in the 1990's,
including sending it to MAS 90 so they could attempt to retrieve documents from that software.
(Trial Tr. 2, at 37:25–38:8).  MAS 90 verified the financial documents were on the laptop, but
most were too corrupted by age to be recovered.  (Trial Tr. 2, at 38:8–11).

**RESPONSE**:  Incomplete.  (*See* Response to ¶ 87.)  Nutraceutical cannot use the lack of

documentation as a reason to rely on Ms. Maine's unsubstantiated testimony.

91.  As a result, Sunfeather was unable to produce complete financial records showing all
of the sales they made to whom, and in which states, in the 1990's.  (Trial Tr. 2, at 38:21–23).
Even the records that were obtained and produced were not complete, as some of the
information was corrupted even within retrievable records.  (Trial Tr. 2, at 63:13–21; Trial Ex.
1040).

**RESPONSE**:  Incomplete.  (*See* Response to ¶ 87.)  Nutraceutical cannot use the lack of

documentation as a reason to rely on Ms. Maine's unsubstantiated testimony.

Dated:  March 11, 2014.

      **MICHAEL BEST & FRIEDRICH LLP**

      _____*/s Katherine W. Schill*_____
      Jonathan H. Margolies
      Katherine W. Schill
      Patricia L. Jenness
      **MICHAEL BEST & FRIEDRICH LLP**
      100 East Wisconsin Avenue, Suite 3300
      Milwaukee, Wisconsin  53202-4108
      (414) 271-6560
      jhmargolies@michaelbest.com
      kwschill@michaelbest.com
      pljenness@michaelbest.com

      OF COUNSEL:
      Dianne M. Smith-Misemer, Esq.
      Cheryl L. Burbach, Esq.
      **HOVEY WILLIAMS LLP**
      10801 Mastin Boulevard, Suite 1000
      Overland Park, Kansas 66210
      (913) 647 – 9050
      dsmisemer@hoveywilliams.com
      cburbach@hoveywilliams.com
      ATTORNEYS FOR PLAINTIFF
      S. C. JOHNSON & SON, INC.