IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

S. C. JOHNSON & SON, INC.,

        Plaintiff,

vs.

NUTRACEUTICAL CORPORATION and
NUTRAMARKS, INC.,

        Defendants.

Case No. 2:11-cv-00861-RTR

**S. C. JOHNSON & SON, INC.'S RESPONSE TO DEFENDANTS'
POST-TRIAL PROPOSED CONCLUSIONS OF LAW**

Nutraceutical's Conclusions of Law ("NCOL") mix case cites and argumentative factual conclusions. For ease of the Court, and to prevent repetition of the same legal points asserted in S. C. Johnson's Conclusions of Law ("SCJ COL"), S. C. Johnson has grouped its responses by topic area, providing case citations relevant to the general areas of law (common law rights, abandonment, the validity of the Chervitz registration, and lost profits), with specific references within each topic area to Nutraceutical's Conclusions of Law.

**NUTRACEUTICAL FAILED TO PROVE PRIOR COMMON LAW RIGHTS**
**[Response to NCOL ¶¶ 96-127]**

Nutraceutical's evidence falls far short of the standard for proving prior common law rights. It failed to prove that its predecessor, SunFeather, obtained common law rights in any particular geographic area in the nation, let alone the entire nation. Nutraceutical's position regarding its alleged common law rights actually contradicts its own public statements regarding the geographic limitation of such rights:

1

> Common law trademark rights do not provide us with the same level of protection as afforded by a United States Federal registration of a trademark. In addition common law trademark rights are limited to the geographic area in which the trademark is actually used.

(Tr. Ex. 48 at 9.)

Instead of presenting evidence of actual sales or market penetration in any particular geographic market, Nutraceutical asks the Court to make "inferences" of nationwide use that lack any basis in fact or law.

At the outset, NCOL ¶ 102 is simply wrong. While SunFeather may have used BUG OFF in commerce in 1992, S. C. Johnson owned a registered mark at the time. (Trial Ex. 4.) No common law rights can accrue while a registered mark has nationwide priority. 15 U.S.C. § 1115(b)(5). *See also Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, No. 03 C 6070, 2004 U.S. Dist. LEXIS 23064, at * 39 (N.D. Ill. Nov. 15, 2004) (a non-registrant's use of a mark is "frozen" at the time another's trademark application is filed and can therefore acquire no additional rights during the period of registration) (citing *Quill Corp. v. Le Blanc*, 654 F. Supp. 380, 385 (D. N.H. 1987)). SunFeather's earliest common law rights could not have accrued until after April 10, 1995, when S. C. Johnson's earliest trademark registration was cancelled.

Moreover, Nutraceutical's apparent position that it need not prove market penetration in specific geographic markets is simply contrary to law. (*see, e.g.,* NCOL ¶¶ 108-127.) Prior common law rights are a limited exception to the rights of the registrant, and only for the geographic areas in which the defendant can prove those rights by market penetration which is substantial and continuous. *See* SCJ COL ¶¶ 11-13. Though Nutraceutical pays lip service to the concept of "market area," NCOL ¶¶ 97-99, it fails to provide the state-by-state, region-by-region, or area-by-area analysis required to determine market penetration. *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1397-98 (3d Cir. 1985); *Burger King of Fla.,*

*Inc. v. Hoots*, 403 F.2d 904, 907 (7th Cir. 1968) (trademark rights should be limited to a specific area within a state if sales and customers indicate use in only that specific area). S. C. Johnson's Findings of Fact ("SCJ FOF") ¶¶ 69-132 demonstrate that Nutraceutical failed to show both market penetration in any geographic area to obtain common law rights, and the necessary continuity to maintain those rights to the present day. *See* SCJ's FOF ¶¶ 69-142.

Nutraceutical instead argues that this Court should "infer" nationwide sales that "were large for a small company such as SunFeather." *See* NCOL ¶ 126. Tellingly, no case law is provided regarding such an inference of "nationwide sales" that somehow is affected by the size of the entity asking for the inference. Indeed, the law says exactly the opposite regarding broad "inferences." *See Natural Footwear*, 760 F.2d at 1397-98 ("Th[e] failure to scrutinize the extent of [an infringer]'s sales, advertising, and reputation on either a state-by-state or region-by-region basis is, we belief, inconsistent with the language of the Lanham Act . . . as well as the proposition that a common law mark is to receive no greater protection than its reputation in any specific area warrants."). No cited case by either side recognizes **national** common law rights that supersede a junior user's registration. While cases note that nationwide rights may be possible, the senior user must prove its market penetration in every single jurisdiction in the nation for nationwide rights to accrue. *Natural Footwear*, 760 F.2d at 1397-98. (*See also Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995); *Sweetarts, Inc. v. Sunline, Inc.*, 436 F.2d 705, 708 (8th Cir. 1971); *Burger King of Fla.*, 403 F.2d at 908).

