# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**S.C. JOHNSON & SON, INC.,**

   Plaintiff-Counterclaim Defendant,

 **v.**            **Case No. 11-C-861**

**NUTRACEUTICAL CORPORATION and
NUTRAMARKS, INC.,**

   Defendants-Counterclaimants.

---

# DECISION AND ORDER

---

The following Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure in this trademark infringement action relating to the parties' competing claims to the use of the trademark "BUG OFF" in conjunction with insect repellant products. The Court conducted a bench trial on the claims of the Plaintiff, S.C. Johnson & Son, Inc. ("SCJ"), and the counterclaims of the Defendants, Nutraceutical Corporation ("Nutraceutical") and NutraMarks, Inc. ("NutraMarks") (collectively the "Defendants").

SCJ has pending claims for trademark counterfeiting (count I) and trademark infringement (count II) in violation of the Lanham Act, 15 U.S.C. § 1114; false designation of origin (count III) and unfair competition (count IV) in violation of 15

U.S.C. § 1125; and unfair competition under Wisconsin common law (count V).[1]  (ECF No. 1.)  The Defendants have pending counterclaims against SCJ for false designation of origin under § 43(a) of the Lanham Act (first counterclaim); declaratory judgment of trademark invalidity pursuant to 15 U.S.C. § 1052(d) and 28 U.S.C. §§ 2201 and 2202 (second counterclaim); and for trademark cancellation pursuant to 15 U.S.C. § 1119 (third counterclaim).  (ECF No. 5.)

The parties filed post-trial proposed findings of fact and conclusions of law, and responses (ECF Nos. 77-79, 84-86.)  In responding to the Defendants' proposed findings, SCJ raised several evidentiary issues.  Those objections have been considered in the Court's analysis of the testimony and evidence presented at trial.

This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121; 28 U.S.C. § 1331; and 28 U.S.C. § 1338(a), and over the Wisconsin unfair competition cause of action under 28 U.S.C. 1338(b) and 28 U.S.C. § 1367.  Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c).

Before launching into the factual findings, the Court provides a bird's eye view of the case.  SCJ's trademark claims arise from three federal registrations for the mark BUG OFF the earliest of which, referred to as the Chervitz registration, has a June 22, 1998, priority date.  The Defendants' counterclaims are based on their claimed ownership of nationwide common law rights to BUG OFF predating SCJ's registered trademark rights.

---

[1] The same standards that govern SCJ's Lanham Act claims govern its state unfair competition claims.  *Mid-West Mgmt., Inc. v. Capstar Radio Operating Co.,* 04-C-720-C, 2004 WL 2535404, at *3 (W.D. Wis. Oct. 21, 2004).

The parties agree that the BUG OFF marks are confusingly similar. The issues before the Court are whether the Defendants have established nationwide common law rights in BUG OFF, whether the Defendants abandoned any common law trademark, whether SCJ's earliest trademark that began in 1998 is invalid, and whether SCJ has abandoned its BUG OFF trademarks.

## Findings of Fact

Although many consumers are painfully aware of the importance of insect repellants, they may not be aware of the market size. In 1998-99, the market for insect repellents in the United States was approximately $230 million. The 2013 market was approximately $336 million. While there are various types of insect repellants, many types are sold in the same sections of stores, and even in the same product display, as shown by a Target store display with clip-on products, natural repellants, and traditional spray-on repellants in one display. (Trial Exs. 20, 1050.)

SCJ is a corporation organized under Wisconsin law with its principal place of business located in Racine, Wisconsin. SCJ makes, distributes, and sells dozens of insect repellant products, including various formulations of aerosol sprays and spritzers (such as Off!, Naturals, Deep Woods Off, and Deep Woods Dry), as well as candles, clip-ons, and other products all falling under the primary Off! brand. Several of these products are also sold under the sub-brand name "Deep Woods." Promoting the Off! brand is SCJ's first priority, followed by promotion of the Deep Woods sub-brand. SCJ's OFF! line has about 51% of the market today, and had 55% of the market in the late 1990's.

Nutraceutical and NutraMarks are Delaware corporations with their principal

place of business in Park City, Utah. Nutraceutical manufactures and markets a variety of products primarily geared to consumers interested in natural and organic products. Its approximate annual sales are in excess of $200 million. NutraMarks holds the rights to the intellectual property of Nutraceutical, which includes ownership of over 290 trademarks. In February 2011, Nutraceutical became the successor-in-interest to Sunfeather Natural Soap Company ("Sunfeather"), a Potsdam, New York company founded by Sandy Maine ("Maine"). Sometime in the early 1980s, Maine began making and bottling an all-natural bug repellant that she named "BUG OFF."

### Chervitz & Kaz Registrations

The earliest of the three BUG OFF trademarks owned by SCJ was originally the subject of an application for U.S. Registration No. 2,369,898 filed on June 22, 1998, by Melvin Chervitz ("Chervitz") (the "Chervitz registration") for the mark BUG OFF used with "wristbands for repelling insects." The registration provided January 26, 1998, as the date of first use in commerce and a priority date of June 22, 1998, based on its PTO (United States Patent and Trademark Office) filing date. The Chervitz registration issued on July 25, 2000. To support the claim that BUG OFF was used in commerce as of June 22, 1998, Chervitz relied on a price list from Seven C's International Liquid Crystal Products,[2] which included a listing for a "BUG OFF ™ Bracelet." The price list does not include information indicating any actual sales, purchasers, or locations where sales took

---

[2] Neither the parties nor the Court's review of the record disclose the nature of the relationship between Chervitz and Seven C's International Liquid Crystal Products.

place to support his use-based trademark registration.

Chervitz later filed a supplemental declaration dated February 5, 2003, with exhibits providing additional information regarding his sales activity. (Trial Ex. 11.) Chervitz traveled from Missouri to Texas on January 28, 1998, taking samples of the BUG OFF wristbands with him to make them available for purchase. On May 26, 1998, Chervitz's BUG OFF wristband was highlighted on a St. Louis radio station. Chevitz made a May 28, 1998, sale of six units of the BUG OFF product to Sandy Parres, who told him she heard about the product on the radio program. Chervitz also reported a May 30, 1998, sales call on Spicer's, a St. Louis novelty and gift store, and subsequent sales of a number of BUG OFF products to Spicer's. Chervitz also sent samples of BUG OFF product in April and June 1998 to an out-of-state company. The supplemental declaration originally included exhibits, which SCJ no longer has. The exhibits were records of sales but SCJ does not recall exactly what they consisted of.

SCJ's second of three trademarks to BUG OFF originated with the June 23, 1998, filing of an intent-to-use ("ITU") application to register the mark BUG OFF and an accompanying design by DeJay Corporation ("DeJay"), which was acquired by Kaz, Inc. ("Kaz") in August 1998. The PTO examiner cited the Chervitz registration as a basis to refuse to register the DeJay/Kaz ITU application (the "Kaz application"). In January 2001, Kaz responded with a petition to cancel the Chervitz registration, claiming that

Chervitz had not made actual use in commerce of the mark as of the filing date.[3]

Chervitz was deposed on October 23, 2003, as part of the Trademark Trial and Appeal Board ("TTAB") cancellation proceeding[4] and testified he had sold approximately one gross of the product to Spicer's of St. Louis in either May, June, or July 1998. However, he had "no documentation that reflect[ed] that sale," the variety store did not appear on Chervitz's customer list for 1998, and he could not recall the unit price. (Trial Ex. 1111-06-1111-07.)

