UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

S.C. JOHNSON & SON, INC.,

              Plaintiff,

    v.                                      Case No. 11-cv-861-pp

NUTRACEUTICAL CORPORATION,
and NUTRAMARKS, INC.,

              Defendants.

---

**ORDER GRANTING MOTION FOR JUDGMENT CONSISTENT WITH
SEVENTH CIRCUIT'S OPINION (DKT. NO. 119), GRANTING DEFENDANTS'
MOTION FOR ATTORNEY'S FEES (DKT. NO. 130) AND GRANTING
PLAINTIFF'S MOTION TO RESTRICT DOCUMENT (DKT. NO. 148)**

---

This case has stuck around much longer than the pesky mosquitos the

parties' products sought to repel; plaintiff S.C. Johnson & Son, Inc. filed its

complaint seven and a half years ago. Dkt. No. 1. Judge Rudolph T. Randa

presided over a February 2014 bench trial and, after post-trial briefing, entered

judgment in favor of the plaintiff. Dkt. No. 89. On appeal, the Seventh Circuit

reversed, finding that the plaintiff had pulled a "bait-and-switch" on the

defendants. Dkt. No. 117; S.C. Johnson & Son, Inc. v. Nutraceutical

Corporation, 835 F.3d 660, 667 (7th Cir. 2016). After remand, the defendants

filed a motion for a judgment consistent with the Seventh Circuit's opinion.

Dkt. No. 119. On February 21, 2017, this court issued an order finding for the

defendants on their first and second counterclaims. Dkt. No. 127. The court

held oral argument on the amount of profits to be disgorged, and gave the

1

defendants time to submit their motion for attorney's fees and costs. Dkt. No. 128. They did so on April 7, 2017. Dkt. No. 130.

On July 17, 2018, the court issued an order asking the plaintiff to provide briefing on the proper amount of disgorgement, and asking the parties to explain whether the Supreme Court's holding in <u>Octane Fitness, LLC v. Icon Health & Fitness, Inc.</u>, 572 U.S. 545 (2014) applied to the defendants' motion for attorney's fees. Dkt. No. 143. The parties provided their responses on August 17, 2018. Dkt. Nos. 145-150. The court now awards the defendants $232,000 in disgorged profits, grants the defendants' motion for attorney's fees and grants the plaintiff's motion to restrict document.

## I.    BACKGROUND

### A.    Procedural History

The complaint alleged that defendants Nutraceutical Corp. and Nutramarks, Inc. had engaged in trademark counterfeiting, trademark infringement, false designation of origin, and unfair competition regarding a "BUG OFF" mark. Dkt. No. 1. The defendants answered and counterclaimed on January 23, 2012, alleging that *they* were the senior users of the BUG OFF mark by virtue of their predecessor's—Sunfeather Natural Soap Company, Inc. ("Sunfeather")—nationwide use of the mark since 1992. Dkt. No. 5 at 7. The parties proceeded through discovery and on August 15, 2013, the plaintiff filed a motion for summary judgment. Dkt. No. 29.

1.    Summary Judgment

For reasons that will become clear later in this decision, the court recounts here only the *plaintiff's* arguments at summary judgment.

In its opening brief, the plaintiff asserted that it had acquired a federal registration for the BUG OFF mark with a first use date of 1998. Dkt. No. 30-1 at 3. It argued that because it had shown a valid registration, the defendants had the burden of demonstrating a "prior use" defense—in other words, that they had established common law trademark rights in the BUG OFF mark prior to the plaintiff's first use date in 1998. Id. at 9. The plaintiff contended that the defendants could not show this because (a) they could not identify the specific geographic territories where the prior good faith use had occurred and (b) they could not demonstrate that the prior good faith use was both continuous and substantial. Dkt. No. 30-1 at 1. The plaintiff urged the court to apply the "market penetration" test to analyze whether the defendants' prior use had established nationwide common law rights to the mark. Id. at 11 (citing Brandt Industries, Ltd. v. Pitonyak Machinery Corp., No. 1:10-cv-0857-TWP-DML, 2012 WL 3777145 (S.D. Ind. Aug. 29, 2012)). This test would require the court to analyze four factors on a state-by-state or region-by-region basis to determine the scope of the defendants' alleged common law rights to the mark. Id. at 11-17 (citing Natural Footwear, Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1397 (3d. Cir. 1985)).

The plaintiff also argued that the defendants could not show substantial and continuous use of the mark. Id. at 18. This argument focused on how the

defendants' product appeared only in nationwide catalogs and not specific territories. Id. at 20. The plaintiff did not argue (or mention) that the defendants' post-2012 sales (or lack thereof) would render their defense and counterclaims meritless.

In its reply brief, the plaintiff re-iterated its focus on the pre-1998 time period. Dkt. No. 47. It conceded that the defendants had used the mark prior to 1998, but maintained that this "use" was not sufficient to establish common law trademark rights. Dkt. No. 47 at 7 ("[The plaintiff does not dispute that Defendants' 'use' of BUG OFF occurred prior to [the plaintiff's] priority date of June 22, 1998."). The plaintiff again advocated for the district court to apply a market-by-market market penetration test to determine whether the defendant could establish nationwide common law rights to the mark. Id. It said:

> A common law trademark is only protected in identified geographic areas where customers would associate the mark with the senior user's product. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415-16 (1916). Federal courts therefore apply the 'market penetration' test to determine in what markets, if any, the senior user's mark is used and known. Based on the lack of evidence regarding *specific markets* where Defendants' product was sold, no reasonably jury could find that defendants are entitled to a common law trademark in any market.

Dkt. No. 47 at 7. As in its opening brief, the plaintiff's reply brief did not raise the defendants' alleged (lack of) post-2012 use as a ground for granting summary judgment.

Judge Randa's January 14, 2014 decision recounted both the plaintiff's and the defendants' histories using the BUG OFF mark. Dkt. No. 65. He neither adopted nor rejected the plaintiff's recommendation that he apply the

"market penetration" test, instead finding (after reviewing Sunfeather's use of the BUG OFF mark prior to 1998) that

> [v]iewed in the light most favorable to Sunfeather, it has presented sufficient evidence upon which a reasonably jury could find that it was the senior user of the mark and was distributing its BUG OFF product nationally prior to January 26, 1998, the date of first use in commerce claimed by the Chervitz registration that [the plaintiff] eventually purchased and now owns. Therefore, [the plaintiff's] motion for summary judgment on the issue of trademark ownership is denied.

Dkt. No. 65 at 26. Notably, Judge Randa also observed that "[t]he Defendants' sales records demonstrate continued sale of Sunfeather BUG OFF, from the time of acquisition through present." Id. at 20.