Moreover, the notion that a different standard should apply to "a small company" is a canard that can be rejected out of hand. The law provides an easy way for companies of any size to obtain national rights – they can register with the USPTO. Otherwise, the standard for common law rights is the same for all companies, both large and small: market penetration

3

within a particular geographic area. Further, the market penetration test allows for an analysis of products considered to be part of a "niche" market, so long as the party asserting common law rights presents evidence on the size of the market and the party's share of that market. *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 963 (C.D. Cal. 2012) (failure to present evidence of a senior user's market share of the relevant market weighs against a finding of market penetration). However, Nutraceutical presents neither.

In the absence of the market size and market share, many small companies, like restaurants, have proved rights in their geographic area, and that is the extent of their rights. *See Burger King of Florida. v. Hoots*, 403 F.2d 904, 908 (7th Cir. 1968) (limiting senior user's market of prior continuous use to a twenty-mile radius of Mattoon, Illinois, which entitled the junior user/registrant to nationwide use of the mark, including the remainder of Illinois). *See also Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 928-29 (8th Cir. 1967) (finding that holder of a common law trademark is only entitled to exclusive use of that mark in the market area where the common law trademark was used). This is because "it is a basic principle of trademark law that [an unregistered] trademark will receive protection only for areas in which it has established a reputation." *See also WNS, Inc. v. Deck The Walls, Inc.*, 4 U.S.P.Q.2d 1377 (N.D. Ill. 1987).

A related canard is the comparison by Nutraceutical of SunFeather's sales numbers to the overall size of SunFeather. *See* NCOL ¶ 113. This analysis is simply irrelevant. Even Nutraceutical's own case citation disagrees with Nutraceutical's conclusion—the gross sales and market share must be examined in light of the *market being served* . . . ." *V & V Food Prods., Inc. v. Cacique Cheese Co.,* 683 F. Supp. 662, 668 (N.D. Ill. 1988)*. See also Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 963 (C.D. Cal. 2012) (requiring evidence of market share of the relevant market); *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d

4

467, 473 (3d Cir. 1990) (determining senior user's market share in comparison with total sales of similar products). This requires looking at the size of the relevant market, not the size of the senior user. To apply the law any other way makes no sense. Whether the user is big or small is irrelevant to the market share inquiry, and the quantum of "reputation" that needs to be proved does not fluctuate with the size of the user asserting rights. *See WNS, Inc. v. Deck The Walls, Inc.*, 4 U.S.P.Q.2d 1377 (N.D. Ill. 1987) ("[I]t is a basic principle of trademark law that [an unregistered] trademark will receive protection only for areas in which it has established a reputation.").

Additionally, Nutraceutical misstates the law of natural expansion and the import of catalog distribution. (NCOL ¶¶ 103, 110, 111, and 120-124.) Under its theory, presence in a catalog transforms a handful of sales in a few geographic areas into nationwide trademark rights. This is contrary to law. Instead, for a geographic area to fit within a "zone of natural expansion," a court evaluates "the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and, where applicable (5) possible market penetration by means of products brought in from other areas." *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1282-84 (4th Cir. 1987). The "mere hope of expansion" is not enough. *Blue Ribbon Feed Co. v. Farmers Union Cent. Exchange, Inc.*, 731 F.2d 415, 422 (7th Cir. 1984). The senior user must put forth concrete evidence of the affirmative steps taken to enlarge its trade area. *Id*.

Here, Nutraceutical mistakenly attempts to use SunFeather's inclusion in catalogs as proof of natural expansion throughout the United States. Like sales made on the Internet, the sales made through a catalog must be considered in the geographic area where the consumer is located. *See Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 962 (C.D. Cal. 2012)

5

("[A] sale to a customer through the internet will be considered a sale in the geographical area in which the customer is located."). There is no evidence of the specific geographic markets to which SunFeather's product was sold or advertised through the Smith & Hawken catalog. (SCJ FOF ¶¶ 99-111.) Nor do we know exactly where SunFeather's own catalogs were sent. (Nutraceutical's FOF ¶¶ 60-61; SCJ FOF ¶¶ 171-72.) The same holds true for the Frontier co-op catalog. (SCJ FOF ¶¶ 112-119.) Thus, the use of the catalogs to "expand" the unproven geographic scope of Nutraceutical's purported common law rights fails. One cannot prove a "zone of natural expansion" without first proving the zone of actual common law rights – which Nutraceutical utterly failed to do.