The TTAB did not rule on the merits of Kaz's petition to cancel because the parties settled. In April 2004, Chervitz assigned his rights and registration in the BUG OFF trademark to Kaz. After that, the PTO advanced the Kaz application to registration in 2007 as U.S. Registration No. 3,303,024 (the "'024 registration" or the "Kaz registration").

### SCJ's 2003 BUG OFF Trademark Application

The third of SCJ's three BUG OFF trademarks originated with its filing of a January 29, 2003, ITU trademark application (Ser. No. 78/208245) (the "SCJ application") with the PTO for BUG OFF for "Citronella candles, insect repellants, and insect repelling pads, lamps, and candle lanterns for insect repelling."

On June 23, 2003, SCJ received a letter from Sunfeather's attorney, expressing

---

[3] A petition to cancel is an *inter partes* proceeding resembling a lawsuit that includes written discovery and depositions.

[4] SJC asserts that the testimony was superseded by supplemental declaration. (SCJ Resp. to Defs.' PFOF ¶ 7.) However, the supplemental declaration was given in February 2003, prior to Chervitz's October 2003 deposition.

concern over the application and informing SCJ that Sunfeather had been using BUG OFF on an insect repellant product since at least as early as 1992. (Trial Exs. 35, 1064, 1019). Sunfeather's attorney asked several specific questions regarding SCJ's planned use of BUG OFF to assist Sunfeather in determining whether there would be a likelihood of confusion. (*Id.*)

In response, Sally Davis ("Davis"), SCJ's corporate counsel in charge of pest control, telephoned Sunfeather's attorney and stated that Sunfeather was infringing SCJ's OFF! mark. Davis never provided any information to Sunfeather regarding SCJ's intended use of BUG OFF because the conversation ended relatively quickly once the issue of OFF! was raised. Davis also stated that SCJ had owned an earlier BUG OFF registration from the late 1980s until the early 1990s, which would have prevented the acquisition of common law rights while it was in force. After Davis stated that Sunfeather's use was infringing SCJ's trademark rights, Sunfeather's counsel represented that she would review their respective rights and get back to Davis with a response, but Davis never heard back. Aside from that conversation, SCJ has never asserted that Sunfeather was infringing the OFF! mark, in this litigation or otherwise.

On July 13, 2003, SCJ received a PTO office action refusing its registration based on likelihood of confusion with the Chervitz registration. The Kaz application was also cited by the PTO examiner as a basis to refuse to register the SCJ application. Rather than contesting the PTO examiner's determination, SCJ decided to initiate cancellation proceedings against Kaz seeking cancellation of the Chervitz registration. SCJ's July 22, 2005, petition presented two grounds for cancellation: (1) the likelihood of confusion

with SCJ's long-standing rights in the OFF! mark dating back to 1957; and, (2) upon information and belief Chervitz had not made sufficient use of the BUG OFF mark in commerce to support his application to register the mark. SCJ alleged:

> For more than three years, Kaz pursued cancellation of the [Chervitz] Registration on the very grounds of no use at the time of application filing that [SCJ] now alleges here. Kaz would have to change its prior position 180 degrees to avoid the implications and affect [sic] of the allegations it made . . . namely, that the BUG OFF mark was not in use at the time the application for the Registration was filed and therefore was subject to cancellation.

(Trial Ex. 1058-07 (SCJ's Pet. for Cancellation) ¶¶ 20, 21.)  In October 2005 SCJ also opposed the Kaz application. The TTAB consolidated the two proceedings.

During discovery related to the TTAB proceedings, Kaz provided SCJ with information, including a declaration, documentation, and product samples, that Chervitz had produced to Kaz. SCJ did not have access to this information when it filed its petition to cancel. The information caused SCJ to decide that Chervitz had established use-based activities in interstate commerce that would be sufficient to support an actual use application. Consequently, SCJ and Kaz resolved their dispute by an agreement dated January 18, 2007, that provided, among other things, an assignment to SCJ of the Chervitz registration and, upon issuance, the Kaz registration, as well as the rights associated with those registrations. SCJ paid Kaz $1.1 million for the Chervitz and Kaz registrations and other rights and responsibilities. (Trial Ex. 9.)

As part of the agreement, SCJ licensed the Chervitz Registration back to Kaz royalty-free, allowing Kaz to continue selling BUG OFF wristbands until December 31,

2009. (*Id.*) Kaz could not manufacture or sell any product after December 31, 2009, but it was not required to recall already-shipped inventory. Kaz abided by the license agreement and ceased all sales of the BUG OFF wrist bands by the stated date, but some BUG OFF wristband products may have remained in the stream of commerce through 2010 as third-party retailers continued to sell off their existing inventory. (Trial Ex. 32.)[5]

Beginning in 1999, millions of Kaz BUG OFF wristbands were sold throughout the United States, including at Wal-Mart stores. The packaging labeled the wristbands as citronella and as non-toxic. (*See* Trial Ex. 1065.) In 2007, total sales of Kaz BUG OFF wristbands were $2.3 million. In 2008, total sales exceeded $642,000.

### SCJ's BUG OFF Registrations

Based on evidence of continued use in commerce, the PTO renewed SCJ's BUG OFF registrations in 2009. SCJ is the successor-in-interest to the Chervitz and Kaz registrations in connection with their BUG OFF trademark rights.

In 2008, SCJ conducted a focus group for an insect repellant wristband concept. (*See* Trial Ex. 22.) SCJ tested this "paper concept" with consumers to gauge interest. A working prototype was created for the purpose of testing within SCJ's entomology research center. The prototype was not tested on consumers because that would not have

---

[5] The Defendants challenge the admissibility trial exhibit 32, which was identified as a document generated by SCJ from the ACNielsen database which tracks actual sales by retail outlet for particular product. (Trial Tr. 1, at 58.) The Defendants assert that the Court should give the document limited weight because it does not say that it is from ACNielsen, Davis did not obtain the document herself and does not have first-hand knowledge of how ACNielsen inputs the data. However, the document is supported sufficiently by the direct testimony of Davis, in-house counsel for SCJ, who explained how the data is collected, and how SCJ obtained access to the information. (*See id* at 58, 100-02.)

been allowed by the EPA.

SCJ began using the BUG OFF trademark on insect repellant spray in March 2010, placing it in block print on the back of its 11 oz. aerosol cans of "Off! Deep Woods" spray. SCJ makes twelve to fifteen insect repellant products, each of which contain the same formula, though some have more or less DEET.

 

BUG OFF appears on the back of SCJ two products — the 9- and 11-oz. cans of Off! Deep Woods, as shown in the photos. The BUG OFF mark on the top of the back of the can is featured next to the OFF mark so it is prominent when the can's back is viewed by the consumer. If use of a mark had no branding value, SCJ's marketing department would veto it.