### 2. February 4, 2014 Bench Trial

The parties filed their final pre-trial reports on January 6, 2014 (dkt. nos. 58, 61)—before Judge Randa issued the summary judgment decision on January 14, 2014. Neither party's "Statement of Issues" mentioned the defendants' post-2012 sales as an issue for trial. The plaintiff framed the issues with a focus on the years prior to 1998:

> Determining who owns superior rights in the BUG OFF mark is a major issue in this case, and turns on whether Nutraceutical can prove prior good faith use of its mark by establishing substantial mark penetration in any specific geographical market prior to June, 1998. . . . [The plaintiff] does not believe [the defendants] can meet [their] burden of proof because the evidence reveals only sporadic and insubstantial sales by SunFeather prior to June of 1998.

Dkt. No. 58 at 3.

During its opening argument at trial, the plaintiff again advocated for the court to analyze whether the defendants had established their common law trademark rights on a market-by-market, state-by-state basis. Dkt. No. 76 at

10 ("Courts uniformly require parties to establish their common law rights on a market-by-market, state-by-state basis."). The plaintiff's argument did not mention the defendants' post-2012 use (or alleged lack of use) of the BUG OFF mark as a basis for Judge Randa to find in favor of the plaintiff. See Dkt. No. 76 at 6-20.

The bench trial started on February 3, 2014 and concluded the next day. Dkt. Nos. 75, 76. Instead of closing arguments, the parties asked Judge Randa to allow them to submit post-trial briefs, and he agreed. Dkt. No. 75 at 111. On February 25, 2014, the parties submitted proposed findings of fact and proposed conclusions of law. Dkt. No. 77-79.[1] They filed their responses to each other's proposed findings of fact and conclusions of law on March 11, 2014. Dkt Nos. 84-86.

### 3. Post-Trial Briefing

The court will touch on two relevant aspects of the post-trial submissions. First, the plaintiff's proposed findings of fact offered no facts about the defendants' post-2012 use of the BUG OFF mark. Dkt. No. 78. In its conclusions of law submission, the plaintiff said,

> The evidence further does not support the broad conclusion that any use of the BUG OFF mark in particular geographic markets was continuous from prior to S.C. Johnson's earliest registrations ***through the present***. Indeed, the evidence establishes that sales decreased over time, and that from one year to the next, sales in any given market were inconsistent and sporadic.

---

[1] The defendants combined their findings of fact and conclusions of law into one document, dkt. no. 77; the plaintiff submitted findings of fact, dkt. no. 78, separate from its proposed conclusions of law, dkt. no. 79.

Dkt. No. 79 at 11 (emphasis added). The plaintiff clarified its position in its opposition to the defendants' post-trial submissions; in response to the defendants' proposed finding of fact eighty-five, the defendant wrote:

> Incomplete. [The defendants] submitted documentary evidence of sales of the SunFeather Bug OFF products only for 2011 and 2012, not for 2013 and 2014 (Trial Ex. 1108.) This document demonstrates that a BUG OFF product was sold in approximately twenty-two states, which is far from nationwide. (Trial Ex. 1108.) The sales that do exist are too small to demonstrate continued use for purposes of establishing prior common law rights. (Tr. Ex. 1108.) There is no testimonial evidence supporting continued use either. The testimony cited by Nutraceutical does not indicate that SunFeather BUG OFF products are available in retail stores or where these purported retail stores are located. (Tr. Tran. 2, pp. 103:18-104:2.) Instead, the testimony merely states that SunFeather products are manufactured by Nutraceutical subsidiaries. (Tr. Tran. 2, pp. 103:18-104:2).

Dkt. No. 85 at 35. In its response brief to the defendants' conclusions of law, the plaintiff asserted that "[the defendants] ha[ve] not presented any evidence of sales from 2013 through the present. It simply failed to provide evidence that any market penetration was continuous from first use through the present day." Dkt. No. 86 at 7.

### 2. Judge Randa's August 29, 2014 Verdict

Judge Randa issued his decision on August 29, 2014. After recounting the histories of the parties' use of BUG OFF, he analyzed whether the defendants had established common law rights to BUG OFF. Id. at 22. He observed that the parties disagreed on "the proper test for establishing a common law interest in a trademark and whether a party may prove a nationwide common law trademark." Id. at 25. He recounted that the plaintiff advocated using the "market penetration test" to determine whether a party

had established common law trademark rights and cited <u>Natural Footwear</u>, 760

F.2d at 1395, in support of its proposition. <u>Id.</u> at 25. Judge Randa commented

that the defendants objected to the market penetration test, citing <u>Buzz Off</u>

<u>Insect Shield, LLC v. S.C. Johnson & Son, Inc.</u>, 606 F.Supp. 2d 571 (M.D.N.C.

2009) as case from—at the time—five years earlier, in which the plaintiff itself

had argued for a totality-of-the-circumstances test (rather than a market

penetration test) when it suited the plaintiff's interests. <u>Id.</u> at 25.

> Indeed, in litigating *BuzzOff* outside this Circuit, [the plaintiff]
> advocated and prevailed with its contention that "[e]stablishment of
> common law rights is determined 'on a case by case basis,
> considering the totality of the circumstances.' *Johnny Blastoff, Inc.*
> *v. L.A. Rams Football Co.,* 188 F.3d 427, 433 (7th Cir. 1999)
> (affirming determination of prior established common law rights as
> basis for infringement and injunctive relief." (Ex. A, Def's Reply
> (SCJ's Mem. Support Permanent Nationwide Inj.) 8.) (ECF No. 84-1)
> [The plaintiff] now argues for a market penetration test and does not
> mention *Johnny Blastoff*—a decision which is binding on this Court.
> At best, SCJ's position regarding the proper test for establishing
> nationwide common law rights in chameleonic, and its contradictory
> behavior concerns the court.

<u>Id.</u> at 26. Judge Randa used the totality of the circumstances test to determine

that the defendants had established protectable rights in the mark. <u>Id.</u> at 26-

30. He concluded that

> [t]he totality of the circumstances indicate that Sunfeather has
> established a national presence based on the promotion and sales
> of its product in Frontier and Smith & Hawken's catalogs, its
> availability in Smith & Hawken's stores, its internet presence, its
> own national catalog circulation, and its marketing and sales at craft
> and trade shows. Thus, Sunfeather has presented sufficient
> evidence that it was the senior user of the BUG OFF mark and it
> was using the mark nationally from the cancellation of SCJ's mark
> until June 22, 1998. *See Johnny Blastoff, Inc.*, 188 F.3d at 433-34.

Dkt. No 89 at 29-30.

Despite this criticism of the plaintiff, Judge Randa found that the defendants "ha[d] not presented evidence that they have continuously used the BUG OFF mark." Id. at 30. He noted that while the defendants' sales records demonstrated continued sale of Sunfeather BUG OFF from the time of acquisition through 2012, "they do not demonstrate continued sales after 2012. This constitutes non-use for more than one year. Therefore, the Defendants have not demonstrated continuous use of the BUG OFF mark." Id. He then found that the plaintiff had not abandoned its use of the BUG OFF mark. Id. at 30-35.