Nutraceutical is also trying a sleight of hand regarding the definition of the relevant market. At this point in the litigation, it is beyond dispute that the relevant market is consumers interested in buying insect repellent. This point was made by the USPTO in its rejections of SunFeather's applications in light of the Chervitz and Kaz registrations. (Tr. Exs. 39-41.) It was reiterated by Nutraceutical in its counterclaim that S. C. Johnson's use of BUG OFF on insect repellents was infringing Nutraceutical's alleged common law rights. For Nutraceutical to now claim that the relevant market is "a small niche market for all natural bug repellents", NCOL ¶ 126, contradicts the evidence and the law of the case. Nutraceutical's motivations are transparent. The undisputed evidence is that the annual market for insect repellent was over $230 million in 1998, and over $336 million in 2013. (SCJ FOF ¶ 71.) At its highest estimation, SunFeather's sales would be measured in hundredths of a percent of that market.

Further, even to the extent that the Court accepts Nutraceutical's assertion of the "small niche market for all natural bug repellents," Nutraceutical must present actual evidence of the

6

size of that market and its share within that market. *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 963 (C.D. Cal. 2012). Nutraceutical has attempted to do neither.

Finally, Nutraceutical's findings of fact and conclusions of law entirely omit the continuity prong of the defense of prior common law rights. As made clear in *Brandt Indus. v. Pitonyak Mach. Corp.,* No. 1:10-cv-0857-TWP-DML, 2012 U.S. Dist. LEXIS 122901, at *14-18 (S.D. Ind. Aug. 29, 2012), even if a senior user shows significant market penetration in an area before the junior user obtained its rights, a break in the market penetration AT ANY POINT destroys common law rights and the registered mark then "takes over" that geographic area. *See Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 712 (9th Cir. 1974) (Non-use for a one-year period defeats continuous use); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F. Supp. 96, 115 (S.D.N.Y. 1989) ("For purposes of the prior use defense, 'continuing' is not the same as lack of abandonment. Instead, any significant interruption of use defeats the prior use defense. The continuity requirement is consistent with the strong policy underlying the Lanham Act which rewards those who first seek federal registration.").

The undisputed evidence here is that Smith & Hawken stopped selling BUG OFF in 2004, so any "inferences" of rights in any geographic region from those purported sales simply evaporate without proof of continuous use. Moreover, the sales Ms. Maine conceded were accurate and complete, those from 2008-2011, show fewer than 3,600 units sold in 2008, and no market penetration in any geographic area. (SCJ FOF ¶¶ 85-88.) Even if every other proposed finding of fact and conclusion of law regarding early sales by Nutraceutical were accepted (which of course they should not be), the 2008-2011 numbers end the inquiry. Further, Nutraceutical has not presented any evidence of sales from 2013 through the present. It simply

7

failed to provide evidence that any market penetration was continuous from first use through the present day.

As discussed in SCJ FOF ¶¶ 90-98 and SCJ COL ¶¶ 80-82, Nutraceutical may not rely on inferences that its sales were larger than its documentation shows. Any losses of documents were the fault of SunFeather and Nutraceutical alone, which have been on notice since at least 2002 of the importance of proving sales. (Trial Exs. 39-41.) A small company is just as capable of retaining records as a large company, but SunFeather purged its records with Nutraceutical's knowledge. Moreover, the documentation of sales from 2008-2011, which Ms. Maine conceded was complete, reveals that the volume and geographic scope of SunFeather's sales are insufficient to support common law rights anywhere. (SCJ FOF ¶¶ 85-88..)

Nutraceutical's flawed contention that it established prior common law rights in BUG OFF throughout the entire United States flies in the face of public policy. If a party could simply point to presence in a catalog, or at a trade show – without evidence of the amount or location of actual sales – as sufficient to prove "nationwide" trademark rights, the trademark registration system would cease to have any value. Any product placement in a national catalog or on the Internet would suffice to trump a federal registration regardless of actual sales activity. Moreover, under Nutraceutical's logic, a small company would not have to bother even saving sales information. Trademark owners which have invested millions in a mark (as S. C. Johnson has in purchasing and using the BUG OFF registrations) would be at the mercy of witness memories a decade or more later. That undermines the purpose of the system of trademark registration, *i.e.,* to provide certainty and encourage investment in brands for the furtherance of the national economy.