SCJ sells an 8-oz. can of Off! Deep Woods aerosol spray, which looks nearly identical to, and contains the same formula as, the 9- and 11-oz. cans. However, in place of BUG OFF it bears the mark TICKS OFF. SCJ uses the marks BUG OFF and TICKS OFF on the back of the can as an additional way for consumers to recognize its products and to keep its future options open from a branding perspective. Research establishes that

consumers of these insect repellants look at and read the back of the can before making a purchase.

SCJ often uses marks on the backs of products. Based on specimens of use, SCJ has obtained trademark registrations for marks used only on the backs of products. As an example, SCJ uses the registered mark, "We work hard so you won't have to" solely on the back of Scrubbing Bubbles products. (Trial Ex. 46.)

An August 4, 2010, email from an SCJ in-house paralegal advised that SCJ should "keep using these [wrist bands] in order to keep the registration [for wrist bands for repelling insects] active. If we are not using products under the BUG-OFF name, a third party could petition to cancel our registration." (Tr. Ex. 1062.) (ECF No. 45-47.)

Purchasing the Chervitz registration from Kaz made it possible for SCJ to proceed with obtaining an additional registration for BUG OFF for "insect repellants" as reflected in the SCJ application. Because SCJ had still not used BUG OFF on candles, pads, lamps, or lanterns, SCJ divided the application leaving these remaining items the subject of a continuing ITU application. (*See* Trial Ex. 7.) The application remains "intent to use" for citronella candles, insect repelling pads, and lamp and candle lanterns. The PTO allowed the SCJ application for the BUG OFF trademark for insect repellents to advance to registration under Registration No. 3,963,304 (the "SCJ registration"), which issued May 17, 2011.

An August 16, 2011, internal SCJ email from Jason Allen[6] regarding the continuing application BUG-OFF for "citronella candles and insect repelling pads; lamps and candle lanterns for insect repelling" suggests adding the wording to the back panel of either SCJ's Club PowerPad SKU[7] or its Sportsman Power Pad SKU to "protect the Trademark," which was the "same tactic" SCJ had used to protect other trademarks. (Trial Ex. 1063 (August 16, 2011, email).)

There is no evidence of any sales, advertising, or other use of BUG OFF for wristbands after 2010. Aside from the license to Kaz, SCJ never licensed any other entity to sell BUG OFF wristbands. SCJ has never sold a wristband itself. SCJ does not currently have the technology to develop a wristband able to deliver the level of insect repellency that it wants consumers to associate with the BUG OFF and OFF! Brands. However, wristbands come up frequently during SCJ project meetings because SCJ knows that consumers love them.

BUG OFF is not a primary brand for any SCJ bug repellant product, has never appeared on the front of any product, and has never appeared in any advertising for any product. The only market research SCJ has done regarding use of BUG OFF as a brand was a 2008 paper concept board study. SCJ sold 2.1 million units of the 9- and 11-oz. Off! BUG OFF aerosol spray cans from 2010 through the date of the trial, totaling

---

[6] Allen's position at SCJ was not identified at trial.

[7] SKU is an acronym for "store keeping unit." (Trial Tr. 1, 141.)

approximately $11.6 million dollars in gross sales.[8]  For 2010 to 2012, SCJ had expenses of $5,713,477.  SCJ did not provide its claimed costs or net profit for 2013, instead simply providing its gross revenue number as part of $11.6 total above. Therefore, for the entire time period of SCJ's sales from 2010 through 2013, when applied to the $11.6 million dollars in gross sales, SCJ's total revenue was $5,886,523.

 At least one SCJ product bearing the BUG OFF mark is carried in 3,500 Wal-Mart stores.  SCJ has plans to increase the use of BUG OFF because it is a smart and clever play on its main brand OFF!  It is a slow process because of the limited size of the product containers and the EPA requirements regarding extensive label contents on those containers.

### Sunfeather's Use of Bug-Off

In 1979 the Defendants' predecessor-in-interest, Maine, founded a sole proprietorship, Sunfeather, in Potsdam, New York.  Until about 1989 her product line was limited to handmade artisan soaps.

While working as an Adirondack wilderness guide in the 1980s, Maine recognized a need for a DEET-free bug repellant with a more pleasing smell than the pine tar product she had been using.  At an herbal conference she obtained a recipe for an all-natural bug repellant formula which she developed, bottled under the BUG OFF mark in the early 1980s, and gave to her wilderness-guide clients who were overwhelmingly positive about

---

[8]The parties disagree on the amount of SCJ's costs.  (*See* SCJ's Response to Defs. PFOF ¶¶ 45-46.)   However, based on the trial testimony of Anne Brolly, SCJ's Senior Director of Brand Marketing on Raid and OFF! for North America, the costs/expenses were obtained by adding the numbers for delivered profit and marketing spend. (Tr. Tran. 1, 158:23-159:11, Tr. Ex. 31.)

the product. Maine did not do any trademark searches before she selected the name BUG OFF, and she used the name because she thought it was cute, sassy, and eye-catching. Maine was aware of the OFF! brand because her mother used it on her when she was a child.

Because BUG OFF had received such a positive response, Sunfeather began selling it through the Potsdam Consumer Co-Op, again under the mark BUG OFF. In 1992, Sunfeather started marketing and selling BUG OFF at craft fairs in Maryland, Pennsylvania, West Virginia, and Virginia, each of which Sunfeather attended twice a year. These fairs were professionally promoted and would draw as many as 30,000 attendees in the Spring and 60,000 attendees in the Fall. Customers came from all over the region.

In 1993, Sunfeather began marketing BUG OFF at trade shows in addition to craft fairs, starting with the Rochester, New York trade show and then adding George Little Management shows which were held in Arkansas, Atlanta, California, Chicago, Denver, Miami, New York City, Ohio, Philadelphia, Seattle, and Tennessee. Included was the New York International Gift Fair, which fills four floors of the New York Javits Center and is attended by buyers from every state and several countries.

Sunfeather marketed at approximately 24 trade shows in 1992, increasing to 30 to 40 trade shows "[a]t the peak" in 1997. At these shows Sunfeather's multiple soap varieties and other products were marketed. With the exception of two specialty trade shows, BUG OFF was always displayed at the craft fairs and trade shows and Sunfeather took "many, many orders" for the product from people from "every imaginable state."

(Trial Tr. 2, at 11:4–12:4; 14:25–15:1).

Sunfeather lacked its own physical retail location, so the trade shows were its "lifeblood" because that is how it got orders and expanded its market presence more broadly. At the trade shows Sunfeather often gave interviews and provided "media kits" which described all the Sunfeather product lines to the press room. Many of the trade show customers were mom-and-pop stores and gift boutiques which purchased Sunfeather BUG OFF for resale in their brick-and-mortar stores. Over a 20-year period, Maine visited at least 10 or 15 different retailers carrying the BUG OFF product.

By 1992, Sunfeather offered and sold BUG OFF through its own wholesale catalog. Sunfeather distributed 200 to 300 of these catalogs at every trade show and craft fair it attended, and upon request. Also in 1992, Sunfeather began marketing BUG OFF on its website, which was available to consumers nationwide. Sunfeather's report of inventory sales/wholesale for BUG OFF shows sales of 130 units[9] for 1992, 1,079 units for 1993, 5,714 units for 1994, and 1,387 units for 1995. (Trial Ex. 1006.) In 1997 BUG OFF sold a total of 3,518 units. (Trial Ex. 1100-05 BR line.[10])

Sunfeather printed 5,000 copies of its wholesale catalog in 1992, which it distributed until 1993. In 1993, it printed another 15,000 copies, which were distributed from 1993 to 1996 at the rate of about 7,500 catalogs per year. In 1996, Sunfeather

---

[9] See Maine Dep. at 58.