Judge Randa concluded that because "[t]he Defendants ha[d] not established their prior common law continuous use of the BUG OFF mark, SCJ's abandonment of the mark, or the invalidity of the mark," Judge Randa found that the plaintiff had established the elements of its federal trademark infringement claim and that the defendants could not establish the elements of their counterclaims. Id. at 36-37. He issued a permanent injunction against the defendants and ordered them to turn over all infringing product to the plaintiff. Id. at 39.

The defendants filed a motion under Fed. R. Civ. P. 59(e) and 60(b), asking Judge Randa to reconsider that decision. Dkt. No. 98. They argued that "in finding that the Defendants failed to present evidence of continuous use from 2012 to the time of trial . . . the Court seemingly overlooked both [the plaintiff's] repeated admissions and representations on this issue, as well as the Court's own earlier recognition that this fact was undisputed." Id. at 4.

Judge Randa denied the motion on September 22, 2015, finding that the defendants had not established a manifest error of fact or law regarding the court's determination that the defendants had not established continuous use of the mark post-2012. Dkt. No. 107.

3.    Appeal

The defendants appealed. Dkt. No. 109. On August 25, 2016, the Seventh Circuit reversed the judgment in favor of the plaintiff and remanded the case to this court for further proceedings. Dkt. No. 117; see also Nutraceutical, 835 F.3d 660 (7th Cir. 2016).

The Seventh Circuit recounted that

> [the defendants] defended on the ground of prior and continuous use. From the time the pleadings were filed through the trial, the parties all agreed that the period in dispute was before 1998. But the earth under [the defendants] shifted after the district court requested post-trial briefing in lieu of closing argument. For the first time, [the plaintiff] argued that [the defendants] had failed to prove continuous use of the mark *after 2012*. The district court was persuaded that this was true and ruled in [the plaintiff's] favor[.]

Nutraceutical, 835 F.3d at 663. The court then reviewed the factual history of the parties' use of the BUG OFF mark as well as the history of the lower court case. Id. at 663-665.

The Seventh Circuit explained, "[i]n determining whether a party has established rights in a trademark, we take into account all relevant facts—the totality of the circumstances," and that "'evidence of actual sales is not necessary to establish ownership.'" Id. at 666 (quoting Johnny Blastoff, 188 F.3d at 434). After setting out the applicable law, the Seventh Circuit remarked, "[w]e might not be here if the district court had not unexpectedly

allowed [the plaintiff] to shift its focus at the eleventh hour to the question whether [the defendants] proved continuous use of BUG OFF products after 2012." Id. The Seventh Circuit agreed with the defendants' characterization of the plaintiff's behavior, stating that "[the defendants] accuse[] [the plaintiff] of pulling off a bait-and-switch maneuver, and that is just what it did." Id. at 667.

The court then identified the numerous pre-trial pleadings in which the plaintiff had not disputed the defendants' sales of infringing product "through the present." Id. It noted that while the plaintiff's pretrial report mentioned continuity of use, it did so only regarding "the period 'prior to June of 1998.'" Id. It observed that "although [the plaintiff] challenged [the defendants'] continuity and amount of sales in general during its opening statement at trial, at no point did it challenge its use of the mark post-2012." Id. Finally, the court remarked that fact number eighty-five of the defendants' proposed findings of fact—the one to which the plaintiff had objected because of the lack of evidence relating to 2013 and 2014 sales—"was practically a copy-paste of the allegations and summary judgment facts that S.C. Johnson had twice previously admitted. Nutraceutical must therefore have felt bushwhacked when it read S.C. Johnson's response." Id.

The Seventh Circuit commented that the plaintiff had argued on appeal that the defendants were on notice that they would need to prove continuity between 2012 and the present "because [the plaintiff] was challenging its continuity of use generally, and because it mentioned recent salses in its opening argument," as well as because "a challenge to post-2012 continuity

was 'subsumed in and implicit in the issues in its pretrial report.'" Id. Flatly

rejecting this contention, the Seventh Circuit said,

> This will not do. S.C. Johnson's issues for trial not only failed to
> allude to the post-2012 period, but also expressly stated that they
> were limited to the pre-1998 period. If S.C. Johnson meant to
> include the post-2012 period, its statements did not convey that
> fact—indeed, they were misleading. Because issues for trial are
> ordinarily limited to those disputed at summary judgment, any
> reasonable litigant would have assumed that it was not required to
> prove post-2012 continuity at trial. In its summary judgment
> response, S.C. Johnson specifically took the position that
> Nutraceutical's post-2012 facts were immaterial. By that time, it had
> already twice admitted the very facts it disputed for the first time
> post-trial, after the presentation of evidence had concluded, when
> Nutraceutical had no chance to respond.

Id. at 667-68. The court reversed the judgment and ordered that the

permanent injunction against the defendants vacated.

>        4.      Remand

On remand, the clerk's office re-assigned the case to this court due to

Judge Randa's passing. Approximately a month and a half after the issuance of

the mandate, the defendants filed a "Motion for Judgment Consistent with the

Seventh Circuit's Opinion." Dkt. No. 119. After the parties had submitted

briefs, the court issued a February 21, 2017 order granting some of the

defendants' requested relief, but leaving open the question of the amount of

disgorged profits that it should award to the defendants. Dkt. No. 127. The

court heard oral argument on that issue on March 15, 2017. Dkt. No. 128. The

court then set a briefing schedule for the defendants' anticipated motion for

attorney's fees. Id. On April 7, 2017, the defendants filed that motion. Dkt. No.

130. On July 17, 2018, the court ordered the parties to file supplemental

briefing on the motion for attorney's fees, and ordered the plaintiff to submit additional briefing on the amount of profits to be disgorged. Dkt. No. 143.

Finally, the plaintiff filed a motion to restrict portions of its supplemental briefing. Dkt. No. 148.

## II.  MOTION FOR JUDGMENT CONSISTENT WITH SEVENTH CIRCUIT'S OPINION (Dkt. No. 119)

### A.  Prior Proceedings

As recounted, the court previously issued two orders on this motion. The first, issued February 21, 2017, outlined the court's rationale for finding that the equities favored granting a an award of disgorged profits. Dkt. No. 127. The court said that

> the amount, if any, of the plaintiff's profits to award is a nuanced determination. As early as 2003, the plaintiff was aware that Sunfeather Natural Soap Company, Inc. asserted rights in the BUG OFF mark, which it claimed to have been using since 1992. [The plaintiff] also knew that there was a likelihood of confusion between the marks. Heedless of Sunfeather's claim, it began to sell infringing products in 2010, placing the mark on the back of its can. However, unlike Sunfeather's use of the mark, the BUG OFF mark is not the primary brand for any of the plaintiff's bug repellant products. It exists only as a tertiary brand that never has appeared on the front of any of the plaintiff's product[s]. The plaintiff's strategy in adding the contested mark to the back of the can is suggested by its lack of advertising for, or market research on, the mark.
>
> In order to deter the plaintiff from viewing its conduct as a mere cost of doing business, the court finds that the equities favor an award of profits. Judge Randa determined that 'for the entire time period of SCJ's sales from 2010 through 2013, when it applied to the $11.6 million dollars in gross sales, SCJ's total revenue was $5,886,523.' Dkt. No. 89, at 13. This court finds that the plaintiff's profits on the 2.1 million units of 9- and 11-ounce Off! BUG OFF aerosol spray cans sold from 2010 through the trial were $5,886,523. [footnote omitted]

The court concludes, however, that awarding over $5.8 million—the plaintiff's entire profit on the two products using the BUG OFF mark on the back of the can—would be a windfall to the defendants. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 963 (7th Cir. 1992). In that case, the Seventh Circuit found problematic an award of a percentage of the wrongdoer's profits. See id.