# S. C. JOHNSON HAS NOT ABANDONED THE CHERVITZ OR KAZ REGISTRATIONS
### [Response to NCOL ¶¶ 132-147]

Both the evidence and the relevant law conclusively establish that S. C. Johnson has not abandoned the Chervitz and Kaz registrations. S. C. Johnson's continued use of the BUG OFF mark on spray-on repellents maintains both registrations because spray repellents and repellant wrist bands are related goods. Moreover, even assuming Nutraceutical could establish non-use of the registered marks, S. C. Johnson does not have an intent not to resume use of the BUG OFF mark on wrist bands. It follows that Nutraceutical's abandonment argument must fail.

**A.  S. C. Johnson's Continued Use Of BUG OFF Maintains The Chervitz And Kaz Registrations.**

*1.  Wrist band repellents and spray-on repellents are related goods.*

It is undisputed that BUG OFF wristbands made and distributed by Kaz remained in the stream of commerce at least through 2010. (Tr. Exs. 29, 32.) In March, 2010, S. C. Johnson began using BUG OFF trademark on its 11 oz. and 9 oz. cans of Deep Woods OFF! repellant. (SCJ FOF ¶ 67.) Since March, 2010, the 11 oz. product has been sold in every Wal-Mart in the United States. (Tr. Ex. 30; Tr. Tran. 2, p. 161:20-25.) The 9 oz. can is sold through other major retail outlets such as Meijer and Rite-Aid (to name just two). (Tr. Ex. 30.) Gross sales of the two products total over $11 million. (Tr. Ex. 31; Tr. Tran. 1, pp. 140:24-141:1.)

As this Court, the United States Patent and Trademark Office, and the Trademark Trial and Appeal Board have already found, insect repelling wrist bands are closely related to spray-on insect repellants. (ECF No. 65; Tr. Exs. 39, pp. 3-8; 40, pp. 3-7; 41, pp. 6-10, 234-49.) "There is no abandonment or break in the chain of priority of use merely because use of the mark is shifted from one line of goods or services to another similar line." *McCarthy on Trademarks*, §17:23 at p. 17-59 (2012); *See also, Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 27 (1st Cir. 1989) ("[A]

9

mark provides protection not only for the product or service to which it is originally applied but also to related items or services.") Notably, "continuance or commencement of sales of closely related goods under the mark is not abandonment of the mark and the earlier use may be relied upon for priority purposes." McCarthy, *supra.* "'Where a registrant discontinues to use a trademark on a certain product, he will not be held to have abandoned the mark if he continues to use the mark on related items . . . .'" *Id.* at 17-58 (quoting *Robinson Co. v. Plastics Research & Development Corp.*, 264 F.Supp. 852 (W.D. Ark. 1967)). As the Seventh Circuit has similarly noted, "[w]e do not see the wide gulf between a trademark for beverage syrups and a trademark for beverages." *Sands, Taylor & Woods Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992). Nutraceutical's proposed conclusions of law to the contrary are incorrect. *See* NCOL ¶¶ 132-140.

The evidence at trial confirms that the goods are related. Consumers find multiple forms of repellants, including both high-DEET and all natural products, in the same store displays. (Tr. Ex. 20; Tr. Tran. 1, pp. 70:15-71:22; 143:23-145:11.) DEET-free wristbands are offered for sale alongside traditional spray-on repellents that contain DEET. (*Id.*) Contrary to Nutraceutical's suggestion, NCOL ¶¶ 137, 138, the issue is not whether actual confusion exists regarding the source of the goods. Actual consumer confusion simply is not relevant here. Rather, the issue is whether a consumer would reasonably expect two products (here, insect repelling wrist bands and insect repelling sprays) to be sold by one company. (Tr. Exs. 39, pp. 10-17; 40, pp. 9-16; 41, pp. 12-19.)