[10] BR was the code used to denote BUG OFF.

printed another 20,000 copies for distribution through 1998.[11]

Beginning in 1994, BUG OFF was carried by Smith & Hawken, a national gardening retailer. Sunfeather's BUG OFF was offered in Smith & Hawken catalogs from 1994 until the company was sold in 2004. (*See* Trial Ex. 1002 (Excerpt of 1994 Catalog).) The 1994 catalog features a photo of BUG OFF with the Sunfeather label. (*Id.*) No 1995 catalog was provided. By 1996, the Smith & Hawken catalogs show the BUG OFF product with Smith & Hawken's name on the front of the bottle. (*See* Trial Exs. 1069, 1070.) In the spring of 1996, BUG OFF was featured both as a "staff favorite" and later in the catalog. The 1997 catalogs also include BUG OFF. (*See* Trial Ex. 1073.)

The catalog was Smith & Hawken's primary marketing vehicle and was distributed to every state in the United States. BUG OFF was included in Smith & Hawken's spring (two distributions, or "drops" per year) and summer catalogs (three "drops" per year), as well as the tool catalog (one "drop" per year).

In 1994 the spring and summer catalogs had an approximate circulation of one million copies (200,000 copies per drop). The tool catalog had an additional circulation of approximately 200,000 annually. Catalog circulation increased roughly 5-10% over the next few years. BUG OFF was sold through the Smith & Hawken catalog continuously from approximately 1994 through 2004.

Sunfeather sold thousands of units of BUG OFF through Smith & Hawken each

---

[11] SCJ challenges paragraph 61 of the Defendants' proposed findings of fact as contradictory and asserts it should be disregarded. However, the Court does not find SCJ's argument persuasive.

year.  The inclusion of BUG OFF in Smith & Hawken's catalogs doubled Sunfeather's sales and increased its marketplace notoriety  At some point the BUG OFF sold through Smith & Hawken bore labels with the Smith & Hawken mark on the front and the Sunfeather trademark on the back.  Maine believed that customers noticed the Sunfeather trademark on the back of these products and that its placement there was valuable.

To earn a place in Smith & Hawken's catalog, products had to meet or exceed its sales goals.  At $8 per bottle, Sunfeather's BUG OFF had to sell in high volume — roughly 700 units per season — to be considered a "best seller" and earn repeated placement in the catalog.  The fact that it was included in the catalog for more than seven years means that it met these sales goals.  Marta Benson ("Benson"), Smith & Hawken's catalog merchandise manager from 1992 to 1996, considered Sunfeather BUG OFF to be iconic to the Smith & Hawken catalog.

From 1994 until 1996, Sunfeather BUG OFF was also carried in Smith & Hawken's four brick-and-mortar stores in California.  After Smith & Hawken was purchased by a publicly traded holding firm in 1996, it began opening more stores, and by the summer of 1997 it had 25 retail stores in Arizona, California, Colorado, Connecticut, Illinois, Indiana, Maryland, New York, Ohio, Oregon, Pennsylvania, Texas, Virginia, and Washington.  By 2000 Smith & Hawken operated 43 stores in twenty states.  Its catalogs were always available in the stores and offered to interested customers.  Sunfeather BUG OFF was also available on the Smith & Hawken website at least as early as 2000.

In late 1996, Sunfeather also started selling BUG OFF through Frontier Natural

Products' Co-op ("Frontier"), a wholesale co-op based in Norway, Iowa that distributes its catalogs and products nationwide to the natural foods market. (*See* Trial Ex. 1082 (Member Patronage List—includes all U.S. states).) During the relevant time period, Frontier published and distributed a wholesale catalog twice a year and a retail catalog annually. Sunfeather's BUG OFF repellant first appeared in the 1997 spring/summer edition of the wholesale catalog (*see* Trial Ex. 1081, at 06) which contained nearly four two-column pages listing Sunfeather's products, including BUG OFF. (*Id.*) There are no photographs of the products.

The wholesale catalog was distributed to approximately 15,000 wholesalers in the spring of 1997, although the figure might vary from 5,000 to 10,000 either way. Frontier's wholesale catalog was distributed to a nationwide customer base and had a general trend of increasing circulation through 2002. Sunfeather's BUG OFF was distributed through Frontier's retail catalog approximately once a year from 1998 through about 2007. Frontier sales records demonstrate actual sales of BUG OFF as early as November 1996 through June 1998, and additional actual sales of BUG OFF through Frontier from 1998 through 2001. (Trial Ex. 1097.)

In the mid-1990s, Smith & Hawken was Sunfeather's biggest BUG OFF customer, followed by Frontier. By 1997 Sunfeather sales were growing at approximately 15% per year, and Maine added 14 employees to handle administration and sales. In 2001, Sunfeather added other BUG OFF products, including a balm, a spritzer, a soy candle, and a soap and shampoo bar.

According to Maine's testimony, during her first year of business — before she

added BUG OFF to the line — Sunfeather's sales were $90, the second year they were $900, the third year $9,000, and the fourth year $90,000. By 1998, Sunfeather's total sales topped $1 million. From 1997 to 1998 BUG OFF was included in approximately 85% of all Sunfeather's customer orders, representing approximately 15% of the company's sales. The record contains no evidence of actual sales of BUG OFF repellant from any trade or craft show that Sunfeather attended. The record also contains no evidence of the number of potential customers that actually visited Sunfeather's booths at trade or craft shows. A document purporting to summarize Sunfeather's sales to Smith & Hawken from 1998-2007 shows no sales through Smith & Hawken in 1998. (Trial Ex. 1004.)[12]

Throughout the 1990s and 2000s, Sunfeather continued to market its BUG OFF product through nationwide trade show appearances, catalogs, and other types of marketing.

In December 2002, Sunfeather filed three separate applications to register the BUG OFF mark. One, for insect repellant oil, recited a date of first use of March 1992, and the other two, for a soy candle, and cosmetics and personal care products, recited a first use date of 2001. The PTO refused to register Sunfeather's mark citing both the Chervitz and Kaz registrations. The PTO found that all three applications would pose a likelihood of confusion with the Chervitz and Kaz registrations. (Trial Exs. 39, at 010-11;

---

[12] There is a reference to Smith & Hawken at the top of page 1004-01. However, its meaning is unclear.

40 at 009-10; 41 at 012-13, 234-49.)  Sunfeather responded with the argument, which was rejected by the TTAB, that its goods were different from those covered by the Chervitz and Kaz registrations.    The TTAB affirmed the PTO's finding of a likelihood of confusion.  (Trial Ex. 41 at 251-65.)