Dkt. No. 127 at 8-9 (emphasis added).

On July 17, 2018, after hearing oral argument, the court issued its

second order:

At the March 15, 2017 hearing, the defendant asked the court award it $4,458,263.66 in disgorgement of profits. Dkt. No. 128. To arrive at this number, the defendants used trial exhibit 31, observing that from 2010 to 2012, the plaintiff made a gross profit of $8,920,493 from sales of infringing products. The defendants then noted that the plaintiff had established deductions for that same period of $5,518,442, leaving a net profit of $3,402,051. The defendants divided the plaintiff's net profit by their gross product (approximately 3.4 million/approximately 8.9 million) to get a "profit ratio" of 38%. The defendants then looked to the trial transcript at page 141 for evidence that the plaintiff had $2,779,507 in gross profits from sales of the infringing products in 2013. The trial had produced no evidence of deductions or costs on this number, so the defendants proposed to bring their award down from their original request for $5.8 million by applying the 38% profit ratio (taken from the 2010-2012 numbers) to the 2013 number, to arrive at $1,056,212.66 in net profits for 2013. Then, they added the net profits for 2010-2012 ($3,402,051) to the net profits for 2013 ($1,056,212.66), for a total requested award of $4,458,263.66.

The defendants justified their request by citing WMS Gaming Inc. v. WPC Prod. Ltd., 542 F.3d 601 (7th Cir. 2008), for the proposition that the Seventh Circuit has placed the burden on the trademark infringer to prove its costs or deductions, once the defendants have proven the plaintiff's sales. Id., 542 F.3d at 608-09. Here, the defendants asserted, the plaintiff failed to prove apportionment—the plaintiff produced no evidence of the profits that are attributable to the use of the infringing, BUG OFF mark. As for whether an award of approximately $4.4 million constitutes a windfall, the defendants argued that $4.4 million is a very small percentage of the defendant's total profit across all product lines for the affected years. The defendants pointed to page 139 of the trial

14

transcript for the proposition that the plaintiff accrued $165 million gross profit in 2013 on insect repellant sales alone; $4.4 million would amount to approximately 2.7% of the total profit for just that year. In sum, the defendant argued, $4.4 million would be a large enough award to be a deterrent, but not so great as to become a punishment.

In response, the plaintiff said that the court should award the defendants a sum of zero dollars for disgorgement of profit because the sales numbers that the defendants cited are for sales attributable to the use of the OFF! mark, not from the BUG OFF mark. The plaintiff accused the defendants of making inconsistent arguments—for instance, at trial, the defendants tried to argue that the plaintiff's use of the BUG OFF mark was only strategic and inconsequential, but post-remand they argued the BUG OFF mark's importance to the plaintiff's profits. [footnote omitted] The plaintiff cited testimony from Anne Brolly at pages 138-148 of the trial transcript, where she testified that the primary mark on these cans was "OFF" and "Deep Woods Off." It pointed to Ms. Brolly's testimony that "BUG OFF" was a catchy slogan and noted that the defendants pressed Ms. Brolly on whether the plaintiff spent any money advertising the BUG OFF mark. The plaintiff directed the court to the Seventh Circuit's jury instruction on disgorgement of profits, which, they say, required the defendants to link the profit to the infringing use. Because the defendants did not show such a link, the plaintiff argued, the court should decline to award disgorgement of profits.

As for what amount would constitute a windfall for the defendants, the plaintiff noted that the defendants bought the previous owner of the BUG OFF mark, Sunfeather, in 2011 for $285,000. It pointed to trial exhibit 221—the closing index of the acquisition docket—and noted that that $285,000 included trademarks, unregistered trademarks, product line and product on the shelf. The plaintiff observed that the defendants' sales numbers per year in 2013 were $15,000, which it argued showed that the BUG OFF mark is worth a fraction of $285,000. Finally, the plaintiff pointed to Sands[, Taylor & Wood Co. v. Quaker Oats Co.,] 978 F.2d [947,] at 963 [(7th Cir. 1992)], and noted that, after remand, the district court in that case awarded a disgorgement amount for infringing use of a primary mark that constituted .5% to 1% of the total year of sales. The plaintiff did not propose a specific amount of award, but spent its time re-arguing the question of whether the court should award profits at all.

In reply, the defendants noted (correctly) that this court already had found disgorgement of profits to be proper because of the plaintiff's awareness of Sunfeather's mark since 2003. They pointed to the trial transcript at pages 40 and 41, where the plaintiff's corporate counsel, Sally Davis, testified as to the BUG OFF mark's importance. They reminded the court that the plaintiff has the burden to apportion its profits, and asserted that the evidence does not show that the OFF mark was the only reason for the sales. They reiterated that an award of $4.4 million would be proper given the total profit that plaintiff makes in the insect market.

Dkt. No. 143 at 5-8. At the end of the order, the court informed the plaintiff that "[t]he question of 'whether an award of disgorgement of profits was proper' was—and is—no longer an issue[.]" Id. at 8. The court told the plaintiff that it could submit an additional brief proposing and justifying an amount of disgorgement of profits or—if it chose not to—the court would decide the motion based on the defendants' briefing and argument. Id. at 9.

B.    Plaintiff's Supplemental Brief (Dkt. No. 149)

The plaintiff submitted the requested supplemental brief on August 17, 2018. Dkt. No. 149. That brief argued that the court should follow the Sands decision and award the defendants a reasonable royalty fee of the plaintiff's sales. Id. at 1. It proposed that the court award the defendants roughly 1% of the plaintiff's total sales of $11.6 million—resulting in an award of $116,000. Id. at 3. The plaintiff asserted that in Sands, the Seventh Circuit had reversed the district court's 10% royalty fee as "not equitable." Id. at 4.