Nutraceutical contends that the products are not related because the wrist bands are DEET-free while the Deep Woods OFF! product bearing the BUG OFF trademark contains DEET. (NCOL ¶ 139) This misguided contention fails for several reasons. First, neither the

10

Chervitz nor the Kaz Registration is limited to repellant wrist bands that do not contain DEET or are made of only natural ingredients. (Tr. Exs. 1, 2.) Thus the rights represented by those registrations cannot be limited in the manner Nutraceutical suggests. Second, this contention flies in the face of Nutraceutical's counterclaim against S. C. Johnson for trademark infringement based on S. C. Johnson's use of BUG OFF on its Deep Woods OFF! product. Through its counterclaim, Nutraceutical contends that the use of BUG OFF by S. C. Johnson on its Deep Woods OFF! product creates a likelihood of confusion with Nutraceutical's BUG OFF mark as used on DEET-free repellants. Nutraceutical cannot both allege (and even concede) a likelihood of confusion for infringement purposes, which presumes that the marks are used on the same or similar goods and are sold through the same or similar channels of trade to the same or similar target customers, and simultaneously contend that the products' markets are so distinct that the products are not related for abandonment purposes. Third, the evidence described above fully supports the Court's previous finding that the goods are related. (ECF No. 65, p. 11.)

### 2. S. C. Johnson's Use of BUG OFF is Bona Fide Use in Commerce.

Nutraceutical's attempt to discredit S. C. Johnson's trademark use as less than *bona fide,* NCOL ¶¶ 141-147, simply ignores the applicable law and the undisputed evidence. Use in commerce cannot reasonably be deemed use "merely to reserve a right in a mark" when a mark is placed on products sold throughout the entire United States in mass merchandisers including Wal-Mart. Indeed, the Lanham Act acknowledges as much by explaining that

> a mark shall be deemed to be in use in commerce . . . on goods when . . . it is placed ***in any manner on the goods or their containers*** or the displays associated therewith or on the tags or labels affixed thereto . . . and . . . the goods are sold or transported in commerce . . . .

15 U.S.C. §1127.

11

The legislative history of the amendment that added the prohibition against reserving rights in a mark makes clear that the revision was "designed to eliminate the commercially transparent practice of token use." 7 U.S.C.C.A.N. at 5607. S. C. Johnson's substantial use of BUG OFF takes it light years away from "token use," a recognized "legal fiction" whereby a company could truthfully assert actual use by shipping a single trademarked product to a subsidiary or other related entity. *Id.* at 5582, 5607; *Specht v. Google, Inc.*, 660 F.Supp. 2d 858, 863-64 (N.D.Ill. 2009). Here, by contrast, S. C. Johnson sold millions of cans of Deep Woods OFF!, through Wal-Mart and other national retailers, in the ordinary course of business. That is neither token use nor use made merely to reserve rights in a mark.[1]

The revised definition of use in commerce was intended "to mean commercial use which is typical in a particular industry." 7 U.S.C.C.A.N. at 5607. It cannot reasonably be disputed that S. C. Johnson's use of its BUG OFF mark is typical in its industry. Other companies sell products with trademarks only on the back. SunFeather included its house brand on the back of BUG OFF repellant sold through Smith & Hawken. (SCJ FOF ¶ 110.) Surely that was not token use, as customers saw the name and contacted SunFeather as a result. (SCJ FOF ¶ 111.) "Additionally, the definition [of use in commerce] should be interpreted with flexibility so as to encompass various genuine, but less traditional, trademark uses, such as those made . . . to preserve ownership rights in a mark if, absent an intent to abandon, use of a mark is interrupted due to special circumstances." 7 U.S.C.C.A.N. at 5607.

Nutraceutical's reliance on *Imperial Tobacco Limited v. Philip Morris, Inc.*, 889 F.2d 1575, 1581 (Fed. Cir. 1990); *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96 (5th Cir.

---

[1] Indeed, Nutraceutical argues out of both sides of its mouth by contending both that S. C. Johnson has made but a token use of BUG OFF and, only a few pages later, that S. C. Johnson has made over 7 million dollars in profits by virtue of this same use.

12

1983), and *Procter & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185 (S.D.N.Y. 1979), NCOL ¶ 142, is entirely misplaced and cannot support its position. For example, in *Imperial Tobacco*, the registrant had made **no use** of the registered mark in connection with **any** product in the United States at the time the cancellation petition was filed. 899 F.2d at 1578. S. C. Johnson's commercialization of the BUG OFF mark is not the warehousing warned against in *Imperial Tobacco*.