Sunfeather did not assert that it owned trademark rights in BUG OFF predating the Chervitz or the Kaz registration.  In order to make that argument, Maine's attorney told her that Sunfeather would have had to file a petition to cancel with the TTAB, which could cost more than $150,000 — an amount that was "not within [Sunfeather's] grasp." (Trial Tr. 2, at 41:11-19.)[13]  However, neither Maine nor her attorney wrote Chervitz or Kaz to assert that Sunfeather had superior rights or common law rights, although Maine agreed that such letters would not have been expensive.

In February 2011 Sunfeather sold its assets including the BUG OFF trademark rights for $285,000 to the Defendants, who took over the sales and distribution of the Sunfeather BUG OFF branded products.  (Trial Ex. 1021-07.)  Sunfeather continues to manufacture its soap, but various entities within Nutraceutical manufacture the BUG OFF products.  Through at least 2012, Nutraceutical continued to sell and distribute BUG OFF bug repellant soap, herbal oil, spritzer, and balm under the Sunfeather name.  The products are available for purchase online at http://www.sunfeather.com/outdoor.html.    Sales records demonstrate continued sale of Sunfeather BUG OFF from the time of acquisition

---

[13]  A cancellation petition would have been significantly more expensive than simply responding to the PTO's initial refusal by arguing no likelihood of confusion.

through 2012.  (*See* Trial Ex. 1108 (Nutra 00330).)[14]  The sales records indicate that BUG OFF products were sold in 31 states during the first two years following Sunfeather's acquisition by the Defendants.

## Sunfeather's Sales Records

Sunfeather's sales data for 2008 through 2011 was in pretty good order because Nutraceutical required that information to place a monetary value on Sunfeather prior to acquisition.  Company sales had declined due to the recession, and in 2008 sales to all sources were 3,586 units sold to 230 customers.

However, in the early 1990's Sunfeather had used Oak Street software to track its sales records.  In 1997 Oak Street crashed and Sunfeather replaced it with another program called MAS 90.  Maine indicated that after the crash in 1997, she still had records demonstrating use sufficient to support her 2002 trademark applications.  In 1998, Sunfeather's computers crashed again, and it lost much of its accounting records.

After Nutraceutical purchased Sunfeather in February of 2011, and prior to this lawsuit, Maine hired a service to shred many historical paper records, including boxes of invoices containing potentially sensitive credit card information.  Nutraceutical paid for the destruction of documents despite understanding its obligation to preserve such documents to prove common law rights.

In connection with this lawsuit, Sunfeather attempted to find all documents related to actual sales of BUG OFF in the early 1990's.  It attempted to retrieve files from an old

---

[14] Trial Ex. 1041 is a scanned copy of the identical document.

laptop used in the 1990's, which it sent to MAS 90 so it could attempt to retrieve documents from that software. MAS 90 verified that the financial documents were on the laptop, but most were too corrupted by age to be recovered. As a result, Sunfeather was unable to produce complete financial records showing where and to whom sales were made in the 1990's. The records that were obtained and produced were not complete, because even within retrievable records some of the information was corrupted (*See* Trial Ex. 1040).

## ANALYSIS

Because SCJ owns three current federally registered trademarks in BUG OFF and the parties agree that there is a likelihood of confusion, the focus of the litigation has been on the Defendants' affirmative defenses. Federal registration of a mark under the Lanham Act is prima facie evidence that the registrant has exclusive rights to use the registered mark in commerce, subject to any common law legal and equitable defenses which would be otherwise assertible if the mark were unregistered. 15 U.S.C. § 1115(a).

### Common Law Rights to BUG OFF

Even when a plaintiff has a federally registered trademark, a defendant may have rights to use that mark in the areas in which it had trademark rights and in good faith used them continuously prior to the plaintiff's registration application. 15 U.S.C. § 1115(b); *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 104 (7th Cir. 1970) (holding that the defendant's innocent continuous use of the mark prior to plaintiff's registration was a defense to a trademark infringement claim for geographic areas where the defendant, but not the plaintiff, was using the mark prior to plaintiff's federal

registration); *Burger King of Fla., Inc. v. Hoots*, 403 F.2d 904, 907 (7th Cir. 1968) (stating that defendants who adopted a mark without knowledge of the plaintiff's prior use and who had continuously used the mark from a date prior to plaintiffs' federal registration of the mark are entitled to protection in the area of such earlier remote use).

Prior to federal registration, trademark priority is determined by the first use in a market area. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("Under the common law, one must win the race to the marketplace to establish the exclusive right to a market"). A second user who uses the mark in good faith may still use its trademark in areas geographically remote from the market appropriated by the first user. *V & V Food Prods., Inc. v. Cacique Cheese Co., Inc.,* 683 F. Supp. 662, 666 (N.D. Ill. 1988). The second user has the right to use its trademark "except to the extent that such use infringes what valid right [any previous users] have acquired by their continuous use of the same mark prior to plaintiff's federal registration." *Burger King*, 403 F.2d at 907; *see also Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395 (3d Cir. 1985).

The Defendants assert that they are the senior user of the BUG OFF mark and are entitled to a nationwide zone of exclusion over SCJ — the junior user.[15]  SCJ admits that

---

[15] As terms of art used in the field of trademark law, "senior user" denotes "the first seller to adopt and use a mark in the United States," and "junior user" denotes "the second seller to adopt the mark, even though the junior user may be the first in time within a given remote territory."  J. Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair Competition* § 26:1 at 26-4 (4th ed. 2014).

Sunfeather used the BUG OFF mark but asserts that it did not prove market penetration in any geographic market prior to SCJ's BUG OFF trademark dating to June 22, 1998. In its final brief, SCJ's position becomes more nuanced in that it asserts, for the first time, that it had an earlier trademark for BUG OFF (Trial Ex. 4), and therefore Sunfeather could not have accrued any rights until after April 10, 1995, when that earlier trademark was cancelled. (SCJ's Resp. to Defs. Post-Trial Conclusions of Law, 2.) (ECF No. 86.)

SCJ's earliest federal registration for the BUG OFF mark in connection with insect repellant, U.S. Registration No. 1,506,763 (the "'763 registration") was issued on October 4, 1988, based on use in commerce dating back to October 10, 1985, and was in effect until April 10, 1995, when the PTO cancelled the mark for failure to file an acceptable declaration of use under Section 8 of the Lanham Act, 15 U.S.C. § 1058. (*See* Trial Ex. 4.) (*See also,* Court's Jan. 14, 2014, Decision & Order, at 6.) (ECF No. 65.)

However, registration does not give a registrant the benefit of the date of first use alleged in its application. *See Harvey Aluminum (Inc.) v. Am. Screen Prods. Co.*, 305 F.2d 479, 481 (C.C.P.A. 1962). A registration on the Principal Register provides prima facie evidence of the registrant's ownership and exclusive right to use the mark, 15 U.S.C. § 1057(B), as well as proof of the continual use of the mark dating back to the filing date of the application for registration, *see J.C. Hall Co. v. Hallmark Cards, Inc.,* 340 F.2d 960, 962 (C.C.P.A. 1965). Furthermore, a Principal Register registration is constructive notice of a claim of ownership so as to eliminate any defense of good faith adoption. *See* 15 U.S.C. § 1072. The impact of SCJ's BUG OFF trademark between October 1988 and April 10, 1995, on common law rights claimed by the Defendants will

be further discussed.