The plaintiff argued that the nature and scope of its infringing use counseled for a low amount of reasonable royalty fees; the BUG OFF mark was a "tertiary mark" used on the back of two sizes of Deep Woods OFF! repellant. Id. at 6. It also argued that BUG OFF never featured prominently on the

16

plaintiff's products; at trial, no one disputed that the OFF! mark was the primary brand driving the plaintiff's sales. Id. at 7 (citing Dkt. No. 76 at 142). The plaintiff contended that the evidence showed that "BUG OFF had no particularly special value in connection with selling repellents." Id. Finally, the plaintiff noted that one of the factors from the district court litigation in Sands was "the amount that the licensor and licensee would have agreed upon in voluntary negotiations." Id. For this factor, the plaintiff asserted that the defendants bought "all of the assets of Sunfeather, including five registered trademarks and over 30 unregistered marks, along with the goodwill associated with each mark for $285,000." Dkt. No. 149 at 8 (citing Dkt. No. 75 at 108; Trial Ex. 1021).

C.      Analysis

The question, then, is whether the appropriate amount of disgorged profits to award the defendants is the defendants' proposed amount of approximately $4.4 million, the plaintiff's proposed amount of $116,000 or something else entirely.

Section 35(a) of the Lanham Act, 15 U.S.C. §1117(a) provides that on a violation of 15 U.S.C. §1125(a), a plaintiff may be entitled to recover a defendant's profits—"subject to the principles of equity." 15 U.S.C. §1117(a). The statute contains several hints for determining the appropriate *amount* of profits: (1) "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendants must prove all elements of cost or deduction claimed[;]"; (2) "If the court shall find that the amount of the recovery based on

17

profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case[;]" and (3) "Such sum in either of the above circumstances shall constitute compensation and not a penalty." Id.

In the defendants' original motion for judgment consistent with the Seventh Circuit's opinion, they asked the court to award them the entirety of the plaintiff's profits on the 2.1 million units of 9- and 11-ounce Off! BUG OFF aerosol spray cans from 2010 through trial ($5,866,523). Dkt. No. 127. They justified this request by arguing that the statute required the defendants to prove only the plaintiff's sales of the infringing product—the *plaintiff* had the burden of showing appropriate deductions. They argued that the plaintiff had offered no evidence on the amount of profits attributable to the BUG OFF Mark, and thus that the court should award them the entire $5.8 million in gross profits.

The court rejected that proposal in its February 21, 2017 order, finding that that amount would be a windfall for the defendants. Dkt. No. 127 at 8-9 (citing Sands, 978 F.2d at 963). At the March 15, 2017 oral argument, the defendants returned with a revised number: $4,458,263.66.[2] Dkt. No. 143 at 5. Their rationale remained the same: the plaintiff had the burden to produce evidence of apportionment and had not done so. Id. As to whether $4.4 million would constitute a windfall, the defendants argued that $4.4 million

---

[2] The court's July 17, 2018 order explained how the defendants had calculated this new amount. See dkt. No. 143 at 5-6.

represented a minute fraction of the plaintiff's total sales from insect repellant; in 2013 alone, the plaintiff made $165 million in gross profits. Id. at 6.

The court agrees that the defendants have done all that the statute requires them to to—they submitted evidence of the plaintiff's sales. The court also agrees (and the plaintiff's supplemental brief did not dispute) that the plaintiff failed to produce any evidence of apportionment, costs or other deductions at trial. Nevertheless, the court finds that even the defendants' modified disgorgement request is excessive and would constitute a windfall.

Evidence at trial showed that the Nutraceutical defendants purchased the predecessor company—Sunfeather—in 2011 for $285,000. Dkt. No. 75 at 81; 108. This purchase price included all Sunfeather's trademarks (five registered and approximately thirty unregistered), its product line and the goodwill associated with each of the marks. Trial Ex. 1021-04; 1021-28 to 30. A Nutraceutical representative testified that the company did not conduct a specific valuation of the BUG OFF business when it bought the company. Dkt. No. 75 at 99 ("We valued SunFeather as an entity, and so we didn't break apart various pieces."). Accordingly, the court does not know how Sunfeather valued the BUG OFF brand when it sold it to the defendants in 2011. Even assuming the $285,000 purchase price was entirely attributable to the BUG OFF Brand (which is unlikely, given that there were numerous other registered and unregistered marks), an award of $4.4 million would give the defendants upwards of fifteen times the amount they spent on the brand. The balance of

equities mitigates against allowing the defendants to reap such a bounty from the plaintiff's infringement.

Moving to the question of what amount would be appropriate, the Seventh Circuit's decision in Sands provides some guidance. There, plaintiff Sands ("STW") was a small company that acquired "Joseph Middleby, Jr., Inc." in 1973 and became the owner of a "THIRST-AID" mark. Sands, 978 F.2d at 950. In the late '70s and early '80s, STW underwent economic hardship and its gross profits dropped to about $3.1 million. Id. In late 1983 and early 1984, defendant Quaker Oats ran an aid campaign—"Gatorade is Thirst Aid"—for its popular sports drink, Gatorade. Id. STW sued and, at a bench trial, the district court "award[ed] STW 10% of Quaker's pre-tax profits on Gatorade for the period during which Quaker used 'Thirst Aid' in its advertising." Id. at 951. After resolving the other issues on appeal, the Seventh Circuit reviewed the $24 million profit award. Id. at 961. Noting that the district court had relied on Quaker Oats' purported "bad faith," the Seventh Circuit found the evidence of bad faith to be sparse. Id. at 963. Instead, it found that

> [t]here is no question that Quaker developed the "Thirst Aid" campaign entirely independently, with no knowledge of STW's marks. In such a case, an award of $24 million in profits is not "equitable"; rather, it is a windfall to the plaintiff. Quaker may have been unjustly enriched by using STW's mark without paying for it, but the award of profits bears no relationship to that enrichment. A reasonable royalty, perhaps related in some way to the fee STW was paid by Pet, would more accurately reflect both the extent of Quaker's unjust enrichment and the interest of STW that has been infringed.

Id. In a footnote ending the profits discussion, the Seventh Circuit direct the district court to recalculate the award:

> (1) the court may not simply award STW a percentage of Quaker's profits; (2) the court should use a reasonable royalty as a baseline or starting point for determining the appropriate award; (3) in determining the appropriate award, the court may take into account the possible need for deterrence, which may involve consideration of the amount of Quaker's profits.

Id. at 963 n.19. On remand, the Sands district court relied on the following nine factors to make its determination:

> (1) the royalty rates received in prior licenses by the licensor;
> (2) prior rates paid by the licensee;
> (3) the licensor's licensing policies;
> (4) the nature and scope of the infringer's infringing use;
> (5) the special value of the mark to the infringer;
> (6) the profitability of the infringer's use;
> (7) the lack of viable alternatives;
> (8) the opinion of expert witnesses;
> (9) the amount that the licensor and licensee would have agreed upon in voluntary negotiations.