Similarly, this case does not present the type of "trademark maintenance program" at issue in *Humble*. There, after the plaintiff had changed its name from Humble to Exxon and spent over $12 million to advertise the name change, it attempted to maintain the Humble trademark through extremely limited sales. 695 F.2d 96, 98. Specifically, it sold products bearing both the Exxon and Humble trademarks – but less than $200.00 worth of products over a three year period. *Id.* It further sold bulk products with the name Humble only on the invoices. *Id.* Again, however, the sales were limited: less than $400,000 over a seven year period and only to selected customers. *Id.* For both categories, the targeted customers were informed that they were receiving the Exxon products they had requested. *Id.* at 100. S. C. Johnson's use of BUG OFF in the ordinary course of business is targeted at all customers through mass merchandisers. (SCJ FOF ¶¶ 186-189.) Millions of dollars' worth of products bearing the BUG OFF mark have been sold since March, 2010. (SCJ FOF ¶¶ 67-68.) That does not represent a mere "trademark maintenance program."

Finally, the facts of *Proctor & Gamble* further support the conclusion that S. C. Johnson's use is *bona fide*. There, the plaintiff attempted to preserve rights in registered marks by making nominal shipments, once a year, of cases of products branded with the marks. 485 F.Supp. 1185, 1206. The company had no knowledge regarding or interest in whether the goods

13

were ultimately sold to actual end users.  *Id.* at 1205.  A set price for all such products of $2 per case was charged.  *Id*.  The sales of the product at issue amounted to merely $874.70 over twelve years.  *Id.* at 1206.  The court held that while the shipments may not have been sporadic or casual, they were "certainly nominal and does not represent a bond fide attempt to establish a trade in any meaningful way."  *Id*.  Again, this is in sharp contrast to the facts of this case, in which S. C. Johnson does, indeed, sell BUG OFF branded products in the ordinary course of business with the expectation that mass merchants will sell them to end user customers.  (SCJ FOF ¶¶ 186-189.)

Ms. Maine and Ms. Brolly agree that placement of a trademark on the back of a container of insect repellant is valuable trademark use.  (SCJ FOF ¶ 192.)  They further agree that consumers notice trademarks used on the back label of repellants.  (SCJ FOF ¶ 189.)  By Ms. Maine's own admission regarding consumer behavior, millions and millions of customers see and remember the BUG OFF mark on the back of S. C. Johnson's products.  (SCJ FOF ¶ 192.)  Moreover, the USPTO accepts specimens of use that consist solely of a back label bearing a mark to support applications to register that mark.  (Tr. Tran. 1, pp. 40:17-41:5.)

Nutraceutical's misplaced reliance on some purported negative connotation related to the term "tactic" in an email, NCOL ¶ 144, simply has no merit.  The fact is that one way to implement a strategy of maintaining trademark registrations via trademark use is to use the mark on the back of a product.  No evidence to the contrary exists.  We are aware of no case in which a court has deemed trademark use on millions of goods sold throughout the United States to be use "made merely to reserve a right in a mark."

S. C. Johnson's *bona fide* use in commerce on goods related to insect repelling wrist bands maintains the validity of both the Chervitz and Kaz Registrations through continuing use.

14

B.   No Evidence Exists of an Intent Not to Resume Use.

Even assuming Nutraceutical could prove non-use, it cannot prove the other element of abandonment, *i.e.*, intent not to resume use. S. C. Johnson tested the wrist band concept with consumers. (Tr. Tran. 1, p. 65:6-14; Tr. Ex. 22.) While consumers love the wrist band idea, S. C. Johnson has not yet been able to deliver the desired level of repellency in the wrist band form. *Id.* S. C. Johnson has not rejected the wrist band product. *Id.* It may not have current plans to launch such a product, but that is not the test. The abandonment defense requires the alleged infringer to prove that the trademark owner has an intent not to resume use of the mark. See 15 U.S.C. § 1127. Nutraceutical failed to carry that burden of proof.

## NUTRACEUTICAL'S FLAWED ATTEMPT TO INVALIDATE THE CHERVITZ REGISTRATION FOR INSUFFICIENT USE FAILS
[Response to NCOL ¶¶ 128-131]

Nutraceutical's contention that the Chervitz Registration "does not afford SCJ rights in the BUG OFF mark" lacks basis in both law and fact. The Chervitz Registration is presumed valid. 15 U.S.C. § 1057(a); *CAE, Inc. v. Clear Air Eng'g, Inc.*, 267 F.3d 660 (7th Cir. 2001). Nutraceutical, through its predecessor SunFeather, had actual knowledge of the Chervitz Registration in 2003 and did not take any action against that registration or against Chervitz, who has since passed away. (SCJ FOF ¶ 147.) Any attempt to do so now is barred by laches.