The parties disagree regarding the proper test for establishing a common law interest in a trademark and whether a party may prove a nationwide common law trademark. SCJ asserts that "[c]ourts use the market penetration test to determine whether a party has established legally significant common law trademark rights." (SCJ's Post-Trial Proposed Conclusions of Law, ¶ 14 (citing *Natural Footwear Ltd., Schaffner & Marx,* 760 F.2d at 1395.) (ECF No. 79.) The Defendants counter that SCJ's argument is contrary to a least a century of legal precedent, citing *Diamond Crystal Salt Co. v. Worcester Salt Co.,* 221 F. 66, 66-67 (2d Cir. 1915), and that SCJ's "professed ignorance 'of any [such] cases,' [is striking] because SCJ itself argued for and prevailed upon [the totality of the circumstances] principle only five years ago," citing *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.,* 606 F. Supp. 2d 571 (M.D.N.C. 2009) ("BuzzOff"). (Defs.' Reply, 3.) (ECF No. 84.)

The Defendants contend that the contradictions between SCJ's positions in this action and in *BuzzOff* raise the specter of judicial estoppel. (*Id.* at 7.) (citing *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F. 3d 785, 795 (7th Cir. 2013) ("Judicial estoppel is a flexible equitable doctrine designed to prevent the perversion of the judicial process. The doctrine protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.")) (Internal citations omitted). The Defendants maintain that SCJ should not be permitted to argue against the same principle it championed and prevailed upon only five years ago, just because it no longer suits SCJ's present day needs. (Defs.' Reply, 7.)

Indeed in litigating *BuzzOff* outside this Circuit, SCJ advocated and prevailed with its contention that "[e]stablishment of common law rights is determined 'on a case by case basis, considering the totality of the circumstances.' *Johnny Blastoff, Inc. v. L.A. Rams Football Co.,* 188 F.3d 427, 433 (7th Cir. 1999) (affirming determination of prior established common law rights as basis for infringement and injunctive relief)." (Ex. A, Defs.' Reply (SCJ's Mem. Support Permanent Nationwide Inj. ) 8.) (ECF No. 84-1.) SCJ now argues for a market penetration test and does not mention *Johnny Blastoff* — a decision which is binding on this Court. At best, SCJ's position regarding the proper test for establishing nationwide common law rights is chameleonic, and its contradictory behavior concerns the Court.

Regardless, the Court will consider the totality of the circumstances to determine whether the Defendants have established protectable rights in a mark. *See Johnny Blastoff, Inc.,* 188 F.3d at 433. A party can acquire protectable trademark rights only through use of the mark in connection with its product. *See id.* However, actual sales are not necessary to establish trademark rights. *See id.* at 434. Rather, the Defendants must show appropriation of the mark and "'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark].'" *See id.* at 433-34 (quoting *New W. Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir. 1979)). Public sales alert others that they should not invest resources to develop a mark similar to one already used in the trade. *Zazu Designs*, 979 F.2d at 503 (citing *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1264-65 (5th Cir. 1975)).

With respect to the bona fide use of a trademark, an entity only acquires rights in a trademark through commercial use of the mark. *Johnny Blastoff, Inc.,* 188 F.3d at 433-34. Under common law, ownership is conferred upon the person who employs the first actual use of a mark in a genuine commercial transaction. Also under common law, the winner of the race to the marketplace establishes exclusive use of the mark. *Zazu Designs,* 979 F.2d at 503. To establish use, the mark must be attached to the product or service sold to the public and must be continuous and bona fide. *See DSMR, LLC v. Goldberg*, No. 02-C-5203, 2004 WL 609281, at *4 (N.D. Ill. Mar. 25, 2004). *See also Specht v. Google Inc.,* 747 F.3d 929, 935 (7th Cir. 2014).

As long as there is genuine use of the mark in commerce, ownership may be established even if the first uses are not extensive and do not result in "deep market penetration or widespread recognition." *See Allard Enters., Inc. v. Advanced Programming Res. Inc.,* 146 F.3d 350, 358 (6th Cir. 1998); *Kathreiner's Malzkaffee Fabriken v. Pastor Kneipp Medicine Co.,* 82 F. 321, 326 (7th Cir. 1897) (for rights in a mark to accrue, "[i]t is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation.").

The determination of rights between two users of the same mark, when one has a federally registered mark, does not simply involve a determination of which party presents evidence to demonstrate that it was the first user in each market in question. Rather, the party without the federal registration must prove its prior and continuous rights in a market that preempts the registrant's constructive nationwide rights. 15 U.S.C. § 1115(b)(5); *Allard Enters., Inc.,* 146 F.3d at 361. The determination of sufficient activity

to constitute use is a factual question, in which the use must be enough so that "an appropriate segment of the public mind" identifies the mark as a source designator of the products or services. *See Specht v. Google Inc.,* 758 F. Supp. 2d 570, 588 (N.D. Ill. 2010) (quoting *S Indus., Inc. v. Stone Age Equip., Inc.,* 12 F.Supp.2d 796, 805 (N.D. Ill. 1998)), judgment entered, 09 C 2572, 2011 WL 4737179 (N.D. Ill. Oct. 6, 2011) and aff'd, 747 F.3d 929 (7th Cir. 2014).

The Defendants have shown appropriation of the BUG OFF mark beginning in the 1980s with Sunfeather's use of the recipe for bug repellant that Maine bottled and gave to fellow hikers in New York's Adirondacks. Even after an area cooperative began handling the product, the use of the mark prior to 1995 was within the Potsdam and upstate New York Adirondack Mountain area. Sunfeather would have common law rights to that area, but the evidence does not establish that Sunfeather had nationwide rights as of October 1988.

Within the following decade the distribution of Sunfeather's BUG OFF repellant expanded. However, from October 1988 until April 10, 1995, when SCJ's '763 registration was cancelled, Sunfeather's rights common law rights were "frozen." S*ee Brandt Indus., Ltd. v. Pitonyak Mach. Corp.,* 1:10-CV-0857-TWP-DML, 2012 WL 4467654, at *2 (S.D. Ind. Sept. 26, 2012); *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.,* 03 C 6070, 2004 WL 2967446, at *10 (N.D. Ill. Nov. 15, 2004); *Quill Corp. v. LeBlanc*, 654 F. Supp. 380, 385 (D. N.H. 1987). Therefore, the evidence regarding Sunfeather's BUG OFF use from October 1988 until April 10, 1995, may only be considered with respect to any nationwide common law rights, if the use continued

beyond that date.

The next time frame during which Sunfeather could have obtained common law rights is from April 11, 1995, until June 22, 1998, the priority date for the Chervitz registration. *See Specht,* 747 F.3d at 935 (holding that once a trademark was abandoned it returned to the public domain, could be appropriated anew, and [defendant] became the senior user.)