Sands, Taylor & Wood Co. v. Quaker Oats Co., No. 84 C 8075, 1993 WL 204092, at *4 (N.D. Ill. June 8, 1993) (citing Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)). Using these criteria, the district court found that a royalty rate of 1% for the first year of sales and a .5% royal rate for each subsequent year of sales rendered the appropriate award. Id. at *6. The Seventh Circuit approved of this structure on appeal. Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 1345 (7th Cir. 1994) ("We are convinced that the district court committed no reversible error in deciding upon this valuation, and that this rate is in accord with our mandate in Sands I that the district court calculate a 'reasonable royalty.'").

In this case, the court can evaluate only a few of the nine factors listed by the <u>Sands</u> district court. The court cannot evaluate any previous royalty rates or licensing policies because the record does not contain any evidence of them. The record is likewise devoid of evidence of viable alternatives or the opinions of expert witnesses. The court must focus its analysis on (1) the nature and scope of the infringer's infringing use; (2) the special value of the mark to the infringer; (3) the profitability of the infringer's use; and (4) the amount that the licensor and licensee would have agreed upon in voluntary negotiations.

Even these factors are difficult to evaluate because the arguments the plaintiff makes before this court regarding the appropriate award of disgorged profits are the opposite of the arguments it made before Judge Randa regarding liability. The plaintiff argues to this court that BUG OFF was a relatively unimportant mark—it didn't drive sales, and it wasn't prominently displayed on the packaging—in support of its recommendation that the court award only $116,000 in disgorged profits. Dkt. No. 149. Before Judge Randa, however, the plaintiff was defending against the defendants' allegation that the plaintiff had abandoned its use of the BUG OFF mark. <u>See</u> Dkt. No. 61 at 3. In *that* context, the plaintiff elicited testimony demonstrating the usefulness of the mark, while the *defendants* attempted to show how little value the mark added to the plaintiff's product. <u>Compare</u> Dkt. No. 75 at 106 (Nutraceutical Rep: "I don't know what they were trying to do. I don't see the purpose of "BUG OFF" on the can, factually. I don't know why its there."); <u>with</u> Dkt. No. 76 at 59 (S.C.

Johnson Rep: "It was important to us that we add [BUG OFF] to the OFF! mark family that we had. We also recognized that given the velocity of the sales, BUG OFF was gaining traction and gaining equity with consumers that we wanted. And we wanted to transfer that royalty [sic] and that equity over to S.C. Johnson."). Given this, the court can't really rely on the parties' arguments as to the special value of the mark to the infringer or the profitability of the infringer's use.

The court believes that it can derive four relevant facts from the record: (1) The defendants bought Sunfeather in 2011 for $285,000. (2) The plaintiff used the BUG OFF mark as a tertiary brand, and placed it on the back side of its 9- and 11-ounce cans of bug spray. Dkt. No. 76 at 119. (3) Judge Randa found that the plaintiff "sold 2.1 million units of the 9- and 11-oz. Off! BUGG OFF aerosol spray cans from 2010 through the date of the trial [early February 2014], totaling approximately $11.6 million dollars in gross sales." Dkt. No. 89 at 1-13. (4) Testimony at trial indicated that the OFF! brand drove the plaintiff's sales, not the BUG OFF brand.

Given the low cost to the defendants of acquiring Sunfeather (and the fact that they acquired more than the BUG OFF mark in that acquisition); the fact that the plaintiff used the BUG OFF brand as a tertiary brand, in a low-visibility location on the packaging; the fact that it was the OFF! brand, not the BUG OFF brand, that drove sales; and the fact that the plaintiff's total gross sales of products bearing the infringing mark from 2010 to early 2014 totaled $11.6 million dollars, the court concludes that an award of 2% of the plaintiff's

gross sales during the infringing period is in line with the Seventh Circuit's reasoning, and avoids a windfall to the defendants for the plaintiff's tertiary use of a mark the defendants acquired on the cheap. Further, this royalty percentage of 2% (resulting in disgorged profits of $232,000) is more than 80% of the amount that the defendants paid for Sunfeather in 2011. The court concludes that this award comports with the principles of equity and is rationally tied to the available evidence.

**III.  Defendant's Motion for Attorney's Fees (Dkt. No. 130)**

    A.  <u>Parties' Arguments</u>

        1.  Defendants' Brief (Dkt. No. 131)

In their April 2017 opening brief, the defendants argued that the court should consider this case exceptional because the plaintiff advanced "objectively unreasonably legal theories." Dkt. No. 131 at 5. They asserted that under <u>Burford v. Accounting Practice Sales, Inc.</u>, 786 F.3d 582, 588 (7th Cir. 2015) and <u>Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC</u>, 626 F.3d 958, 963-64 (7th Cir. 2010), the "exceptional case" justifying an award of attorneys' fees is one where the losing party abused the process by bringing an objectively unreasonable claim. <u>Id.</u> The defendants contended that the plaintiff's objectively unreasonable legal theories "were directly contrary to Seventh Circuit precedent and [the plaintiff's] own position in prior litigation, and [the plaintiff] had no defenses to [the defendants] infringement claims." Dkt. No. 131 at 5.

The defendants observed that throughout the case, the plaintiff consistently had advocated that the defendants could not establish sufficient market penetration to establish common law trademark rights. Id. (citing dkt. no. 79 at 4-5). This, they contended, was not the applicable test: in 1999, the Seventh Circuit decided Johnny Blastoff, which held that a totality-of-the-circumstances analysis controlled whether a party established common law trademark rights. Johnny Blastoff, 188 F.3d at 433. The defendants also argued that the plaintiff knew about Johnny Blastoff because in a 2009 Middle District of North Carolina case, the plaintiff had defended a trademark case using the totality-of-the circumstances test and by citing Johnny Blastoff. Dkt. No. 131 at 7 (citing plaintiff's Memorandum of Law in Support of Motion for Nationwide Injunction, Buzzoff Insect Shield, LLC v. S.C. Johnson & Son, Inc., 1:05-cv-00363-JAB-PTS, Dkt. No. 317 at 8 (M.D.N.C. June 15, 2007) ("Establishment of common law rights in a mark is determined 'on a case by case basis, considering the totality of the circumstances.' Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 433 (7th Cir. 1999).").

The defendants also argued that the plaintiff continued to infringe on the BUG OFF mark despite knowing that its defenses were meritless. Id. at 9. They pointed to the Seventh Circuit's decision on appeal, which called the plaintiff's litigation tactics a "bait and switch." Id. at 10. They also noted that the Seventh Circuit had reversed the judgment in favor of the plaintiff because "it could not 'permit [the plaintiff] to profit from [its] tactic.'" Id. at 11 (quoting Nutraceutical,

835 F.3d at 668). The defendants requested $630,449.82 in attorney's fees. Id. at 13.

2.    Plaintiff's Response (Dkt. No. 132)

The plaintiff responded that "the Seventh Circuit sets an exceedingly high standard for determining whether a case is 'exceptional' for purposes of awarding attorneys' fees under the Lanham Act." Dkt. No. 132 at 7. It extensively quoted Nightingale, arguing that the defendants could not show that the plaintiff abused the litigation process. Id.  The plaintiff argued that the Seventh Circuit defined "abuse of process" as "'[bringing] a frivolous claim *in order to obtain an advantage unrelated to obtaining a favorable judgment* is to commit an abuse of process.'" Id. (quoting Nightingale, 626 F.3d at 966 (emphasis added by plaintiff)). It cited Burford, where the Seventh Circuit denied attorney's fees because it couldn't say that the *only* reason for bringing the case was to impose costs on the opposing party. Dkt. No. 132 at 8 (citing Burford, 786 F.3d at 585).