Moreover, a party may only petition to cancel a federal registration, based on allegedly insufficient use in commerce, within five years of registration. 15 U.S.C. § 1064. "[Section 1064] is, in effect, a five year time limit barring certain attacks on a registration. It should be noted that this section is not dependent on the filing of a declaration under § [1065] which provides incontestable rights of use to a limited extent . . . ." *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 761 n.6 (CCPA 1982). The Chervitz Registration issued on

15

July 25, 2000. (Tr. Ex. 1.) Thus the window for anyone, including Nutraceutical, to seek cancellation of the Chervitz Registration based on insufficient use in commerce closed in July, 2005.

Even if such a challenge were allowed, however, the undisputed evidence establishes that ample evidence of use in commerce existed to support the application for and the issuance of the Chervitz Registration.

To establish "use in commerce," a registrant or applicant need only demonstrate that its mark "is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . and . . . the goods are sold ***or transported*** in commerce . . ." 15 U.S.C. § 1127. This is a lower burden of proof than that required to prove prior common law rights in a trademark. *Zazu Designs*, 979 F.2d at 505.

The evidence provided by Mr. Chervitz is more substantial that Nutraceutical's summary, NCOL ¶¶129-130, and establishes that he used the BUG OFF mark in 1998 on goods that were sold or transported in commerce. For example, he exhibited his BUG OFF wristbands and distributed brochures featuring that product at the 1998 National Ad Specialty Convention in Dallas, Texas, travelling there from St. Louis via plane. (Tr. Ex. 12, p. 2.) Mr. Chervitz also sent product samples to a customer named Smart Productions and a different customer in Arizona. (*Id.*, p. 4.) His BUG OFF product was featured on a radio broadcast, and that segment led directly to actual product sales. (*Id.*, pp. 3-4.) Mr. Chervitz sent price lists including the BUG OFF product to sales representatives, customers, and potential customers. (Tr. Ex. 10.) From 1997-1998, Chervitz' manufacturer supplied to Chervitz an inventory of wristbands that Chervitz sold over a four year period from 1998-2002. (Tr. Ex. 12, pp. 4-5.) Chervitz began working with a different manufacturer in 2002. (*Id.*, p. 5.)

16

Whether that evidence would establish common law rights in any specific geographic market is not at issue.  Rather, the issue is whether Nutraceutical overcame the presumption of validity and proved that the Chervitz Registration was not supported by use in commerce. Nutraceutical failed to carry its burden of proof.

Nutraceutical's reliance on *Central Mfg. v. Brett*, 492 F.3d 876 (7th Cir. 2007), NCOL ¶131, is misplaced.  The *Central Mfg.* court determined that the trademark owner in that case "has repeatedly sought ways to get around trademark law's prohibition on the stockpiling of unused marks, and this case is no different." *Id.* at 883.  The court affirmed the district court's credibility determination that the registrant in that case hadn't made the use he claimed to have made.  *Id.* at 882-83.  By contrast, no such conclusion is possible based on the record in this case. No basis exists to question the testimony and evidence presented by Mr. Chervitz.  That evidence provides more than enough proof of the use in commerce needed to support the issuance of a federal trademark registration – and more proof than offered in *Central Mfg*.  *See, e.g., Zazu, Designs v. L'Oreal, S.A.*, 979 F.2d 499, 505 (7th Cir. 1992) ("a single sale, combined with proof of intent to go on selling, permit the vendor to register the mark.")

## DEFENDANTS' REQUEST FOR AN AWARD OF PROFITS LACKS MERIT
### [Response to NCOL ¶¶ 148-152]

The foregoing Conclusions demonstrate that S. C. Johnson is the exclusive nationwide owner of the BUG OFF trademark, and should prevail in this case. S. C. Johnson recognizes, however, that profits are only awarded when required by equity to redress bad faith infringement and deter wrongful conduct.  While S. C. Johnson believes its merits on ownership are unassailable, it does not seek profits because it concluded that Nutraceutical did not act in bad faith or intentionally.  Nutraceutical's continued but nearly frivolous request for profits in this

17

case causes S. C. Johnson to reconsider its conclusion regarding whether Nutraceutical has acted in bad faith.