As previously discussed, between 1995 and 1998 Sunfeather's BUG OFF advertising and promotion expanded beyond Potsdam and the New York Adirondack Mountain area. Sunfeather had an internet site and was selling its BUG OFF repellant on line. It was mailing between 7,500 and 13,333 catalogs annually to its customer list nationwide. Sunfeather was marketing BUG OFF and selling at trade and craft shows across the country.[16] Sunfeather's products were promoted and sold by retailer Smith & Hawken, particularly in its catalog which was mailed throughout the country and was readily available to store customers. Beginning in 1997 BUG OFF was sold through Frontier's spring and summer wholesale catalogs, sent to 15,000 wholesalers throughout the country, and its annual retail catalog. The totality of the circumstances indicate that Sunfeather has established a national presence based on the promotion and sales of its product in Frontier and Smith & Hawken's catalogs, its availability in Smith & Hawken's

---

[16] Sunfeather's sales records for April through the end of June 1998 indicate that it sold BUG OFF products in 14 states: Pennsylvania, Ohio, Maine, Massachusetts, Tennessee, Indiana, Virginia, Montana, New York, Texas, West Virginia, Connecticut, Georgia, and California. In addition, it promoted its products through trade shows in Chicago, Illinois; Miami, Florida; Seattle, Washington; and Arkansas. That establishes that Sunfeather had sales and/or promotions in 18 states.

stores, its internet presence, its own national catalog circulation, and its marketing and sales at craft and trade shows. Thus, Sunfeather has presented sufficient evidence that it was the senior user of the BUG OFF mark and it was using the mark nationally from the cancellation of SCJ's mark until June 22, 1998. *See Johnny Blastoff, Inc.,* 188 F.3d at 433-34

Despite this national use of BUG OFF, the Defendants' defense based on its common law use of the mark falters because they have not presented evidence that they have continuously used the BUG OFF mark. In terms of any common law rights, the Defendants have the burden of showing that they continuously maintained use of the mark in the claimed area. "Continuing" is not the same as lack of abandonment: it means use without significant interruption. *See McCarthy on Trademarks and Unfair Competition*, § 26:55 at 101. Non-use for one year negates "continuing." *Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.,* 493 F.2d 709, 712 (9th Cir. 1974).

Smith & Hawken and Frontier no longer promote the Defendants BUG-OFF. Through 2012 Nutraceutical continued to sell and distribute BUG OFF bug repellant soap, herbal oil, spritzer, and balm sold under the Sunfeather name. The products are available for purchase online at http://www.sunfeather.com/outdoor.html. The Defendants' sales records demonstrate continued sale of Sunfeather BUG OFF from the time of acquisition through 2012, but they do not demonstrate continued sales after 2012. This constitutes non-use for more than one year. Therefore, the Defendants have not demonstrated continuous use of the BUG OFF mark.

**Abandonment**

The Defendants assert that SCJ has abandoned its trademark interests under the Chervitz and Kaz registrations because it has not sold a wristband since 2009 or 2010 and has no intent to do so. SCJ contends that the Defendants have waived any claim of abandonment because it was not raised as an affirmative defense or in discovery. It further contends that even if not waived, the Defendants have not established the defense. The Defendants counter that SCJ has known of their contention that SCJ's trademarks are invalid since they filed their answer, and they did not specifically plead abandonment in their answer because they did not learn of the defense until they took the Rule 30(b)(6) deposition. They further state that SCJ cannot contend it was surprised or prejudiced because the abandonment defense was raised by the Defendants in their summary judgment papers with no objection by SCJ, they listed the defense first in the statement of issues in their final pretrial report (ECF No. 61), and the defense was explicitly addressed by both parties at trial.

Rule 8(c) of the Federal Rules of Civil Procedure directs parties to raise affirmative defenses in the pleadings; however, a delay in raising an affirmative defense only results in waiver if the other party is prejudiced as a result. *See Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 632 (7th Cir. 2010). SCJ has not presented any argument or showing that it has been prejudiced. Therefore, the Defendants are not to be deemed to have waived the affirmative defense.

Trademark rights are acquired and retained only through actual use of a mark. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 954-55 (7th Cir. 1992) ("Because trademark rights derive from the use of a mark in commerce . . . , the owner of

a mark will lose his exclusive rights if he fails actually to use it."). A mark is used in commerce in connection with services "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127.

If SCJ had abandoned and never resumed use of the mark, the Defendants could not have infringed on SCJ's intellectual property by their use of BUG OFF. *Specht,* 747 F.3d at 934 (citing 15 U.S.C. § 1127; *Central Mfg., Inc. v. Brett,* 492 F.3d 876, 881 (7th Cir. 2007)). A trademark is abandoned if its "use in commerce" has been discontinued with no intent to resume use. *Id.* (citing 15 U.S.C. § 1127; *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1214 (7th Cir. 1997)). Under the Lanham Act, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment," 15 U.S.C. § 1127." *Id.* A prima facie showing of abandonment may be rebutted with evidence excusing the nonuse or demonstrating an intent to resume use. *Id.* (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 955 (7th Cir. 1992)). But the intent to resume use in commerce must be formulated within the three years of nonuse. *Id.* The statutory language clarifies that "'use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *Id.*

Three consecutive years of nonuse creates a presumption that the owner intended not to resume use of the mark. *Id.* If the presumption is triggered, the owner of the mark "has the burden of producing evidence of either actual use during the relevant period or intent to resume use. The ultimate burden of proof (by a preponderance of the evidence) remains always on the challenger." *Emergency One, Inc. v. Am. FireEagle, Ltd.,* 228 F.3d

531, 536 (4th Cir. 2000) (citations omitted); *see also Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 938-39 (7th Cir. 1989).

No wristbands were sold after 2010. Thus, three years had passed as of the February 2014 trial of this action, and SCJ is presumed not to intend to resume the use of the mark. However, SCJ has made use of the mark on a closely related product — the back of two sizes of cans of its insect repellant products. The spray-on repellants sold by SCJ are related to insect repellant wrist bands. (*See* Ex. 41, at 251-65 (TTAB decision in *In re Sunfeather Natural Soap Co.,* Ser. No. 76/480170, mailed on Sept. 25, 2008, upholding PTO examiner's refusal to register Sunfeather's BUG OFF mark because of the likelihood of confusion with registered mark and finding that Sunfeather's goods, including insect repellant sprays, and the Chervitz and Kaz insect repellant wrist bands were "related inasmuch as they are insect repellants in various forms for personal use," *id.* at 265).).

The Defendants assert that SCJ is disingenuous or simply trying to improperly reserve the mark because it is only using it on two out of more than a dozen potential products. They also point to the SCJ email that refers to using a mark on the back of the can as a tactic. However, neither argument persuades the Court that SCJ is not actually using the mark. "[T]he fact that a product bears more than one mark does not mean that each can not be a valid trademark." *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 154 (6th Cir. 1973).

Davis's conflicting testimony regarding what she thought of the use of the word "tactic" by a SCJ colleague is more demonstrative of her loyalty to SCJ, and her attempt

to diminish the weight of her colleague's comment, than to what SCJ is doing with the mark. The Court is persuaded that container size may not permit the extra mark on some cans and that the process of revising the product labels is not swift. Furthermore, it also finds the testimony that SCJ will not market a wristband until the quality satisfies its standards credible.