The plaintiff argued that the defendants "can point to no conduct on the part of [the plaintiff] suggesting that [the plaintiff] brought its claim to gain an advantaged unrelated to obtaining a favorable judgment." Id. at 10. It told the court that "[t]he parties worked together to streamline trial, stipulating to a shortened bench trial as opposed to a jury trial" and that "the Court complimented the parties on how they tried the case." Id. at 10.

As for Johnny Blastoff, the plaintiff explained its belief that a totality-of-the-circumstances test "does not repudiate the need to establish proof of

26

market penetration in particular geographic areas, or of continuous use of the mark in those areas." Id. at 14. It says that the "totality of the circumstances" test and the "market penetration" tests "are not mutually exclusive; indeed both approaches look to similar factors to evaluate whether the purchasing public recognizes the mark in conjunction with the product." Id. at 14. The plaintiff blamed the defendants, observing that they never cited Johnny Blastoff in their post-trial briefing. Id. at 15. It also argued that the BuzzOff decision involved an unrelated case with an entirely different set of facts; "[u]nlike this case, the BuzzOff case included substantial evidence of advertising and sales on a state-by-state basis in support of a claim of nationwide common law rights." Id. at 16 (emphasis in original).

Finally, the plaintiff argued for the strength of its original litigating position, calling the Seventh Circuit's holding on common law rights an "outlier." Id. at 17. It contended that prior to the Seventh Circuit's decision, "no court had ever found that a website, standing alone, support[ed] a finding of a nationwide usage of a mark." Id. The plaintiff defended its post-trial argument about post-2012 sales on the ground that it had argued from the beginning that the defendants could not prove continuous and substantial use of the mark. Id. at 19.

3.     Defendants' Reply (Dkt. No. 134)

The defendants charged the plaintiff with attempting to re-litigate trademark infringement law in the Seventh Circuit. Dkt. No. 134 at 4-5. They argued that the plaintiff's response "provide[d] no explanation for its failure to

27

cite binding precedent, particularly when it had previously advanced and prevailed on the totality of the circumstances test in another case and was fully aware of its applicability in this case." Id. at 7. The defendants concluded by reiterating that the plaintiff had no valid defenses to the defendants' infringement claims and that the plaintiff's "eleventh hour bait-and-switch prolonged the resolution of this matter" causing the defendants to incur sizeable additional costs. Id. at 14.

### 4.    The Court's July 17, 2018 Order

The second half of the court's July 17, 2018 order began by analyzing the motion for attorney's fees. Dkt. No. 143. It recounted how the Lanham Act allowed for the prevailing party to seek attorney's fees in "exceptional cases." Id. at 9 (quoting 15 U.S.C. §1117(a)). It cited Nightingale, 626 F.3d at 963-64, as providing guidance for which Lanham Act cases would qualify as "exceptional" and observed that district courts as well as the Seventh Circuit had applied Nightingale to decide attorney's fees. Id. at 10 (citing Burford, 786 F.3d at 590) (district court case citations omitted).

The court questioned, however, whether Nightingale remained the standard, given the Supreme Court's April 2014 decision of Octane Fitness, 572 U.S. 545. Id. at 11. After reviewing Octane Fitness, this court wrote,

> [T]he Seventh Circuit has not yet ruled on whether Octane Fitness applies to 15 U.S.C. §1117. The Supreme Court issued its decision in Octane Fitness on April 29, 2014; the Seventh Circuit heard argument in Burford on December 8, 2014 (over seven months later), and issued its decision in that case on May 13, 2015, never mentioning Octane Fitness. Neither party's brief discusses whether Octane Fitness applies with regard to attorneys' fees calculations under the Lanham Act, or what (if any) effect that the court's

28

application of <u>Octane Fitness</u> might have on the defendants' motion. It is unclear to the court whether the parties omitted arguments about <u>Octane Fitness</u> by choice—the plaintiff's counsel mentioned "a Supreme Court case" when asked about attorneys' fees at the March 15, 2017 hearing—or whether the parties inadvertently missed the possible application of this case. Regardless, the court would like the parties to provide supplemental briefing addressing whether the court should apply <u>Octane Fitness</u> in making an attorneys' fees determination, and if so, what effect the application of that case has on the defendants' motion for attorneys' fees.

Dkt. No. 143 at 12.

     5.     Supplemental Briefing (Dkt. Nos. 145, 146)

In the wake of that order, the defendants argued that the court should apply the standard from <u>Octane Fitness</u> in determining whether to grant attorney's fees. Dkt. No. 145 at 5. They cited the other circuits that have applied <u>Octane Fitness</u> in Lanham Act cases. <u>Id.</u> at 6. They also noted that district courts in the remaining circuits also have applied <u>Octane Fitness</u> to Lanham Act cases. Dkt. No. 145 at 7 (citing <u>VIDIVIXI, LLC v. Grattan</u>, No. 15-CV-7364 (JGK), 2016 WL 4367972, at *4 (S.D.N.Y. Aug. 13, 2016); <u>Brady Worldwide, Inc. v. Haz-Mat Response Technologies, Inc.</u>, Case No. 15-CV-643-JPS, 2016 WL 7839150, at *4-5 (E.D. Wis. Aug 17, 2016); <u>Arrow Elecs., Inc. v. Arrow P'ship, LLC</u>, No. 15-CV-02370-BRJ, 2017 WL 713914, at *5-10 (D. Colo. Jan. 17, 2017); <u>Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.</u>, No. CV 11-5052-JLV, 2017 WL 1052575, at *4 (D.S.D. Mar. 20, 2017)).

The defendants asserted that <u>Octane Fitness</u> gives this court greater discretion than <u>Nightingale</u> to decide whether a given case is "exceptional." Dkt. No. 145 at 8. Applying the "totality of the circumstances" framework, the defendants reiterated their previous arguments that (1) the plaintiff had

29

advanced unreasonable legal theories; (2) the plaintiff had continued to infringe despite knowing of the defendants' senior rights in the BUG OFF mark; and (3) and the plaintiff had executed an "inequitable post-trial bait-and-switch." Id. at 10. The defendants highlighted the weakness of the plaintiff's litigating position by observing that the plaintiff never made post-2012 use an issue until post-trial briefing, and that the plaintiff had maintained an argument for the market penetration test despite knowing of binding precedent mandating a totality-of-the-circumstances analysis. Id. at 13-15. They reiterated their request for $630,449.82. Id. at 16.