Contrary to the implication in NCOL ¶ 149, profits are not simply awarded upon a finding of infringement. An award of profits must be based on a finding that the award is required by equity. Courts in the Seventh Circuit are reluctant to award profits absent evidence of actual injury and without evidence of deliberate infringement. *See Gorenstein Enters, v. Quality Care-USA*, 874 F.2d 431, 436 (7th Cir. 1989) ("The[] provisions [of 15 U.S.C. § 1117(a)] are properly invoked when ...the infringement is deliberate."); *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092, 2000 U.S. Dist. LEXIS 5238, at *42-44 (N.D. Ill. Mar. 23, 2000) (disgorgement of profits appropriate based on a finding of bad faith as "an imposition of an award for purposes of deterrence . . . ."). Disgorgement of profits would be inappropriate given the circumstances of this case. S. C. Johnson lawfully acquired the BUG OFF registrations which have been used in commerce consistently — by S. C. Johnson's predecessors in interest, then by S. C. Johnson's licensee, and now by S. C. Johnson itself – since the filing dates of the applications.

For all the reasons discussed in S.C. Johnson's Findings of Fact and its Conclusions of Law, Nutraceutical's blithe assertion of "willfulness" in NCOL ¶ 150 is ludicrous. S. C. Johnson not only knew it was the owner of the registered trademark, it knew from the public record that Sunfeather's attempt to registering its mark was rejected (in favor of the marks S. C. Johnson now owns) and has never seen – even after a two-day trial – any geographic area where Sunfeather established common law rights.

Additionally, Defendants had actual knowledge of not only the Chervitz Registration but also the Kaz Application (which ultimately issued as the Kaz Registration), now owned by S. C.

18

Johnson and asserted in this case, beginning in 2003. (SCJ FOF ¶ 147.) Not once did SunFeather assert its purported rights against either Chervitz or Kaz despite Kaz' nationwide sales of natural insect repellant wristbands beginning in 1999. (SCJ FOF ¶ 149.) Equity rewards the vigilant – not those who fail to enforce or even assert their trademark rights. *Lantz v. Comm'r*, 607 F.3d 479, 483 (7th Cir. 2010); *Argus Research Group, Inc. v. Argus Sec., Inc.*, 204 F. Supp. 2d 533 (E.D.N.Y. 2002).

Nutraceutical's assertion in NCOL¶ 151 utterly fails to demonstrate that any profits accrued to S. C. Johnson due to use of the BUG OFF mark. It is undisputed that the cans were sold under the primary OFF! trademark and the DEEP WOODS OFF! submark, both of which were the drivers of the sale. (Tr. Tran. 1, p. 142:3-5.) While BUG OFF was certainly used as a trademark on the bottle[2], no evidence exists that use of the BUG OFF mark contributes to the profitability of the two products on which S. C. Johnson uses the mark. (*Id.*) No equitable principles support an award of profits to Defendants in this case, even assuming they somehow prevail on their counterclaims. No evidence exists that S. C. Johnson has been unjustly enriched through its use of BUG OFF, and S. C. Johnson did not engage in any conduct that should be deterred.

An award of profits would not only confer an undeserved windfall on Defendants, but an unwarranted penalty on S. C. Johnson, which followed the rules, and acquired registrations for its marks before using them. The equitable considerations weigh strongly against awarding profits in this case. Defendants are not entitled to an award of profits.

---

[2] A fact Nutraceutical now admits, despite its assertions of abandonment and lack of *bona fide* use in its previous conclusions

19

Dated:  March _____, 2014.

                               **MICHAEL BEST & FRIEDRICH LLP**

                               */sKatherine W. Schill*
                               Jonathan H. Margolies
                               Katherine W. Schill
                               Patricia L. Jenness
                               **MICHAEL BEST & FRIEDRICH LLP**
                               100 East Wisconsin Avenue, Suite 3300
                               Milwaukee, Wisconsin  53202-4108
                               (414) 271-6560
                               jhmargolies@michaelbest.com
                               kwschill@michaelbest.com
                               pljenness@michaelbest.com

                               OF COUNSEL:
                               Dianne M. Smith-Misemer, Esq.
                               Cheryl L. Burbach, Esq.
                               **HOVEY WILLIAMS LLP**
                               10801 Mastin Boulevard, Suite 1000
                               Overland Park, Kansas 66210
                               (913) 647 – 9050
                               dsmisemer@hoveywilliams.com
                               cburbach@hoveywilliams.com
                               ATTORNEYS FOR PLAINTIFF
                               S. C. JOHNSON & SON, INC.

083178-9006\14664346.1

20

Case 2:11-cv-00861-RTR   Filed 03/11/14   Page 20 of 20   Document 86