The Defendants rely on *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F.2d 96, 100 (5th Cir. 1983) and *Procter & Gamble Co. v. Johnson & Johnson Inc.,* 485 F. Supp. 1185, 1204 (S.D.N.Y. 1979), aff'd, 636 F.2d 1203 (2d Cir. 1980), in asserting that the Court should not allow SCJ to engage in a trademark maintenance program. They also cite *Imperial Tobacco Ltd. v. Philip Morris, Inc*., 899 F.2d 1575, 1581 (Fed. Cir. 1990); *Blue Bell, Inc. v. Farah Mfg. Co, Inc*., 508 F.2d 1260, 1267 (5th Cir. 1975). (Def.'s Prop. FOF and Conclusions of Law ¶¶ 146, 142.)

Each of the cases cited by the Defendants is distinguishable. *Exxon Corp*, 695 F.2d at 100, held that limited arranged sales of "HUMBLE" products as part of Exxon's trademark maintenance program did not constitute "use" sufficient to avoid prima facie abandonment under Lanham Act where the mark "Humble" was used only on isolated products or selected invoices sent to targeted customers, and no sales were made that depended upon the mark for identification of source.

In *Procter & Gamble*, plaintiff Procter and Gamble ("P & G") maintained a "Minor Brands Program" for the purpose of protecting its ownership rights in brand names not being actively used in commerce on its products. Employees not normally involved in P & G's merchandising operation took an active P & G product, labeled it

with a minor brand, and shipped it to customers. For example, P & G's Prell shampoo was bottled under 13 different minor brand labels. Fifty units of each were shipped annually to at least ten states. The court held that P & G had no enforceable rights in the mark SURE for tampons on the basis of its inclusion in this minor brands program. *Procter & Gamble*, 485 F. Supp. at 1204-07.

*Imperial Tobacco, Ltd.,* 899 F.2d at 1582-83, held that promotional use of a mark in sales of whiskey, pens, watches, sunglasses, and food did not constitute use of the mark for cigarettes, and that as a result, the mark had been abandoned.

*Blue Bell, Inc.,* 508 F.2d at 1265,[17] involved competing claims to identical marks by manufacturers of men's clothing. The court held that Farah's shipment of one pair of slacks bearing the mark to each of its twelve regional sales managers, who paid for the pants and became owners of the garments, was insufficient to constitute use of the mark because the sales were not made to customers, but served as an accounting device to charge the salesmen with their cost in case of loss. The "sales" did not matter because they were not made to the public.

SCJ's conduct is not analogous to that addressed in the cases relied on by the Defendants. The Defendants have not met their burden of establishing that SCJ intends to abandon the BUG OFF mark.

---

[17] The court was applying Texas law but drew from "general principles of trademark law" because no cases had yet been decided under the Texas law enacted a year earlier. *See Blue Bell, Inc.*, 508 F.2d at 1264.

**Chervitz Registration**

With respect to the Chervitz registration relied upon by SCJ to claim priority as of June 1998, the Defendants contend that the Chervitz registration lacked a bona fide use at the time of registration. SCJ contends that the Defendants' challenge is barred by laches because the Defendants, through their predecessor Sunfeather, had actual knowledge of the Chervitz registration in 2003 and did nothing against the registration or against Chervitz; the window to seek cancellation of Chervitz registration based on insufficient use in commerce closed in July 2005; and even if a challenge were allowed, there is ample evidence of use in commerce to support the application for, and issuance of the registration. The Defendants maintain that laches does not apply to its claim of lack of a bona fide use as a defense to trademark infringement.

The Court will not explore SCJ's reliance on laches or incontestability of the Chervitz registration because it agrees with SCJ that, even if the Defendants' argument regarding lack of bona fide use were considered on its merits, the Defendants would fail. Their argument does not take into account the information contained in the supplemental Chervitz declaration as previously outlined in the findings of fact. That evidence establishes sufficient use in commence to satisfy the requirement for a trademark application. *See Zazu Designs,* 979 F.2d at 503.

**Conclusions of Law**

SCJ has three valid trademarks to BUG OFF, and is currently using the BUG OFF mark in conjunction with insect repellants, a product closely related to insect repellant wristbands. The Defendants have not established their prior common law continuous use

- 36 -

of the BUG OFF mark, SCJ's abandonment of the mark, or the invalidity of the mark. The Defendants' use of the mark has infringed upon SCJ's BUG OFF trademark. Due to the likelihood of confusion between the parties' BUG OFF marks, SCJ has established the elements of its federal trademark infringement and state common law claims.

The Defendants have failed to establish that they owned rights to the BUG OFF trademark superior to those of SCJ. Therefore, their counterclaims are dismissed with prejudice.

SCJ asserts it is entitled to permanent injunction against the Defendants' use of BUG OFF. The Defendants have not responded to SCJ's request for injunctive relief. The Lanham Act allows the owner of a registered trademark whose rights have been knowingly and intentionally violated to obtain injunctive relief to prevent further violations. 15 U.S.C. § 1116. A party seeking a permanent injunction must satisfy the following four factors: 1) The existence of irreparable injury (including a continuing and imminent threat of harm); 2) remedies at law are inadequate to compensate for that threat of harm; 3) whether the balance of hardships between plaintiff and defendant tips in favor of a remedy in equity; and 4) the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms,* ___ U.S. ___, 130 S.Ct. 2743, 2747-48 (2010) (citing *eBay Inc. v. MercExchanges, L.L.C.,* 547 U.S. 388, 391 (2006)).

"[I]t is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir. 2002). Likewise, the difficulty in assessing the damages associated with a loss of goodwill supports finding that the

plaintiff lacked an adequate remedy at law. *Id.; see also Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 902 (7th Cir. 2001) (noting that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by [trademark] violations") (citation omitted); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997) (noting that injury to goodwill "can constitute irreparable harm for which a plaintiff has no adequate remedy at law"). The Defendants have not identified any hardships that they will experience due to a permanent injunction.

"In trademark infringement cases, [the Seventh Circuit has] stated that 'the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interest in not being deceived about the products they purchased.'" *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 n.8 (7th Cir. 1988) (citation omitted). Given that the parties agree there is a likelihood of confusion among consumers, the Court finds that the public would be best served by entering a permanent injunction against the Defendants. Therefore, SCJ's request for permanent injunctive relief is granted. SCJ's Complaint described its request for injunctive relief, and that request has been incorporated below. The Court has added a deadline for the turnover order.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

SCJ has **PREVAILED** on its Lanham Act and common law unfair competition claims against the Defendants;

The Defendants' counterclaims are **DISMISSED** with prejudice.

SCJ is **GRANTED** a permanent injunction against the Defendants as follows:

The Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them or acting for, with, by, through or under them, are permanently enjoined from counterfeiting and infringing SCJ's BUG-OFF® Mark, from unfair competition with SCJ and from falsely designating the origin of the SCJ goods; and,

No later than September 28, 2014,  the Defendants must deliver up for destruction to SCJ all unauthorized products and/or advertisements in its possession or under its control bearing the infringing BUG OFF mark or any simulation, reproduction, counterfeit, copy or colorable imitation thereof, pursuant to 15 U.S.C.§ 1118.

This entire action is **TERMINATED**;

The Clerk of Court is **DIRECTED TO ENTER** judgment accordingly; and

SCJ **MAY FILE** a bill of costs with the Clerk of Court;

Dated at Milwaukee, Wisconsin, this 29th day of August, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**