The plaintiff responded that "under either the existing standard or the more flexible *Octane Fitness* standard," this case is not exceptional. Dkt. No. 146 at 2. It commented that even though the Seventh Circuit has not specifically adopted Octane Fitness,

> [g]iven (1) the identical language of the applicable Patent Act and Lanham Act statutes regarding the Court's authority to exercise its discretion to award attorney's fees in 'exceptional cases,' (2) the Supreme Court's citation to the 'identical fee-shifting provision' of the Lanham Act in rendering its opinion, and (3) the rulings of every other circuit to decide the issue, [the plaintiff] sees no reason why the *Octane Fitness* standard would not apply to assessments of whether a case is "exceptional" under the Lanham Act.

Dkt. No. 146 at 3-4. The plaintiff surveyed several cases applying the Octane Fitness standard to both Patent Act and Lanham Act cases, noting that these cases focused on the strength of the party's litigating position, not on the eventual correctness or ultimate success of the position. Id. at 6 (citing VocalTag Ltd. v. Agis Automatisering B.V., No. 13-cv-612-jdp, 2016 WL 5395878, at *1 (W.D. Wis. Sept. 27, 2016)).

Regarding the strength of its litigating position, the plaintiff argued that the *defendants* did not move for summary judgment—the *plaintiff* did. Id. at 7-8. It noted that while the Seventh Circuit ultimately reversed, Judge Randa had found for the plaintiff both on post-trial briefing and on reconsideration. Id. at 9-10. Finally, the plaintiff stated that the parties had attempted early mediation, that the parties had stipulated to the likelihood of confusion element, and that "while the Court would have ordered destruction of [the defendant's] inventory, [the plaintiff] stipulated to a stay of that destruction until appellate issues were resolved." Id. at 11-12. It claimed these efforts were an attempt to "streamline the case and decrease expenses to both sides." Id. at 12.

B.    Analysis

The Lanham Act provides "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). Octane Fitness interpreted the attorney fees provision of the Patent Act, 35 U.S.C. §285, which contains language identical to the Lanham Act: "[t]he court in exceptional cases may award attorney fees to the prevailing party." 35 U.S.C. §285.

The Seventh Circuit has not yet ruled whether Octane Fitness applies to the Lanham Act. Other circuits have. In the court's last order, it noted that the Third, Fourth, Fifth Sixth, Ninth, Eleventh and Federal Circuits all had recognized that Octane Fitness changed the standard for fee shifting under the Lanham Act. Dkt. No. 143 at 11-12 (citations omitted). Since then, the First,

Second and Eighth Circuits have followed suit. Scholz v. Goudreau, 901 F.3d 37, 49-50 (1st Cir. 2018); Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530-31 (2d Cir. 2018); Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc., 908 F.3d 313, 346 (8th Cir. 2018). As the defendants note, district courts in both the Seventh and Tenth Circuits—the only two circuits that have not yet applied Octane Fitness to the Lanham Act—have applied Octane Fitness to Lanham Act cases. See Brady Worldwide, 2016 WL 7839150, at *4-5; Arrow Elecs, 2017 WL 713914, at *1. Neither the court nor the parties have found a case in which a court considered whether to apply Octane Fitness, but declined to do so. Neither party argues that Octane Fitness does not apply here. Given the weight of authority, the court will apply Octane Fitness.

Under Octane Fitness, an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, 572 U.S. at 554. District courts are to use their discretion, "considering the totality of the circumstances." Id. In rejecting the Federal Circuit's "overly rigid" standard, the Supreme Court indicated that a district court may award fees even in a case where a party's conduct is not independently sanctionable. Id. at 555.

The court concedes that Judge Randa decided the summary judgment motion, presided over the bench trial and wrote the decision in favor of the

plaintiff. But considering the totality of the circumstances from this court's vantage point, the defendants are entitled to attorney's fees because of the plaintiff's unreasonable litigation tactics.

Prior to the case being assigned to this court, two federal courts had criticized the plaintiff's litigation strategies. Judge Randa called the plaintiff's inconsistent positions "chameleonic" and concerning to the court. Dkt. No. 89 at 26. The Seventh Circuit—considering a *different* litigation tactic—used phrases such as "bait-and-switch" and "bushwhacked" in characterizing the plaintiff's argument that the defendant should have known it would need to address post-2012 sales. Nutraceutical, 835 F.3d at 667. Even *this* court has had difficulty with the plaintiff insisting on pursuing its own agenda, rather than addressing the issue the court directed it to address. The court's February 21, 2017 order stated that "the equities favor an award of profits," and scheduled oral argument to hear argument only as to the *amount* of award. Dkt. No. 127. Instead of addressing the amount of the award, the plaintiff asserted that the court should not award profits at all—an argument directly contrary to what the court already had decided. Dkt. No 128; see also Dkt. No. 143 at 8-9. The court's July 17, 2018 order commented that "the plaintiff ignored the court's February 21, 2017 order finding that an award of profits was proper" and had to explain that "whether an amount of disgorgement of profits was proper was—and is—no longer an issue." Dkt. No. 143 at 8.

Under these circumstances, the court finds this case to be "exceptional" and will award attorneys' fees. The defendants request $630,449.82 in

attorney's fees. After reviewing the declarations of Kenney D. Nate, dkt. no. 130-1, and Aaron T. Olejniczak, dkt. no. 130-5, the court finds this amount reasonable.

## IV.  MOTION TO RESTRICT (DKT. NO. 148)

On August 17, 2018, the plaintiff filed a motion to restrict the plaintiff's supplemental brief in support of its position on the amount of disgorged profits. Dkt. No. 148. It indicated that portions of the brief contain "financial information such as sales and profits that the parties designated as highly confidential or confidential." Id. at 1. The court finds that the plaintiff has stated good cause for the motion to restrict and under General L.R. 79(d) will grant the motion.

## V.  CONCLUSION

The court **GRANTS** the defendants' Motion for Judgment Consistent with the Seventh Circuit's Opinion. Dkt. No. 119.

The court **AWARDS** the defendants the amount of $232,000 in disgorged profits.

The court **GRANTS** the defendants' Motion for Attorney's Fees. Dkt. No. 130.

The court **AWARDS** the defendants the amount of $630,449.82 in reasonable attorneys' fees.

The court **GRANTS** the plaintiff's Motion to Restrict. Dkt. No. 148.

The court **ORDERS** that the clerk's office shall **RESTRICT** the document at Dkt. No. 149-1 to the court and case participants until further order of the court.

The court **ORDERS** that this case is **DISMISSED**. The court will enter judgment accordingly..

Dated in Milwaukee, Wisconsin this 22nd day of March, 2019.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**